# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 08-CV-3995 (JFB) (ETB)

————————————

ROCCO MARINI, JOSEPHINE MARINI, AND T&R KNITTING MILL, INC.,

Plaintiffs,

VERSUS

HAROLD ADAMO, JR., LISA ADAMO, THE BOLTON GROUP, INC., AND H. EDWARD RARE COINS & COLLECTIBLES, INC.,

Defendants.

————————————

**MEMORANDUM AND ORDER**
September 26, 2011

————————————

Joseph F. Bianco, District Judge:

Plaintiffs Rocco Marini ("Marini"), Josephine Marini ("Mrs. Marini" or "Josephine"), and T&R Knitting Mill, Inc. ("T&R" or "T&R Knitting") (collectively, "plaintiffs") brought this action against defendants Harold Adamo, Jr. ("Adamo"), Lisa Adamo ("Mrs. Adamo" or "Lisa"), The Bolton Group, Inc. ("Bolton" or "The Bolton Group"), and H. Edward Rare Coins & Collectibles, Inc. ("H. Edward") (collectively, "defendants"), alleging, *inter alia*, that Adamo violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO"), and asserting claims for securities fraud pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Defendants have moved for partial summary judgment on plaintiffs' securities fraud and RICO claims, and on plaintiffs' state-law fraud, breach of contract, and New York General Business Law § 349 claims. For the reasons set forth herein, defendants' motion is denied with respect to the securities fraud, RICO, and state-law fraud and breach of contract claims. Defendants' motion is granted, however, with respect to plaintiffs' General Business Law claim.

## I. Background

### A. Facts

The following facts are taken from the parties' depositions, declarations, exhibits and respective Local 56.1 statements of facts.[1]  Upon consideration of a motion for

---

[1] Where only one party's 56.1 statement is cited, the cited fact is not contested by the other party or the other party has offered no evidence to controvert that fact.

1

summary judgment, the Court construes the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005). Defendants have also noted that their motion is "largely" based on plaintiffs' version of the facts, which defendants have accepted for purposes of this motion only. (Defs.' Mem. of Law at 7.)

Plaintiffs' claims in this case stem from their purchase of rare coins from defendants at what plaintiffs claim were fraudulently inflated prices. Specifically, plaintiffs claim that defendants engaged in a multi-year scheme to defraud plaintiffs in connection with numerous rare coin transactions that ultimately resulted in an alleged loss to plaintiffs of approximately $14.5 million. (Pls.' Opp. at 9-10.)

By way of background, Marini and his wife, Josephine, became close friends with Adamo and his wife, Lisa, after the couples met each other in 1992. (Defs.' 56.1 ¶ 4.) The Marinis and Adamos are godparents to certain of the others' children, and they frequently socialized and went on family vacations together. (*Id.* ¶¶ 5-6.) Prior to engaging in the coin dealings that are the subject of the current action, Marini and Adamo apparently did not conduct any business together. Instead, Marini earned his living as a garment manufacturer through his company, T&R Knitting (Marini 12/31/09 Depo. at 199:8-203:25), and Adamo worked as a coin dealer, first as a salesperson for a company known as United Numismatics (Adamo 6/23/09 Depo. at 89:24-92:13) and later as a coin dealer through two companies (H. Edward and The Bolton Group) that he co-owns with his wife. (*Id.* at 24:15-26:5, 30:2-31:15; Defs. 56.1 ¶¶ 65-66.)

In August 2002, Marini and Adamo had an in-person meeting during which Adamo made numerous representations to Marini that rare coins were an excellent investment opportunity. (Defs. 56.1 ¶ 7.) Specifically, in order to induce Marini to purchase coins from Adamo, Adamo represented to Marini that "the kind of coins that he was going to get us into were the top 1 percent of 1 percent, very rare, and those weren't the kind of coins that he has ever seen go down [in value]." (Marini 12/31/09 Depo. at 17:22-18:2; *see also* Defs.' 56.1 ¶ 7.) Adamo also told Marini that Marini could expect twenty to forty percent returns and that, if demanded by Marini, Adamo could repurchase coins from Marini at their present value within twenty-four to forty-eight hours of such demand. (Defs.' 56.1 ¶ 7.) In addition, Adamo insisted that Marini buy and sell coins only through Adamo. (Marini 12/31/09 Depo. at 5:18-6:6.) However, Adamo's coins were not subject to such a restrictive agreement, and Adamo was free to buy and sell his own coins without notifying Marini. (Defs.' 56.1 ¶ 9.) Further, although Adamo also told Marini that "it wasn't wise to publicize" his coin dealings with Adamo, Adamo did not direct Marini not to tell anyone else about the dealings. (Marini Depo. at 52:7-13.) Marini testified that his close relationship with Adamo, combined with Adamo's reassurances that Marini could "cash out in 24 to 48 hours," that the coins were rare and "couldn't go down in value," and that Marini was "getting in at what [Adamo] called the dirt bottom," made it "compelling for [Marini] to start investing with [Adamo]." (T&R 12/23/09 Depo. at 264:2-265:19.)

Consequently, Marini made his first coin purchase from Adamo in September 2002. (Defs.' 56.1 ¶ 18.) Over the course of approximately the next five years, until in or

about May 2007,[2] plaintiffs made at least sixty-nine[3] payments to defendants (either to Adamo, The Bolton Group, or H. Edward) for the purchase of 144 coins. (*Id.* ¶ 19; Harris Decl. Ex. O; Parrella Decl. Ex. A at 5-30; Weinberg Decl. Ex. A.) From September 2002 through March 15, 2005, certain of these payments were made not by Marini himself, but instead were made by T&R Knitting on Marini's behalf in repayment for certain shareholder loans that Marini had made to T&R. (Defs.' 56.1 ¶ 1.) It is undisputed, however, that T&R does not own any of the coins that are the subject of this lawsuit, and that no defendant caused T&R to make any of these payments. (*Id.* ¶¶ 1, 3.) At least one payment also was made by Josephine Marini. (Harris Decl. Ex. O, Line 27.) In terms of methods of payment, plaintiffs paid defendants either by cash, check, or by wire transfer. (*Id.*) Moreover, regarding receipt of the coins, plaintiffs acknowledge that Marini received all of the coins at issue in person and never received any of these coins through the mail. (*Id.* ¶ 24.)

As to the nature of Marini and Adamo's business relationship, it is undisputed that Marini did not know anything about rare coins and that, until Marini became suspicious of Adamo in June 2008, Marini "believe[d] everything" Adamo told him

about the coins. (Defs.' 56.1 ¶ 11; Pls.' Response to Defs.' 56.1 ¶ 11.) Josephine, Marini's wife, was not involved in the decision-making process with respect to buying or trading coins, and she testified that once she and Marini "decided to buy coins," she "left it up to [Marini] to follow the advice of [Adamo] for which coins to buy." (J. Marini 12/28/09 Depo. at 49:21-50:16; *see also* Defs.' 56.1 ¶ 15.) Further, Marini did not contact Adamo about purchasing coins, but instead waited for Adamo to contact him regarding the coins that Adamo had obtained for Marini. (Defs.' 56.1 ¶ 12.) Lisa Adamo, however, neither made representations about rare coins to plaintiffs nor caused plaintiffs to purchase any coins. (*Id.* ¶ 72.) However, Lisa was present when certain cash payments were made by Marini to Adamo, and Marini testified that she "was just as engaging as [Marini] and Mr. Adamo." (Marini 6/25/10 Depo. at 73:6-24.)

Regarding the scheme to defraud, plaintiffs claim that Adamo "bilk[ed] Marini out of nearly 15 million dollars" by fraudulently misrepresenting "the value of the coins [Adamo] sold Marini and the propriety of coin investments," and by "continu[ing] to refuse to honor commitments to buy back Marini's coin purchases." (Second Amended Complaint ("SAC") Intro.) By way of example, plaintiffs allege that each time Marini made a coin purchase, Adamo reiterated the same purportedly false assurances he had given to Marini during their initial conversation in August 2002, namely, that Adamo was offering Marini extremely rare and valuable coins that were "a great value" and were "important . . . to add to our portfolio." (Defs.' 56.1 ¶ 13; Marini 12/31/09 Depo. at 8:19-24.) Moreover, with each transaction, Adamo not only purportedly told Marini that the proposed coins were "great for our portfolios" but also "led [Marini] to believe

---

[2] Although plaintiffs allege that the scheme to defraud extended into 2008, Marini testified that he stopped purchasing coins from defendants in or around May 2007. (Marini 6/25/07 Depo. at 70:10-17; Marini 12/31/09 Depo. at 112:18-113:25.)

[3] In their response to defendants' 56.1 statement, plaintiffs referred the Court to Exhibit A to plaintiffs' Amended RICO Statement, which sets forth eighty-three payments allegedly made to defendants. In any event, this distinction is not dispositive for purposes of the Court's present analysis.

that he was purchasing one [coin] for him and one for [Marini]." (Marini 12/31/09 Depo. at 8:3-18.) According to Marini, Adamo "constantly reminded [Marini] of the security of the investment," told Marini that he could "liquidate within 24 to 48 hours," and stated that he "would never put [Marini] into coins that [Adamo] wouldn't put himself into." (Marini 12/31/09 Depo. at 195:25-196:8.) On other occasions, Adamo "stressed [that the coins] were priced at dirt bottom, at the highest rarity," and that Adamo was "putting a collection together that would yield us a very good return at the end of our investment period." (Marini 12/31/09 Depo. at 184:18-24.) Marini also testified that Adamo told him during at least one conversation that Marini would be "a happy man" once he realized "what [Adamo was] doing for [him] and the investments" Marini was making. (Marini 6/25/10 Depo. at 16:9-17.) As a result of these assurances, Marini explained that he relied upon Adamo and "felt like we were partners, building portfolios together." (Marini 12/31/09 Depo. at 196:8-9.)

Furthermore, throughout the course of their dealings, Adamo periodically would send Marini statements that reflected the purchase prices and current values of the coins in Marini's portfolio. (Marini 12/31/09 Depo. at 40:16-21; 67:9-11.) Most of these statements showed "no loss" on a single coin, although there were some coins that apparently showed a loss in value. (*Id.* at 40:22-41:11.) Marini testified, however, that he did not know whether those losses were "due to a loss or due to a typo or mistake." (*Id.* at 41:9-11.) Certain of these coin statements were given to Marini in-person (*id.* at 165:8-11), while others were sent via e-mail. (Marini Decl. Ex. A at PL003855-57, PL003868-70, PL003881-83, PL003904-08.)

In February 2006, Marini had a meeting with Adamo where the two discussed the topic of published price guides for coins. (Marini 12/31/09 Depo. at 54:15-22.) Prior to that meeting, Marini had purchased a copy of the "Red Book," which contains "coin descriptions, populations," and prices, and he was "having trouble" matching up the coins on his yearly statements with the coins that were listed in the book, although he "might have found one coin" for which his purchase price was "close to the price" listed in the Red Book. (*Id.* at 54:23-55:14, 57:14:18.) When Marini asked Adamo about the Red Book, however, Adamo "dismissed it immediately," and explained that "a lot of the information that was in that book wasn't from current information" and was not specific to Adamo's or Marini's portfolio because "you wouldn't necessarily see that kind of quality rarity [sic] listed publicly in that book." (*Id.* at 59:6-21.) Marini accepted Adamo's explanation and "continued our conversation." (*Id.* at 59:19-21.)

In May 2007, Marini stopped purchasing coins from Adamo because Marini did not have additional, available funds at that time. (Marini 6/25/07 Depo. at 70:10-17; Marini 12/31/09 Depo. at 112:18-113:25.) Accordingly, Marini informed Adamo that he "needed to cash out of roughly a million dollars worth of coins from the coin portfolio." (Marini 12/31/09 Depo. at 113:20-25.) Although it is not entirely clear from the record, it appears that Adamo paid Marini one million dollars in exchange for three coins in early June 2007. (*Id.* at 113:20-115:4; Marini Decl. Ex. A, PL003718.) Marini reported that Adamo had valued these coins at double what Marini had paid for them. (Marini 12/31/09 Depo. at 116:15-19.) Shortly thereafter, Marini informed Adamo that he needed to cash out of more coins, and Adamo responded that he had a buyer for two coins

4

and would be able to pay Marini "in 60-90 days." (Marini 12/31/09 Depo. at 115:6-9; Marini Decl. Ex. A, PL003718.)  Adamo's response surprised Marini, because Marini felt that Adamo was contradicting his earlier promises that Marini could liquidate his coins in twenty-four to forty-eight hours. (Marini 12/31/09 Depo. at 115:6-16.) Ultimately, Adamo bought coins back from Marini for a total of $2.54 million. (Marini Decl. ¶ 9; H. Edward 12/22/09 Depo. at 232:15-20.)  For other coins that Marini wished to sell, Adamo apparently proposed trades instead. (Marini 12/31/09 Depo. at 157:16-18; *see, e.g.*, Marini Decl Ex. A, PL003807 ("I HAVE YOUR 120K CHECK AND THE TRADE COIN READY WHEN YOU IS [sic].").)

Several months later, in November 2007, Marini again asked Adamo about the prices listed for Marini's coins in the Gray Book, another published price guide.  (Marini 12/31/09 Depo. at 60:2-16.)  Specifically, Marini testified:

> [Adamo] was cashing me out of, I believe, an 1879 Stella and I had, I believe, two copies [of the Gray Book] with me. . . . After we finished the dealing of the Stella, Mr. Adamo, I believe, was jotting down some other coins for a future deal and then I said, I have to ask you, I got this publication and I said I'm still having a hard time, I just don't see—first, I was having a hard time trying to even identify if it was the exact coins because some coins on my slabs would have an extra number and I just didn't understand the process, if it made an significant difference . . . .

(*Id.* at 61:13-62:3.)  After Adamo asked Marini whether they were "going there again," Marini explained that he had "just

converted my nest egg into this coin investment" and that he was not able to see any kind of correlation between his coins and the information in the Gray Book.  (*Id.* at 62:3-15.)  In response, Adamo reiterated his previous assurances, noting that the coins he and Marini had were "the top 1 percent" and that "customers that [Adamo] ha[d] known for over 20 years haven't been able to accomplish what [Adamo and Marini had] accomplished in the past six years." (*Id.* at 62:19-24.)

Thereafter, in or around May 2008, Marini gave Adamo one of his "Stella" coins to be sent out for "upgrading," meaning that Adamo would try to obtain a higher grade or a star for the coin from a coin grading service.  (Adamo 6/23/09 Depo. at 287:12-288:15; *see also* Marini Decl. Ex A, PL003796, PL003798.)  In the subsequent months, Marini sent several follow-up emails to Adamo asking when the Stella would be returned. (Marini Decl. Ex. A., PL003834, PL003840, PL003852.) Adamo initially responded to Marini's emails that the coin would be shipped back within a week, but by September 5, 2008, Adamo reported that the Stella was "there being reholder [sic]." (Marini Decl. Ex. A, PL003837, PL003841, PL003842, PL003855.)  The following week, on September 12, 2008, Adamo emailed Marini that the Stella would be "back in 7/8 days." (PL003879.)  Plaintiffs claim, however, that Adamo did not, in fact, send the coin out for upgrading and instead sold it without Marini's permission. (Pls.' Opp. at 17.)  In support of this claim, plaintiffs point to a receipt of purchase that purportedly indicates Adamo sold a Stella coin of the same type, year and grade as Marini's, and with the same unique serial number, in May 2008.  (*Id.* (citing SAC Ex. Y.).) Nevertheless, in contrast to plaintiffs' claims, Adamo has apparently returned a coin to Marini that Adamo claims is

Marini's Stella coin. (*Id.*; *see also* SAC Ex. YY.)[4] Plaintiffs' expert, however, has submitted a report that the coin returned to Marini "is not the same $4 Gold Coin that was consigned" by Marini to Adamo in 2008. (Parella Decl. Ex. B. at 1.)

In any event, in May 2008, around the time that Marini gave the Stella coin to Adamo for upgrading, Marini began to suspect that he was being defrauded by Marini. (Defs.' 56.1 ¶ 21.) In particular, Marini testified that:

> Prior to these deals [in May 2008], I was very clear if it was going to be a trade or a straight cash out deal, everything was going smoothly, any trade deals that I agreed to, I was honored that he was taking the time to maintain the equity and the vitality of the coin portfolio, but, now, it seemed like he was doing whatever he wanted to do.

(Marini 12/31/09 Depo. at 156:16-23.) Consequently, in late May, Marini took some of his coins to another dealer for evaluation. (*Id.* at 156:4-7; 166:4-8.) In addition, in June 2008, Marini began to surreptitiously tape record his conversations with Adamo. (Defs.' 56.1 ¶ 21.) Finally, in July 2008, Marini retained his attorney in this action. (*Id.*)

Plaintiffs also allege that defendants defrauded other victims in a similar manner. Specifically, plaintiffs point to three other purported identified victims: Frank Brancato, another close family friend of the Marinis and the Adamos; Travis Bain, a

former customer who had purchased between twenty-five and fifty coins from H. Edward; and David Albanese, whom Adamo refused to pay for a coin until Adamo was threatened with police action. In particular, plaintiffs claim that Brancato was targeted in a similar fashion to Marini, in that Brancato purchased coins from Adamo after Adamo gave repeated assurances about the profitability of coin investments. (Pls.' Opp. at 18-20; Brancato 12/29/09 Depo. at 44:18-20, 47:2-48:21.) Unlike Marini, however, Brancato ultimately was able to sell his coins back to Adamo for a profit. (Pls.' Opp. at 20 (citing Harris Decl. Ex. Q at FRANK000833, 836).) As to Travis Bain, plaintiffs assert that Bain was injured when Adamo sold him coins that plaintiffs allege were fraudulently overgraded, a fact that Bain learned only when he sold his coins through a major auction house at prices lower than Bain thought he would realize.[5] (Pls.' Opp. at 20-21; Bain 8/30/09 Depo. at 12:18-13:25.) Finally, Albanese is alleged to be a victim of Adamo's because, in 2003, after Albanese had sold a coin to Adamo, Adamo refused to render payment until after Albanese contacted the police for assistance in procuring payment.[6] (Pls.' Opp. at 22;

---

[5] The Court notes, however, that Bain testified that he did not think that Adamo defrauded him. (Bain 8/30/09 Depo. at 19:6-12.)

[6] Plaintiffs have also alleged that Adamo defrauded an unidentified individual whom Adamo referred to as a "sucker" for purchasing a coin at a value that Adamo thought was too high. (Pls.' Opp. at 21.) However, no additional details regarding this alleged victim are contained in the record. Further, although plaintiffs proffered another additional victim, Dominick Grosso, no declarations or other admissible evidence regarding Grosso's interactions with Adamo was provided. Rather, plaintiffs have relied upon inadmissible hearsay. (*See* Pls.' Opp. at 22-23, notes 207-13.) Therefore, the Court has not relied upon plaintiffs' allegations regarding Grosso.

---

[4] Adamo had originally proffered one coin to Marini that he stated was the Stella, but he later provided a different coin, noting, through his attorney, that the first coin returned to Marini was not the original. (*See* SAC Ex. YY.)

Albanese 12/7/09 Depo. at 6:19-8:18, 74:16-77:18.)

## II.  Standard of Review

The standards for summary judgment are well settled.  Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of showing that he or she is entitled to summary judgment.  *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:  (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks omitted); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more

than simply show that there is some metaphysical doubt as to the material facts. . . . The nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'"  *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (internal citations omitted).  Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone "will not defeat an otherwise properly supported motion for summary judgment."  *Id.* at 247-48 (emphasis in original).  Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars' showing that a trial is needed."  *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)).  Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'"  *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

## III.  Discussion

Defendants have moved for partial summary judgment on plaintiffs' securities fraud and RICO claims, and on plaintiffs' state-law fraud, breach of contract, and New York General Business Law § 349 claims.  For the reasons set forth herein, defendants' motion is denied with respect to the securities fraud, RICO, and state-law fraud and breach of contract claims.  Defendants'

motion is granted, however, with respect to plaintiffs' General Business Law claim.[7]

### A. Securities Fraud[8]

#### 1. Legal Standard

Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). In order to state a claim for securities fraud under this Section, the transaction at issue

---

[7] Defendants have argued that T&R Knitting is not a proper plaintiff and must be dismissed from this action. Specifically, defendants argue that Marini caused T&R to make all payments to defendants and that T&R does not own any of the coins at issue in this case. (Defs.' Mem. of Law at 14-15.) Plaintiffs acknowledge that Marini testified that "he purchased some coins with payments from T&R, at times when T&R owed Marini money on loans Marini made to T&R." (Pls.' Opp. at 87.) However, plaintiffs also note that defendants have contested Marini's explanation by questioning the existence of these loans and, consequently, questioning whether the coins paid for by T&R do, in fact, belong to Marini. (Pls.' Opp. at 87.) Thus, given the disputed issues of fact regarding payments made by T&R allegedly on Marini's behalf, defendants' motion for summary judgment to dismiss T&R as a plaintiff is denied.

[8] Defendants argue that plaintiffs' securities fraud claim is limited to transactions that occurred after September 30, 2003 because of the applicable statute of limitations. (*See* Defs.' Mem. of Law at 49.) Plaintiffs concede this point. (*See* Pls.' Opp. at 24.) Therefore, this argument need not be addressed by the Court.

must involve a "security," as defined in Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(a)(1). Although Section 77b(1) sets forth numerous different instruments that may be considered securities, the parties agree that the only category that applies here is that of "investment contract."

In *SEC v. Howey*, 328 U.S. 293 (1946), the Supreme Court defined "investment contract" to mean "a contract, transaction or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits [4] solely from the efforts of a promoter or third party . . . ." *Id.* at 298-99; *accord United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008); *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). The Supreme Court also added a fifth requirement in *Marine Bank v. Weaver*, 455 U.S. 551 (1982), namely, that "for an instrument to be a security the investor must risk loss." *Gary Plastic Packaging Corp. v. Merill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 239 (2d Cir. 1985). Defendants do not dispute, for purposes of their motion, that plaintiff can satisfy the first, third, fourth, and fifth prongs of the *Howey* test. Instead, defendants focus solely on the second prong and contend that plaintiffs cannot establish the existence of a "common enterprise" in this case.

Courts have applied several different tests to determine whether a common enterprise exists, namely: the horizontal commonality test, the broad vertical commonality test, and the narrow or strict vertical commonality test. *Revak*, 18 F.3d at 87-88. Horizontal commonality involves "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Id.* at 87. Vertical commonality, in contrast, "focuses on the relationship

between the promoter and the body of investors," rather than on the sharing or pooling of funds among investors. *Id.* Under the broad vertical commonality test, "the fortunes of the investors need be linked only to the *efforts* of the promoter," while "[s]trict vertical commonality requires that the fortunes of investors be tied to the *fortunes* of the promoter." *Id.* at 88 (emphasis in original) (internal quotation marks and citations omitted). It is undisputed that horizontal commonality does not exist in this case. In addition, the Second Circuit has held that a showing of broad vertical commonality does not satisfy the second prong of the *Howey* test. *Id.* ("If a common enterprise can be established by the mere showing that the fortunes of investors are tied to the efforts of the promoter, two separate questions posed by *Howey*—whether a common enterprise exists and whether the investors' profits are to be derived solely from the efforts of others—are effectively merged into a single inquiry: 'whether the fortuity of the investments collectively is essentially dependent upon promoter expertise.'" (quoting *SEC v. Continental Commodities Corp.*, 497 F.2d 516, 522 (5th Cir. 1974)) (additional citations omitted)). Accordingly, this Court need only focus on whether strict vertical commonality exists in this case.[9]

To support a finding of strict vertical commonality, a plaintiff must establish that "'the fortunes of plaintiff and defendants are linked so that they rise and fall together.'" *Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Invs. Ltd.*, 205 F. Supp. 2d 243, 249 (S.D.N.Y. 2002) (quoting *Dooner v. NMI Ltd.*, 725 F. Supp. 153, 159 (S.D.N.Y. 1989)); *accord In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) (where investment manager was to be paid, in part, through a performance fee equal to 20% of the profits in the investment account, defendant's compensation was "dependent on the successful performance of the investment account" and strict vertical commonality accordingly existed because "[i]f profits were not generated in a calendar year, or if the profits did not exceed the preferred return, then [defendant] did not receive a performance fee" and therefore "financial compensation was linked to the fortunes of the investors"); *Walther v. Maricopa Intern. Inv. Corp.*, No. 97-cv-4816, 1998 WL 186736, at *7 (S.D.N.Y. Apr. 17, 1998) (finding that "success of [plaintiff's] investments were directly tied to the fortunes of the defendants" and strict vertical commonality therefore existed where defendants "were to be paid only if [plaintiff's] funds made substantial gains," and "[c]onsequently, if [plaintiff's] funds appreciated in value, the defendants were financially compensated," whereas "if

---

[9] The Court notes that, in *Revak*, the Second Circuit declined to reach the issue of whether the existence of strict vertical commonality alone "gives rise to a common enterprise." 18 F.3d at 88. However, a number of district courts in this Circuit, as well as the Ninth Circuit Court of Appeals, have found a showing of strict vertical commonality to be sufficient to establish a common enterprise. *See In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) (collecting cases); *accord Brodt v. Bache & Co.*, 595 F.2d 459, 461 (9th Cir. 1978). Defendants concede that this is the proper legal analysis. In any event, the Court

agrees with the above-cited courts that have reached the issue and concludes, for purposes of the pending motion, that a showing of strict vertical commonality would satisfy the common enterprise prong of the *Howey* test. However, as set forth herein, the Court finds that a material factual dispute exists as to whether plaintiffs' and defendants' fortunes were interwoven so as to support a finding of strict vertical commonality. Accordingly, the Court denies defendants' motion for summary judgment on this claim for the reasons set forth *infra.*

[plaintiff's] investment did not perform well, the defendants were not paid" (internal quotation marks omitted)). Stated otherwise, strict vertical commonality exists where there is a "one-to-one relationship between the investor and investment manager" such that there is "an interdependence of *both profits and losses* of the investment." *Kaplan v. Shapiro*, 655 F. Supp. 336, 341 (S.D.N.Y. 1987) (emphasis in original); *see also Lowenbraun v. L.F. Rothschild, Unterberg, Towbin*, 685 F. Supp. 336, 341 (S.D.N.Y. 1988) (noting that "[v]ertical commonality is present when there is interdependence between broker and client for both profits and losses of the investment" and holding that plaintiff had not established vertical commonality because "profits and losses were not interdependent since the broker allegedly profited from the commissions while plaintiffs suffered losses"); *Savino v. E.F. Hutton & Co., Inc.*, 507 F. Supp. 1225, 1238 (S.D.N.Y. 1981) ("It is plain enough that a vertical relationship, that is, a one-to-one relationship between the investor and the investment manager, is capable of being structured so that the profits and losses of the two parties are somehow interdependent. In the Court's opinion, such a structure is all that vertical commonality means under [*SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973)] and *Brodt* [*v. Bache & Co.*, 595 F.2d 459, 461 (9th Cir. 1978)], and is all that *Howey* requires. Accordingly, the Court concludes that a common enterprise should be found where there is vertical commonality such as is described above.").

## 2. Application

Defendants have moved for summary judgment on plaintiffs' securities fraud claim on the ground that plaintiffs have failed to establish that Adamo's sale of coins to Marini constituted an "investment contract" for purposes of the federal securities laws. Specifically, defendants contend that plaintiffs cannot satisfy the strict vertical commonality element of the *Howey* test. In opposition, plaintiffs argue that they can establish the requisite level of commonality in one of two ways: first, plaintiffs contend that their purchase of the same coins as defendants would make their fortunes rise and fall together from owning identical property, and, second, plaintiffs assert that because Adamo earned a percentage commission on plaintiffs' eventual sale of coins, Adamo's fortunes necessarily would rise and fall with the value of plaintiffs' coin portfolio. (Pls.' Opp. at 25.) For the reasons set forth herein, the Court finds that there are disputed issues of material fact that preclude the Court from granting summary judgment on this issue, and, accordingly, defendants' motion for summary judgment on the securities fraud claim is denied.

As an initial matter, the Court disagrees with plaintiffs that Adamo and Marini's ownership of the same types of coins necessarily links their fortunes together for purposes of the strict vertical commonality analysis. First, although Adamo and Marini may have owned similar sets of coins, and their portfolios might therefore have been valued similarly, it is clear from the record that Adamo and Marini maintained separate portfolios. Indeed, Marini acknowledged at his deposition that he understood that Adamo was purchasing *two* of each proposed coin: one for Marini's portfolio and one for Adamo's. (Marini 12/31/09 Depo. at 8:12-18 ("[W]hen Mr. Adamo called me and told me that he had coins that he procured for us, he said these are great for our portfolios, so every time he used it in the context of us and our and all that he led me to believe that *he was purchasing one for him and one for me*." (emphasis added)).) Moreover, in a recorded conversation,

Adamo explained to Marini that, while Adamo viewed their portfolios similarly, their portfolios were not identical in that Adamo owned certain coins that Marini did not: "I may have two of something where you have one. I may have four of something and you have three. You know, a few odds and ends that I have because I liked that I wouldn't recommend to you for investment . . . ." (Marini Decl. Ex. A, PL001123.)

Most important, Adamo was under no obligation to sell his coins at the same time that Marini sold his (Defs. 56.1 ¶ 9); in other words, Adamo was free either to sell his coins before Marini, if an opportunity arose, or to hold onto his coins longer to capitalize on any long-term appreciations in value. Accordingly, while the valuation of their portfolios may have paralleled one another given their similar contents, and any deal that Adamo found could have affected the prices of the coins that Adamo and Marini each owned,[10] the portfolios were not

intertwined such that Marini's and Adamo's fortunes *had* to rise and fall together. Stated otherwise, because plaintiff was free to direct the sale of his coins separate and apart from Adamo's decision to sell his coins, the fortunes of Marini and Adamo clearly were not directly linked. In fact, this exact scenario arose in this case in May 2008, when Adamo paid Marini $1 million to liquidate certain coins in Marini's portfolio. Marini does not claim that Adamo made any profit or otherwise benefited from this transaction, or that Adamo sold his coins at the same time for a similar amount.[11] To the contrary, the record reflects that Adamo used his "emergency" funds to make this payment to Marini (Marini Decl. Ex. A, PL003718) and, in any event, Marini's fortunes rose (Marini acknowledged that he made a profit on these coins) while Adamo's fortunes fell. Further, Marini acknowledged in his deposition that Adamo had never expressed any concern that the prices of his coins would be impacted by Marini's decision to sell a particular coin or to buy a coin that Adamo already owned. (*Id.* at 146:6-147:2.) Therefore, based upon the facts presented in this case, the Court rejects plaintiffs' argument that Marini and Adamo's ownership of the same coins establishes the existence of strict vertical commonality.

Indeed, the cases cited by plaintiffs to support their argument are all distinguishable from this case. For example, although the plaintiffs in *Howey* had purchased separate parcels of land in a citrus grove—just as Marini and Adamo had purchased separate coins here—the transactions were transformed into

---

[10] For example, on one occasion, Adamo emailed Marini about a potential sale that would "push up the prices of our same coins tremendously." (Marini 12/31/09 Depo. at 144:15-154:145:15.) Similarly, on another occasion, Adamo led Marini to believe that they were both selling their identical coins to a purchaser for the same sale price. (*Id.* at 9:15-24.) However, even in this latter deal, it is clear that Marini and Adamo's portfolios and fortunes were not inextricably linked. Specifically, although Adamo was selling his coin because the offered sale price was "great" and he was "advising" Marini to do the same (*id.* at 9:23-24), there is nothing in the record to indicate that Marini *had* to sell his coin because Adamo so advised. To the contrary, Marini could have chosen to hold onto his coin, which would have resulted in Adamo earning a profit on his coin when Marini did not (or did not until a later, unspecified date). Under these circumstances, the "profits and losses of the investment" clearly were not "interdependent." *Kaplan*, 655 F. Supp. at 341.

[11] Marini's claim that Adamo earned commissions based on the sale of Marini's coins is addressed *infra*. As set forth below, there are disputed issues of fact as to whether Adamo actually earned such commissions.

"investment contracts" not because of the ownership of separate parcels, but instead because plaintiffs had been "offer[ed] an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents." 328 U.S. at 299.  The Second Circuit has interpreted *Howey* to mean that "[a] common enterprise within the meaning of *Howey* can be established by a showing of 'horizontal commonality': the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distributions of profits."  *Revak*, 18 F.3d at 87.  Here, in contrast, Adamo was not offering Marini the opportunity to contribute funds and *share* in the profits of a coin portfolio that would be managed by Adamo.    Indeed, it is undisputed that horizontal commonality is not present in this case.  Accordingly, the fact that plaintiffs in *Howey* owned separate parcels of land does not change in the Court's conclusion here.  Likewise, *Securities & Exchange Commission v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943) involved thousands of leaseholders "*sharing* in discovery values" in connection with oil exploration on plots of land.    *Id.* at 348 (emphasis added).  Again, there is no allegation here that plaintiffs were investing with others and sharing in profits.[12]

Furthermore, the Second Circuit's opinion in *Glen-Arden Commodities v. Costantino*, 493 F.2d 1027 (2d Cir. 1974), is also inapposite insofar as the Second Circuit primarily was focused in that case on the importance of the promoter's efforts, a factor that relates not to the common enterprise prong of the *Howey* test, but instead to the fourth prong (*i.e.*, that the profits be derived solely from the efforts of a promoter or third party), which is not at-issue in this case.  *See id.* at 1035 ("Here the customer, . . . while purchasing actual tangible property, was upon the representations of appellants buying in addition services absolutely necessary to the turning of the promised profit. . . . An investor was dependent upon appellants for the utilization of their 'expertise in selecting the type and quality of Scotch whisky and casks to be purchased' . . . . This brings this scheme within the facts of a long line of cases where purported sales of tangible property, service contracts, or both were held to be investment contracts.  There have been many schemes, in short, where the public was led into buying what purported to be tangible items when in fact what was being sold was an investment entrusting the promoters with both the work and the expertise to make the tangible investment pay off." (internal citations and alterations omitted)).[13]

_____

[12] The Court also notes that, in *Howey*, the Supreme Court "narrowed the *Joiner* . . . test [for determining the existence of an investment contract]."  *Gary Plastic Packaging Corp.*, 756 F.2d at 239.  In *Joiner*, the Court stated that the test was "what *character the instrument is given in commerce* by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect."  320 U.S. at 352-53 (emphasis added).  In *Howey*, however, the Court "narrowed the *Joiner* 'character in commerce' test," and set forth the "specific requirements that continue to be the analytical

foundation for determining what constitutes an investment contract."  *Gary Plastic Packaging Corp.*, 756 F.2d at 239.  Accordingly, it is *Howey*, and not *Joiner*, that sets forth the relevant analysis for determining whether a particular investment constitutes an investment contract for purposes of the securities laws.

[13] As noted *supra*, the Second Circuit in *Revak* rejected the broad vertical commonality test, which requires that "the fortunes of the investors . . . be linked only to the *efforts* of the promoter."  18 F.3d at 88 (emphasis in original).

As to plaintiff's second theory of commonality, the Court finds that disputed issues of material fact exist as to whether Adamo earned commissions on the sale of Marini's coins and, accordingly, the Court cannot conclude as a matter of law whether Adamo's fortunes would rise and fall with plaintiffs' fortunes. As a threshold matter, other courts have found that, where an investment manager, such as Adamo, earns a fee based on the ultimate performance of an investment, strict vertical commonality does exist. For example, in *In re J.P. Jeanneret Assocs., Inc.*, the plaintiff demonstrated that the investment manager was to be paid, in part, through a performance fee equal to 20% of the profits in the investment account. 769 F. Supp. 2d at 360. Consequently, defendant's compensation was "dependent on the successful performance of the investment account" and strict vertical commonality therefore existed because "[i]f profits were not generated in a calendar year, or if the profits did not exceed the preferred return, then [defendant] did not receive a performance fee" and therefore

---

Accordingly, to the extent that the holding in *Glen-Arden* implies that a common enterprise may be established solely through a showing that a plaintiff's fortunes are linked to the work and efforts of an investment manager, the Second Circuit has explicitly rejected such reasoning in *Revak*. For this reason, this Court also declines to rely upon *Kemmerer v. Weaver*, 445 F.2d 76 (7th Cir. 1971), also cited by plaintiffs, given that the *Kemmerer* court applied the broad vertical commonality test in reaching its ruling. *See id.* at 79-80 (holding that the "investment scheme involved in the present case clearly qualified as an investment contract" because "the investment by members of the public was a profit-making venture in a common enterprise, the success of which was inescapably tied to the efforts of the ranchers and the other defendants and not to the efforts of the investors" (internal quotation marks, citations, and alterations omitted)).

"financial compensation was linked to the fortunes of the investors." *Id.* Similarly, in *Walther*, the court found that the "success of [plaintiff's] investments [was] directly tied to the fortunes of the defendants" and strict vertical commonality therefore existed because defendants "were to be paid only if [plaintiff's] funds made substantial gains." 1998 WL 186736, at *7. In other words, the fortunes of plaintiff and defendants were linked because "if [plaintiff's] funds appreciated in value, the defendants were financially compensated," whereas "if [plaintiff's] investment did not perform well, the defendants were not paid." *Id.*

In this case, plaintiffs assert that Adamo "retain[ed] a percentage commission on each eventual sale" of Marini's coins. (Pls.' Opp. at 29.) Accordingly, because Adamo asked that Marini sell his coins only through Adamo (Marini 12/31/09 Depo. at 5:21-7:3), if Adamo were to receive a commission on the sale of the coins, his fortunes would be inextricably tied to those of Marini's. However, the record is not clear as to whether Adamo did, in fact, receive a commission based on the sale of coins. As described by Marini, when Marini asked Adamo how Adamo would be making money and what the structure of the deals was, Adamo responded that "[h]e would be making between 5 and 10 percent, depending on what coin." (T&R 12/23/09 Depo. at 290:15-22.) It is not clear from this testimony, however, whether this percentage commission would be earned at the time of purchase or at the time of sale. Moreover, Marini indicated elsewhere in his deposition that Adamo's commission was earned at the time of purchase and that the benefit Adamo received at the time of sale was the availability of Marini's coins to market to other potential customers:

Q:  Did you pay Mr. Adamo a premium for the right to resell the items, the coins, at any time?

A:  No, it was discussed that he would charge me, depending on the coin or the particular dealings, anywhere between 5 to 10 percent on the purchase and he did say that when it came time to cash out, he would benefit from that, as well.

Q:  How he would [sic] benefit from that?

A:  Well, the one thing that he constantly reiterated, that the biggest problem in his industry is finding coins to sell, there was no shortage of buyers, so having the access to a portfolio of this caliber would be very beneficial to him.

(Marini 12/31/09 Depo. at 30:12-31:3.) Although this testimony establishes that Adamo definitely earned a commission at the time of purchase, it does not rule out the possibility that Adamo could also have earned a commission at the time of sale. Because a finding of strict vertical commonality hinges on this latter sales-based commission,[14] and because disputed

issues of material fact exist as to whether Adamo earned a commission upon the sale of Marini's coins, the Court cannot determine as a matter of law whether Adamo's and Marini's fortunes were inextricably linked for purposes of establishing the existence of a common enterprise.  Therefore, defendants' motion for summary judgment on plaintiffs' securities fraud claim is denied.[15]

## B. RICO

Defendants also move for summary judgment on plaintiffs' RICO claim on the grounds that plaintiffs cannot establish either the continuity necessary to establish a RICO pattern of racketeering activity, or that their injuries were caused by defendants' alleged RICO predicate acts.

---

[14] *See, e.g.*, *Copeland v. Hill*, 680 F. Supp. 466, 467-68 (D. Mass. 1988) (sale for the purchase of rare coins did not constitute an investment contract where, *inter alia*, there was "no indication that [the coin dealer] was to receive any compensation other than the profit received on the initial sale of coins to the plaintiffs" and "the gallery would not gain or lose anything if the coins had appreciated or depreciated in market value"); *accord Zion v. Standard Fin. Mgmt. Corp.*, No. 86-cv-3272, 1988 WL 82043, at *1-2 (D. Mass. July 26, 1988) (where plaintiff responded to an advertisement from coin dealer, received "extensive information about [the dealer's] services in the form of brochures,

reports and various other written materials," and later met with company representatives and invested in rare coins, court found that plaintiff had not established strict vertical commonality because "[t]he economic fortunes of plaintiff . . . were independent, not interdependent, of the economic fortunes of defendants").

[15] Defendants have also argued that if plaintiffs' securities fraud claim is allowed to proceed, plaintiffs' RICO claims are barred under the PSLRA, which provides that if conduct is actionable under the federal securities laws, the same transaction cannot also be the basis for liability under RICO.  *See MLSMK Inv. Co. v. JP Morgan Chase & Co.*, --- F.3d ----, 2011 WL 2640579, at *4-5 (2d Cir. 2011).  However, because it is not clear based on the current record whether the transactions at issue here involved "securities," it consequently is unclear whether defendants' alleged conduct is "actionable" under the securities laws. Therefore, the Court is unable to determine at this stage of the litigation—*i.e.*, prior to a jury's determination on the question of whether the transactions here were investment contracts— whether the PSLRA bar applies to preclude plaintiffs' civil RICO claims.

Defendants also argue that plaintiffs are unable to demonstrate that defendants Lisa Adamo or The Bolton Group are part of any RICO enterprise.  For the reasons set forth below, the Court denies defendants' motion.

### 1.  Continuity

#### a.  Legal Standard

To establish a RICO violation, a plaintiff "must plead at least two predicate acts, show that the predicate acts are related, and that they amount to, or pose a threat of, continuing criminal activity."  *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 97 (2d Cir. 1997) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).  "Predicate acts are 'related' for RICO purposes when they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'"  *Id.* (quoting *H.J. Inc.*, 492 U.S. at 240).  As to the threat of continued criminal activity, "a plaintiff in a RICO action must allege either an 'open-ended' pattern of racketeering activity (*i.e.*, past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (*i.e.*, past criminal conduct 'extending over a substantial period of time')."  *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995).  As explained by the Supreme Court:

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. . . . A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. . . . Often a RICO action will be brought before continuity can be established in this way.  In such cases, liability depends on whether the *threat* of continuity is demonstrated. . . . [T]he threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.").

*H.J. Inc.*, 492 U.S. at 241-43 (emphasis in original).

"To satisfy open-ended continuity, the plaintiff . . . must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed."  *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999).  Alternatively, to establish a "closed period of repeated conduct" sufficient to satisfy the continuity requirement, *H.J., Inc.*, 492 U.S. at 241, "'a plaintiff must provide some basis for a court to conclude that defendants' activities were neither isolated nor sporadic,'" and that defendants engaged in such activity for a substantial period of time.  *De Falco v. Bernas*, 244 F.3d 286, 321 (2d Cir. 2001) (quoting *GICC Capital Corp.*, 67 F.3d at 467 (additional quotation marks omitted)); *accord Kades v. Organic Inc.*, No. 00-CV-3671 (LTS), 2003 U.S. Dist. LEXIS 2591, at *35 (S.D.N.Y. Feb. 24, 2003).  "Predicate acts extending over a few weeks or months . . . do not satisfy this requirement."  *Cofacredit*, 187 F.3d at 242 (quoting *H.J., Inc.*, 492 U.S. at 242)).  In calculating the duration of the pattern of racketeering activity, actions that do not constitute predicate racketeering activity are not included; rather, the duration "is measured by the RICO predicate acts the defendants commit."  *De Falco*, 244 F.3d at 321 (citing

*Cofacredit*, 187 F.3d at 243 and *GICC Capital Corp.*, 67 F.3d at 467). Notably, "[s]ince the Supreme Court decided *H.J., Inc.*, [the Second Circuit] has never held a period of less than two years to constitute a 'substantial period of time'" for purposes of closed-ended continuity. *De Falco*, 244 F.3d at 321. Furthermore "[w]hile closed ended continuity is primarily concerned with the time period of the activities, the court also considers factors such as the 'number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes' as relevant when determining whether closed ended continuity exists." *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 78 (E.D.N.Y. 2006) (quoting *De Falco*, 244 F.3d at 321).

### b. Application

Here, the Court finds that plaintiffs have put forth sufficient factual allegations regarding the existence of closed-ended continuity to survive a motion for summary judgment. Specifically, plaintiffs allege that defendants defrauded them over the course of approximately six years, during which time plaintiffs purchased 144 coins from defendants for a total alleged loss of approximately $14.5 million. Courts have routinely found that continuity exists where the alleged scheme spans such a substantial period of time, even where only a single victim or single scheme was involved. *See, e.g., Jacobson v. Cooper*, 882 F.2d 717, 718, 720 (2d Cir. 1989) (where plaintiff alleged that his son and another individual "engag[ed] in a scheme to appropriate [plaintiff's] real estate enterprise," continuity was present because "[t]he related predicates extended over a substantial period of time, here a matter of years, from 1980 until the filing of this action" (internal quotation marks, citation, and alterations omitted)); *Columbus McKinnon Corp. v.*

*HealthNow New York, Inc.*, No. 03-cv-831S, 2006 WL 2827675, at *11 (W.D.N.Y. Sept. 29, 2006) ("[P]laintiff's allegations that [defendant] committed numerous acts of mail fraud, wire fraud and conversion of funds belonging to an employee welfare benefit plan between 1997 and 2001 and then engaged in a separate scheme to deceive the plaintiff from discovering this unlawful activity are sufficient to meet the pleading requirements, under a closed-ended continuity theory, of a pattern of racketeering." (internal citations omitted)); *State Wide Photocopy Corp. v. Tokai Fin. Servs., Inc.*, 909 F. Supp. 137, 140-41 (S.D.N.Y. 1995) ("Plaintiff alleged that defendants committed, over the course of approximately four to five years, specific RICO predicate acts. . . . [These alleged acts] involved systematic and repeated attempts to induce State Wide into transmitting client information and continuous conversion of the information to State Wide's rival. Clearly, these acts were not sporadic. While, generally, plaintiff was the only victim of the alleged scheme, defendants' repeated, related and continuous acts during the course of four years formed a RICO pattern." (internal citations omitted)); *Com-Tech Assocs. v. Computer Assocs. Int'l, Inc.*, 753 F. Supp. 1078, 1091 (E.D.N.Y. 1990) ("The conduct allegedly took place over a period of several years, from approximately 1980 to the present [1990]. . . . [T]hese fraudulent acts were all allegedly intended to further an overall scheme to defraud the limited partners of COM-TECH. . . . Although the letters are written by separate individual defendants, all are related to the same subject matter (the purported effect of the computer industry developments on the development of the COM-TECH program), with the same purpose and same victims (to defraud the limited partners of royalty payments). Furthermore, the plaintiffs allege that the

scheme continued in 1981 and 1982 by concealing the true and accurate amount of receipts received from marketing the program, which scheme was carried out through the numerous fraudulent letters, royalty statements and royalty conciliation reports mailed to the individual limited partners. In light of [the Supreme Court's decision in] *H.J., Inc.*, it matters not that there is a single victim (the limited partners) and a single overall scheme to defraud (diversion or underreporting of royalties) . . . . [P]laintiffs have sufficiently pled a 'pattern of racketeering activity' under section 1962 of RICO.").

Indeed, the Second Circuit has stressed that "[w]hether closed-ended or open-ended, continuity is 'centrally a temporal concept,'" and "[a]lthough *GICC* identified several 'non-dispositive factors' that courts must consider in assessing whether closed-ended continuity has been established, 67 F.3d at 467, those factors are more significant in cases where the period of time over which the alleged racketeering acts borders on 'substantial.'" *Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 282 F. App'x 94, 99 (2d Cir. 2008) (quoting *H.J., Inc.*, 492 U.S. at 242)). Accordingly, in *Fresh Meadow*, the Second Circuit found that continuity existed where the alleged racketeering acts spanned almost three and one-half years and, thus, "the presence or absence of the other factors [was] less critical." *Id.* Likewise, here, plaintiffs have asserted that defendants defrauded them in connection with well over 100 coin transactions over the course of approximately six years. Drawing all reasonable inferences in plaintiffs' favor, the Court concludes that plaintiffs have put forth sufficient factual evidence of a pattern of racketeering activity occurring over a substantial period of time to survive defendants' motion for summary judgment.

Moreover, as to the other non-dispositive factors that are relevant to the continuity analysis, the Court concludes that, after construing the evidence and drawing all reasonable inferences in plaintiffs' favor, these factors, on balance, preclude the Court from granting summary judgment for defendants. Specifically, plaintiffs here have alleged over 100 predicate acts of mail and wire fraud[16] spanning a variety of activities, including the alleged "confiscation" of the Stella coin in May 2008, dozens of payment executions and fund transfers, and numerous communications with Adamo, during which Adamo is alleged to have proposed deals, made statements to induce deals with plaintiffs, and fraudulently misrepresented coin values. (*See generally* Pls.' Opp. Ex. A ("Predicates Catalog").) In other words, plaintiffs here have not merely alleged acts of wire fraud that were incidental to the operation of a legitimate business, but instead have put forth evidence that these wires themselves contained purportedly fraudulent statements and representations. *See Com-Tech*, 753 F. Supp. at 1090 (relying upon acts of mail fraud to find continuity where mailings themselves contained fraudulent statements); *cf. Jerome M. Sobel & Co. v. Fleck*, No. 03-cv-1041, 2003 WL 22839799, at *10 (S.D.N.Y. Dec. 1, 2003) (finding no continuity where, *inter alia*, "the predicate acts of mail and wire fraud were of the 'innocent' variety—that is, they are not alleged to have themselves been fraudulent" and instead "were merely the instrumentalities used to effectuate Fleck's fraudulent scheme"); *Schnell v. Conseco, Inc.*, 43 F. Supp. 2d 438, 446 (S.D.N.Y.

---

[16] Plaintiffs have conceded that certain acts of wire fraud involved purely intrastate communications. As set forth *infra*, because intrastate communications fall outside of the scope of RICO, the Court has not considered these communications in its analysis.

1999) ("While plaintiff's complaint alleges a number of predicate mail and wire fraud acts in furtherance of this scheme, these acts are in themselves innocuous and are not alleged to be false or misleading in any way.  These acts, though allegedly undertaken over a period of 23 months, are insufficient to state a closed-ended pattern of racketeering activity.").  Moreover, based on the current record, the Court finds that plaintiffs have not "'artificially fragment[ed] a singular act [*i.e.*, the negotiation of a licensing agreement] into multiple acts simply to invoke RICO.'"  *Fresh Meadow*, 282 F. App'x at 100 (quoting *Schlaifer Nance*, 119 F.3d at 98).  Instead, plaintiffs have put forth evidence of a series of predicate acts that are related to defendants' ultimate purported goal of overcharging and defrauding plaintiffs, but that nonetheless arise out of separate events, including 144 distinct coin transactions, numerous allegedly fraudulent communications, and the purported confiscation of a coin by Adamo.  *See Fresh Meadow*, 282 F. App'x at 100 (vacating district court's dismissal of RICO action where the alleged predicate acts bore "the same relationship to [defendant's] alleged fraudulent plan to maximize the value of his property, but they [arose] out of distinct events—the faxing of the fabricated affidavit . . . in 1997 and the fraudulent inducement of [plaintiff] to execute the lease in 2001").

Furthermore, plaintiffs have put forth evidence that other victims were targeted by defendants' schemes.  For example, plaintiffs have put forth evidence that Frank Brancato was targeted by Adamo through the same allegedly fraudulent assurances that Adamo made to Marini.  Although Brancato ultimately sold his coins back to Adamo for a profit, drawing all reasonable inferences in plaintiffs' favor, a reasonable jury could conclude that Adamo made such payments to Brancato solely in order to avoid detection and that these payments accordingly were made in furtherance of defendants' alleged scheme to defraud.  *Cf. United States v. Angelilli*, 660 F.2d 23, 37 (2d Cir. 1981) (noting in the context of mail fraud that "'lulling mailings" may be "essential to the fraudulent schemes . . . where the frauds are not isolated and unrelated swindles" (citing *United States v. Ashdown*, 509 F.2d 793, 800 (5th Cir. 1975) ("[P]ost-purchase mailings which are designed to lull the victim into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect are mailings in furtherance of the scheme.")))[17]  As further examples, plaintiffs claim that Adamo overcharged Bain in connection with approximately twenty-five to fifty coin transactions and that he attempted to confiscate a coin from Albanese, just as Adamo purportedly had overcharged plaintiffs and confiscated Marini's Stella coin.  Accordingly, plaintiffs have put forth sufficient evidence to create a material issue of fact as to whether there was a pattern of racketeering, and, as such, defendants' motion for summary judgment on this ground is denied.[18]

---

[17] The Court also notes that plaintiffs here are not seeking to recover damages for any fraud allegedly perpetrated on Brancato and, instead, are putting forth allegations regarding Brancato solely to support their claim that Adamo engaged in a pattern of racketeering activity.  Accordingly, the cases cited by defendants for the proposition that a victim may not maintain a RICO cause of action where the victim has already been "made whole" by defendants with regard to losses (*see* Defs.' Mem. of Law at 23, n.6) are inapposite under these circumstances.

[18] The Court recognizes that only a limited number of defendants allegedly participated in the claimed scheme to defraud.  However, given that the Court must construe the facts and draw all reasonable inferences in plaintiffs' favor for purposes of defendants' motion, the Court

### 2. Causation

#### a. Legal Standard

RICO provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). "From this language, courts have extracted the conditions a plaintiff must meet to satisfy RICO's standing requirements: (1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767 (2d Cir. 1994) (internal quotation marks and citation omitted). As to the causation element, "the compensable injury flowing from a RICO violation necessarily is the harm caused by the predicate acts." *Hemi Grp., LLC v. City of New York, N.Y.*, --- U.S. ----, 130 S.Ct. 983, 991 (2010) (internal quotation marks, alterations, and citation omitted). To establish that a predicate act caused the harm alleged, a plaintiff must make two showings. *See UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010). First, the plaintiff must prove "but for" causation, "meaning that but for the RICO violation, [the plaintiff] would not have been injured." *Id.* (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)). Second, a plaintiff must establish proximate cause, "meaning 'there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct.'" *Id.* (quoting *First Nationwide*

*Bank*, 27 F.3d at 769); *accord Hemi Grp.*, 130 S.Ct. at 989 ("[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'" (quoting *Holmes*, 503 U.S. at 268)). In establishing the existence of a "direct relation between the injury asserted and the injurious conduct alleged[,] [a] link that is too remote, purely contingent, or indirect is insufficient." *Hemi Grp.*, 130 S.Ct. at 989 (internal quotation marks, alterations, and citations omitted). Moreover, "[a]n act which proximately caused an injury is analytically distinct from one which furthered, facilitated, permitted or concealed an injury which happened or could have happened independently of the act." *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F. Supp. 576, 587 (S.D.N.Y. 1995). "Thus, a predicate act cannot be deemed to have proximately caused a plaintiff's injury, even if it was an integral part of the underlying criminal scheme, unless the plaintiff's original loss could not have occurred without the commission of the predicate act." *Leung v. Law*, 387 F. Supp. 2d 105, 122 (E.D.N.Y. 2005).

#### b. Application

Plaintiffs allege that Adamo carried out his scheme through numerous purported acts of mail and wire fraud that allegedly occurred between 2002 and 2008. (*See generally* Predicates Catalog.) In particular, plaintiffs have alleged that Adamo engaged in fifty-five acts of mail fraud and 135 acts of wire fraud. (*Id.*) Defendants, however, contend that plaintiffs cannot prove that their injuries were caused by these predicate acts.

As an initial matter, the Court disagrees with plaintiffs that they need not show that the predicate acts themselves caused their

---

concludes that this factor does not outweigh the other considerations discussed *supra* and does not allow the Court to conclude, as a matter of law, that no reasonable jury could find that defendants' engaged in a pattern of racketeering activity, particularly in light of the substantial period of time over which defendants are alleged to have engaged in such racketeering activity.

injuries. (*See* Pls.' Opp. at 66-72.) As noted *supra*, the Supreme Court plainly stated in *Hemi Group* that "the compensable injury flowing from a RICO violation *necessarily is the harm caused by the predicate acts*." 130 S.Ct. at 991 (emphasis added) (internal quotation marks, alterations, and citation omitted); *see also id.* at 989 ("[T]o state a claim under civil RICO, the plaintiff is required to show that *a RICO predicate offense* 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'" (quoting *Holmes*, 503 U.S. at 268) (emphasis added)). Nevertheless, despite plaintiffs' misstatement of the law, the Court concludes that plaintiffs have presented sufficient evidence regarding their wire fraud allegations and their mail fraud allegations concerning the alleged confiscation of the Stella coin to survive summary judgment. However, the Court also concludes that plaintiffs cannot establish that the remaining alleged acts of mail fraud were the proximate cause of their injuries, and, therefore, plaintiffs are precluded from relying upon these acts to prove causation. Moreover, the Court concludes that any acts of alleged wire fraud that are based on intrastate communications fall outside the scope of RICO.

First, as to plaintiffs' mail fraud allegations, all but five of the purported acts of mail fraud involved either Adamo's receipt of coins that he later sold to Marini or Adamo's payment for such coins. Although Adamo's receipt and payment for coins is a "but for" cause of Marini's injuries—insofar as Adamo could not have sold these coins to Marini without first purchasing and possessing them—the Court concludes that these mailings are too attenuated from the ultimate sale of these coins to Marini to constitute the proximate cause of Marini's injuries. Indeed, plaintiffs' injury had nothing to do with the manner in which Adamo received or paid

for the coins that he sold to Marini, and there is no evidence that Marini either was involved in or even was aware of the transactions through which Adamo obtained the coins. Accordingly, while these acts of mail fraud may be used by plaintiffs to demonstrate a pattern of racketeering activity, plaintiffs may not rely upon these acts to demonstrate proximate cause. As to the other five alleged mail fraud predicates, two of them involved Adamo's alleged dealings with other victims or customers. (*See* Predicates Catalog: Mailings Qualifying as Mail Fraud, Predicate Acts 2-3.) Again, while these allegations relate to the demonstration of a pattern of racketeering activity, they clearly did not cause plaintiffs' injuries and, therefore, may not be used to show proximate cause. Further, as to plaintiffs' allegations that Adamo mailed coins *after* his repurchase of those coins at allegedly fraudulent prices from Marini (*see id.* Mail Fraud Predicate Acts 51-52), these mailings occurred after the transactions with Marini were completed, and Marini's loss—namely, his overpayment for coins—could have occurred without commission of these alleged acts. Accordingly, plaintiffs may not rely upon these acts to establish proximate cause. However, as to plaintiffs' allegation that Adamo mailed the Stella coin that he purportedly confiscated from Marini, the Court concludes that plaintiffs have put forth sufficient proof in order to survive summary judgment that this act proximately caused their injury. Specifically, plaintiffs claim that Adamo essentially stole this coin from Marini by taking possession of the coin and selling it without Marini's permission. Under these circumstances, the mailing of the coin to the dealer whom plaintiffs claim purchased the coin clearly was an integral part of the confiscation of the coin from plaintiffs without which the injury of Marini could not have been completed. Therefore,

plaintiffs may rely upon this alleged act of mail fraud in proving the existence of proximate cause.

As to the alleged acts of wire fraud, plaintiffs acknowledge that four faxes allegedly sent from Adamo to Marini were all sent and received in New York State. (Defs. 56.1 ¶ 26.) Accordingly, because intrastate communications fall outside the scope of RICO, *Cofacredit*, 187 F.3d at 243, plaintiffs may not rely upon these faxes in support of their RICO claim. Plaintiffs' remaining wire fraud allegations relate to payments made to defendants by plaintiffs, requests by defendants for such payments, and various communications between Adamo and Marini. As to the payment-related acts, defendants argue that these acts did not cause plaintiffs' injuries because these payments often were made after Adamo and Marini had agreed upon a price for the coin transaction in question. Conversely, defendants also argue that certain communications that contained proposals for deals cannot be the proximate cause of plaintiffs' injuries because those deals were only agreed to "after further conversation." (Defs. Mem. of Law at 39.) The Court disagrees with defendants' reasoning. As a threshold matter, even assuming that certain payments and requests for payments were made after price negotiations had occurred and a price had been finalized, these payments, and requests for such payments, clearly were an indispensible part of the alleged fraud without which plaintiffs' injury would not have occurred. Stated otherwise, if plaintiffs had not made such payments, the alleged purpose of defendants' fraud—namely, overcharging plaintiffs and defrauding them out of their money—would have been thwarted and plaintiffs would have suffered no injury at all. Likewise, plaintiffs' injury could not have occurred without Adamo's proposal to enter into other coin deals,

because had Adamo not proposed these deals, plaintiffs would not have purchased the coins in question and, consequently, would not have been injured. Indeed, carrying defendants' logic to its reasonable end, plaintiffs could establish proximate cause through wire fraud only if the communication in question represented the entirety of the negotiations and transaction between Adamo and Marini. In other words, under defendants' theory, an act of wire fraud could proximately cause plaintiffs' injury only if the act involved a proposal to do a deal, negotiations about the price of the deal, a finalized agreement, and the consummation of the deal through payment. That theory, however, is incorrect. As described *supra*, although "[a] link that is too remote, purely contingent, or indirect is insufficient" to establish proximate cause, *Hemi Group*, 130 S.Ct. at 989 (internal quotation marks, alterations, and citation omitted), a plaintiff may establish proximate cause where the "original loss could not have occurred without the commission of the predicate act." *Leung*, 387 F. Supp. 2d at 122. Based upon the current record, the Court concludes that a reasonable jury could find that plaintiffs' loss could not have occurred without their payments to defendants, defendants' requests for such payments, and Adamo's proposals of certain deals.

Plaintiffs also rely upon communications between Adamo and Marini that did not either result in or represent the culmination of specific coin transactions and, instead, involved proposed deals that may not have come to fruition, statements by Adamo to induce deals, fraudulently misrepresented coin values, or other fraudulent assurances by Adamo regarding the viability of the coin transactions. As with plaintiffs' other wire fraud allegations, a reasonable jury could conclude that these communications induced plaintiffs to continue making payments to

defendants and to otherwise continuing transacting with defendants, not only by purchasing coins but also by giving Adamo possession of the Stella coin in May 2008 for regrading.   Accordingly, accepting plaintiffs' evidence as true and drawing all reasonable inferences in plaintiffs' favor, the Court cannot conclude, as a matter of law, that plaintiffs are unable to establish that the alleged acts of wire fraud proximately caused their injury.   Therefore, defendants' motion for summary judgment on this ground is denied.[19]

---

[19] Defendants also argue that plaintiffs cannot establish "but for" causation because, according to defendants, "Marini began purchasing coins in September 2002, before **any** predicate RICO acts are alleged to have occurred."   (Defs.' Mem. of Law at 35 (emphasis in original).)   The Court disagrees.   As discussed *supra* in connection with the alleged acts of wire fraud, plaintiffs have put forth evidence that they made numerous payments to defendants beginning as early as September 2002.   (*See, e.g.*, Predicates Catalog: Wirings Qualifying as Wire Fraud, Predicate Acts 30-45.)   Again, as discussed herein, plaintiffs' injuries could not have occurred without these payments.   To the extent defendants argue that these payments do not constitute wire fraud because there is "no evidence that these transactions between parties with New York bank accounts involved interstate wires," (Defs.' Mem. of Law at 39), the Court concludes that plaintiffs have put forth sufficient evidence to create a disputed issue of fact on this point.   Specifically, plaintiffs have provided a sworn declaration from a former Bank of New York employee, who stated that all payments (whether wire or check) made or received by a Bank of New York account holder involved interstate wire transmissions.   (Moss Decl. Ex. A.)   Defendants remaining arguments regarding causation—including that the only reason Marini invested with Adamo was because of Adamo's initial assurances in 2002 and not because of any alleged predicates acts and that plaintiffs cannot establish that each and every coin transaction was caused by a predicate act—

### 3.  Enterprise

#### a.  Legal Standard

A RICO enterprise under Section 1961(4) includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."   18 U.S.C. § 1961(4).   An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct" which is "proved by evidence of ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."   *United States v. Turkette*, 452 U.S. 576, 583 (1981).   Where a complaint alleges an association-in-fact enterprise, courts in this Circuit look to the "hierarchy, organization, and activities" of the association to determine whether "its members functioned as a unit."   *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004) (citations and quotation marks omitted).

The Second Circuit has made clear that "the person and the enterprise referred to must be distinct," and, therefore, "a corporate entity may not be both the RICO person and the RICO enterprise under section 1962(c)."   *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994).   However,

---

all go to factual and credibility determinations that are inappropriate for the Court to make on a motion for summary judgment.   As outlined *supra*, construing the evidence and drawing all reasonable inferences in plaintiffs' favor, as the Court must on defendants' motion for summary judgment, plaintiffs have put forth sufficient evidence to create a disputed issue of fact regarding the cause of plaintiffs' injuries.   Accordingly, for the reasons set forth *supra*, defendants' motion is denied.

"[t]his does not foreclose the possibility of a corporate entity being held liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is *sufficiently distinct from itself*." *Id.* (emphasis added). Thus, "a defendant may be a RICO person and one of a number of members of the RICO enterprise." *Id.* (internal quotation marks omitted). Furthermore, an employee of a corporation is legally distinct from the corporation itself and therefore can function as a RICO person where the corporation is the alleged RICO enterprise. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001).

### b. Application

Here, plaintiffs have asserted that Adamo is the RICO person and that Adamo together with The Bolton Group is the enterprise. Defendants argue that, despite Bolton's incorporation under the laws of the New York, Bolton is not sufficiently separate and distinct from Adamo for it to be part of a RICO enterprise with Adamo.[20] The Court agrees with plaintiffs that the Supreme Court's decision in *Cedric Kushner* forecloses defendants' line of argument. Specifically, in *Cedric Kushner*, the plaintiff alleged that the president and sole shareholder of a closely held corporation was a RICO person who had conducted the corporation's affairs through a pattern of racketeering activity. In

---

[20] Defendants have also moved for summary judgment on the RICO claim with regard to defendant Lisa Adamo, arguing that Lisa Adamo was not part of any RICO enterprise. Plaintiffs acknowledge, however, that Lisa Adamo was not part of any alleged RICO enterprise and, in fact, Lisa Adamo in not named as a defendant in connection with the RICO count in the Second Amended Complaint. Accordingly, the Court need not reach defendants' arguments with regard to Lisa Adamo.

overturning the Second Circuit's decision that the president was not separate from the corporation, and in holding, instead, that the president and the corporate enterprise were distinct for purposes of the RICO analysis, the Supreme Court explained:

> While accepting the "distinctness" principle, we nonetheless disagree with the appellate court's application of that principle to the present circumstances—circumstances in which a corporate employee, acting within the scope of his authority, allegedly conducts the corporation's affairs in a RICO-forbidden way. The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more "separateness" than that.

533 U.S. at 163 (internal quotation marks and citations omitted). Furthermore, the fact that the individual defendant was the sole owner of the corporation did not change the Court's conclusion:

> Linguistically speaking, an employee who conducts the affairs of a corporation through illegal acts comes within the terms of a statute that forbids any "person" unlawfully to conduct an "enterprise," particularly when the statute explicitly defines "person" to include "any individual . . . capable of holding a legal or beneficial interest in property," and defines "enterprise" to include a "corporation." 18 U.S.C. §§ 1961(3), (4). And, linguistically speaking, the employee and the corporation are different "persons,"

even where the employee is the corporation's sole owner. After all, incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs.

*Id.* (citations omitted). Similarly, in this case, plaintiffs have alleged that a corporate employee (Adamo) is the "person" and the corporation, with Adamo, is the "enterprise." The fact that Bolton was co-owned and controlled by Adamo and that Bolton did not have a website, email address, or phone number are not controlling here, where it is undisputed that Bolton has been incorporated as legally separate identity from Adamo. Indeed, defendants have not presented a single case to support their argument that Bolton is not sufficiently distinct from Adamo, despite Bolton's incorporation under the laws of the State of New York.[21]

---

[21] The Court also notes that, as was the case in *Cedric Kushner*, the allegations here are distinguishable from the factual circumstances of other Second Circuit decisions in which a corporate defendant "person" was found not to be distinct from the corporate "enterprise." As explained in *Cedric Kushner*:

> [T]hat precedent involved quite different circumstances which are not presented here. This case concerns a claim that a corporate employee is the "person" and the corporation is the "enterprise." It is natural to speak of a corporate employee as a "person employed by" the corporation. § 1962(c). The earlier Second Circuit precedent concerned a claim that a corporation was the "person" and the corporation, together with all its employees and agents, were the "enterprise." *See Riverwoods Chappaqua Corp. v. Marine Midland*

Moreover, defendants' arguments that Bolton "merely served as an incidental bank account" and "as a separate entity did nothing to Marini" (Defs. Mem. of Law at 45) require the Court to make credibility determinations about the parties' respective evidence that are inappropriate for the Court to make on a motion for summary judgment. Plaintiffs here have presented sufficient factual proof, including evidence that Bolton received payments from plaintiffs, from which a rational jury could conclude (if all plaintiffs' evidence is credited) that Adamo conducted the affairs of the enterprise through a pattern of racketeering activity. In short, drawing all reasonable inferences in plaintiffs' favor, the Court cannot conclude, as a matter of law, that no reasonable jury could find that a RICO enterprise existed in this case. Accordingly, defendants' motion for summary judgment on this ground is denied.

---

> *Bank, N. A.*, 30 F.3d 339, 344 (1994) (affirming dismissal of complaint). It is less natural to speak of a corporation as "employed by" or "associated with" this latter oddly constructed entity. And the Second Circuit's other precedent also involved significantly different allegations compared with the instant case. *See Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 89 (1999) (affirming dismissal where plaintiff alleged that same bank was both "person" and "enterprise"), *cert. denied*, 528 U.S. 1188 (2000); *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (1996) (involving complaint alleging that corporate subsidiaries were "persons" and subsidiaries, taken together as parent, were "enterprise"), *vacated on other grounds*, 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998); *Bennett [v. United States Trust Co. of New York*, 770 F.2d 308, 315, and n. 2 (2d Cir. 1985)], (same as *Anatian*).

533 U.S. at 164.

## C.  State-Law Claims

Defendants have also moved for summary judgment on plaintiffs' claims for common law fraud, breach of contract, and violations of New York General Business Law § 349.  For the reasons set forth *infra*, the Court grants defendants' motion with respect to the General Business Law claim, but denies the motion with respect to the fraud and breach of contract claims.

### 1.  Common Law Fraud

Defendants have moved for summary judgment on plaintiffs' fraud claim to the extent that this claim seeks punitive damages.  Specifically, defendants argue that plaintiffs' case is, in actuality, premised on a contractual agreement between Adamo and Marini "under which Adamo would choose coins for Marini to buy at their current value plus a 5% to 10% commission," (Defs.' Reply at 40), and that, as such, plaintiffs' punitive damages claim must be dismissed, because punitive damages are not available in breach of contract cases without a requisite showing of fraud aimed at the public generally, a showing that defendants contend plaintiffs are unable to make here.  (*See* Defs.' Mem. of Law at 53-54; Defs.' Reply at 40-43.)

As an initial matter, the Court notes that defendants have correctly pointed to a line of cases under New York law which have held that punitive damages are not available for fraud claims arising from a contractual relationship between the parties.  *See Rocanova v. Equitable Life Assur. Soc'y*, 634 N.E.2d 940, 943 (N.Y. 1994) ("Punitive damages are not recoverable for an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights."); *see generally United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 160-61 (2d Cir. 1996) ("Generally, punitive damages are not available for a breach of contract. . . Thus, a private party seeking to recover punitive damages must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally." (internal quotation marks and citations omitted)).  However, the Court concludes that these cases are inapposite to the fraud claims here, in support of which plaintiffs have put forth evidence of fraudulent misrepresentations that extend far beyond any alleged contractual agreement between the parties.  Indeed, plaintiffs' breach of contract claim focuses solely on Adamo's alleged agreement to repurchase coins from Marini within twenty-four to forty-eight hours of such a request from Marini.  (*See* SAC ¶¶ 240-46.)  This alleged conduct represents only a small subset of the business relations and transactions that plaintiffs claim were fraudulent in this case.  Accordingly, plaintiffs' motion for summary judgment with respect to the fraud claim is denied.

### 2.  General Business Law § 349

New York General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."  N.Y. G.B.L. § 349(a) (McKinney's 2004); *accord Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995).  Under this provision, "the gravamen of the complaint must be consumer injury or harm to the public interest," and, as such, "[t]he critical question . . . is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer or a competitor."  *Securitron Magnalock*, 65 F.3d at 264 (internal quotation marks and citation omitted).  Accordingly, to state a claim under Section 349, a plaintiff must

allege, *inter alia*, "that defendants engaged in a consumer-oriented act," a requirement that "has been construed liberally." *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002) (internal quotation marks and citations omitted). "Based on this standard, courts have found sufficient allegations of injury to the public interest where plaintiffs plead repeated acts of deception directed at a broad group of individuals." *Id.* (collecting cases).

In this case, plaintiffs have proffered no evidence that defendants' scheme was aimed at the public generally. For example, plaintiffs have not put forth any evidence that defendants maintained a website, circulated marketing materials, or made other efforts to make misrepresentations to the public generally, or even to a broad group of people. In the absence of any allegations or factual proof that defendants' engaged in consumer-oriented activity within the meaning of the statute, plaintiffs cannot survive defendants' motion for summary judgment on this claim. Accordingly, plaintiffs' General Business Law § 349 claim is dismissed.

### 3. Breach of Contract

Defendants argue that plaintiffs' breach of contract claim must be dismissed because plaintiffs' have not produced sufficient evidence of their damages. Specifically, defendants' contend that plaintiffs' expert's sworn statement that, because of market fluctuations, "many of the coins . . . [in plaintiffs'] collection may have a current market value that is below their peaks of just a few years ago," (Parrella Decl. Ex. A at 2) is insufficient to create a triable issue of fact. The Court, however, disagrees and finds that defendants' argument would require the Court to make credibility determinations regarding plaintiffs' expert's testimony that are not appropriate on a motion for summary judgment. The statement of plaintiffs' expert is sufficient to create a genuine issue of material fact on damages that precludes summary judgment, and, accordingly, defendants' motion for summary judgment on this claim is denied.

### IV.  Conclusion

For the reasons set forth herein, defendants' motion for summary judgment is denied with respect to plaintiffs' securities fraud, RICO, and state-law fraud and breach of contract claims. Defendants' motion is granted, however, with respect to plaintiffs' General Business Law claim.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Date:   September 26, 2011
         Central Islip, NY

\* \* \*

Plaintiffs are represented by Paul A. Brancato, 106-43 157th Street, Jamaica, NY 11433, and by Marianna Moss and Scott A. Moss, 7775 E 28th Avenue, Denver, CO 80238. Defendants are represented by Andrew Seth Harris and Samuel Lucien Butt of Schlam Stone & Dolan LLP, 26 Broadway, New York, NY 10004, and by Leonard Sclafani, Leonard A. Sclafani, P.C., 18 East 41st Street, 15th Floor, New York, NY 10017.