# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————————

№ 08-CV-3995 (JFB) (ETB)

———————————————

ROCCO MARINI, JOSEPHINE MARINI, AND T&R KNITTING MILL, INC.,

Plaintiffs,

VERSUS

HAROLD ADAMO, JR., LISA ADAMO, THE BOLTON GROUP, INC., AND H. EDWARD
RARE COINS & COLLECTIBLES, INC.,

Defendants.

———————————————

**MEMORANDUM AND ORDER**
February 6, 2014

———————————————

JOSEPH F. BIANCO, District Judge:

Plaintiffs Rocco Marini ("Marini"), Josephine Marini ("Mrs. Marini"), and T&R Knitting Mill ("T&R")[1] (collectively, "plaintiffs") bring this action against Harold Adamo, Jr. ("Adamo"), Lisa Adamo ("Mrs. Adamo"), The Bolton Group, Inc. ("Bolton"), and H. Edward Rare Coins & Collectibles, Inc. ("H. Edward") (collectively, "defendants"), asserting claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), as well as claims of fraud, breach of fiduciary duty, unjust enrichment, and money had and received under New York common law. From 2002 to 2007, plaintiffs purchased or traded for eighty-six rare coins from Adamo. In 2008, plaintiffs discovered that these coins were worth significantly less than what they had paid for them. Plaintiffs allege that Adamo did not simply overcharge them for these items, but that Adamo committed fraud and other illegal actions over the course of their business relationship. Plaintiffs seek recovery of their out-of-pocket economic loss of $11,304,709, plus interest, as well as punitive damages in an amount equal to their out-of-pocket loss.

Having held a bench trial, the Court now issues its findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure, and concludes, after carefully considering the evidence introduced at trial, the arguments of counsel,

---

[1] Defendants argue that T&R should be dismissed from this action because plaintiffs claim that T&R never owned any coins and never purchased any coins. (Defs.' Mem. at 25.) However, plaintiffs make clear that T&R is only a plaintiff because defendants declined to stipulate that all coins purchased by Marini with T&R funds were actually on behalf of Marini. (Pls.' Mem. at 107.) Because it now appears that defendants have abandoned that argument, and because the testimony at trial demonstrated that all coins bought using T&R funds were actually on behalf of Marini, T&R is dismissed from this action with no effect on plaintiffs' recovery.

and the controlling law on the issues presented, that plaintiffs have met their burden of proof on all of their claims against defendants Adamo, H. Edward, and Bolton, including meeting their burden of proof under the "clear and convincing evidence" standard required to prove each element of the common law fraud claim. Specifically, the Court finds that plaintiffs have proven that they are entitled to the following relief: (a) Adamo, H. Edward, and Bolton are liable for violations of the Exchange Act, but the Court is requesting supplemental briefing on the issue of damages on this claim;[2] (b) Adamo, H. Edward, and Bolton are liable for $11,304,079 in compensatory damages for committing common law fraud; (c) Adamo is liable for $11,304,079 in compensatory damages for violations of the breach of fiduciary duty; and (d) Adamo, H. Edward, Bolton, are liable for $11,304,079 in compensatory damages for unjust enrichment and money had and received. Plaintiffs are also entitled to pre-judgment and post-judgment interest. However, the Court, in its discretion, declines to award punitive damages.

As set forth in detail below, plaintiffs presented overwhelming evidence that Adamo defrauded Marini by making a series of false and material misrepresentations in order to induce Marini to buy numerous coins from Adamo, for investment purposes, at grossly inflated values over a period of several years. For example, Adamo purchased a 1988 $1 Morgan Silver Dollar in April 2003 for $200, and then sold that same exact coin to Marini in December

2003 for $100,000. Among Adamo's fraudulent oral misrepresentations to induce Marini to purchase coins were the following: (1) Adamo would be buying the same coins as Marini; (2) the coins were liquid and Marini could sell his coins within 24 to 48 hours; and (3) Adamo would only charge a small commission on each coin. Adamo knew these and other material statements were false when he made them. Adamo was able to perpetuate the fraud for several years, and induce Marini to buy additional coins usually at grossly inflated prices, by sending Marini written coin statements that contained false values for Marini's coins. The oral false statements, as well as the false values in the written coin statements, were material and reasonably relied upon by Marini. In reaching its verdict, the Court has carefully examined all of the evidence, including the credibility of each of the witnesses based upon their demeanor, and their answers to the questions in light of all of the evidence in the case. Mr. Marini's testimony was highly credible on each and every one of the key elements of the case and was often corroborated extensively by other evidence in the case, such as coin statements from Adamo, e-mails, taped recordings with Adamo, and wire records and checks. Marini testified that, in addition to the more than $11 million that Marini paid to Adamo for coins through checks and wire transfers, he also paid Adamo approximately $4.7 million in cash. Although Adamo vigorously disputed that such cash was provided to him, the Court found Marini's testimony on that issue to be fully credible in light of his demeanor and all the evidence in the case. In contrast, Adamo's testimony on each of the key issues was lacking in credibility based not only on his demeanor, but also based upon the internal inconsistencies in his testimony over time, the fact that much of his testimony was contradicted by other credible

---

[2] Although the Court concludes that Adamo, H. Edward, and Bolton are liable for violations of the Exchange Act, the Court needs supplemental briefing to determine the amount of damages because (as discussed *infra*) the Court has determined that, under the statute of repose, plaintiff can only recover on that particular claim for damages for any transactions that occurred on or after September 30, 2003.

evidence in the case, and the fact that his testimony defied common sense in many instances. In short, the credible evidence offered by plaintiffs overwhelmingly proved their claims against Adamo, H. Edward, and Bolton, including compensatory damages in the amount of $11,304,079.

With respect to the claims against Mrs. Adamo for unjust enrichment, as well as money had and received, the Court concludes that supplemental briefing is necessary to assist the Court in determining whether liability exists and, if so, the amount of such liability.

## I.   BACKGROUND

On September 30, 2008, plaintiffs filed their complaint alleging violations of the Exchange Act, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, as well as various causes of action under state law. Plaintiffs filed an amended complaint on October 17, 2008. On November 28, 2008, defendants filed a motion to dismiss, and the Court denied that motion on February 13, 2009. Defendants answered the complaint on March 2, 2009. After the completion of some discovery, plaintiffs filed a second amended complaint on June 22, 2010, and defendants answered on July 22, 2010.

On October 16, 2010, defendants moved for partial summary judgment on plaintiffs' securities fraud and RICO claims, as well as on plaintiffs' state law fraud, breach of contract, and New York General Business Law § 349 claims. On September 26, 2011, the Court granted defendants' motion with respect to the General Business Law claim, but denied the motion with respect to all other claims.

On April 11, 2012, the Court so-ordered a stipulation between the parties in which

defendants agreed that the transactions at issue in this case constituted "securities" under the Exchange Act, and, in exchange, plaintiffs dismissed the RICO claim. (ECF No. 156.)

The Court held a bench trial beginning on October 22, 2012, and continuing over twelve days of testimony.[3] The Court heard closing statements from both parties on April 12, 2013. Both sides submitted exhibits to be considered by the Court—including excerpts of depositions—as well as post-trial proposed findings of fact and conclusions of law.

The Court has fully considered all of the evidence presented by the parties, as well as their written submissions. Below are the Court's Findings of Fact and Conclusions of Law.

## II.   FINDINGS OF FACT

The following section constitutes the Court's Findings of Fact[4] pursuant to Federal Rule of Civil Procedure 52(a)(1). These Findings of Fact are drawn from witness testimony at trial and the parties' trial exhibits.

### A.   Marini's Cash Earnings

Marini began buying and selling "irregular" sweaters at flea markets in 1978, when he was 15 years old. (Tr. at 773-76.) Marini then transitioned to supplying these sweaters to flea market and street sellers at wholesale. (*Id.* at 776-77.) Marini began generating significant revenue from this enterprise, and the payments were

---

[3] Both sides consented to a bench trial. (*See* Joint Pretrial Order ("PTO"), ECF No. 200, ¶ 5; Letter Consenting to Pls.' Request for a Bench Trial, June 20, 2012, ECF No. 171.)

[4] To the extent that any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law, and vice-versa.

"primarily cash." (*Id.* at 780.) Marini testified that by his early twenties, he had "generated $5 million of cash." (*Id.* at 821.) As stated *infra*, Marini used this cash to partially fund his purchases of coins.

Defendants vigorously dispute Marini's version of events regarding the "cash hoard" story in their post-trial submissions, labeling it a "ridiculous [] fabrication" "from beginning to end." (Defs.' Mem. at 8.) However, the Court finds Marini's testimony regarding the cash credible, and defendants have introduced no credible evidence to dispute plaintiffs' evidence besides baseless accusations.

In 1984, Marini and his father founded T&R. (Tr. at 362). Marini is currently the sole shareholder of the corporation. (*Id.* at 888.)

### B.  Adamo the Coin Dealer

Adamo is employed as a buyer and seller of rare coins and collectibles (*id.* at 1195) and is extremely knowledge about rare coins (*id.* at 1203-06). Adamo founded H. Edward and Bolton and uses those companies to sell rare coins. (*Id.* at 1195.) Adamo and his wife Mrs. Adamo are the sole owners and directors of Bolton and H. Edward; Adamo is the President of H. Edward and Bolton, while Mrs. Adamo is the Vice President of H. Edward. (*Id.* at 1195-98.) The parties agree that Mrs. Adamo did not sell plaintiffs any coins or make any representations regarding the value of coins.[5]  (JPTO ¶ 17.)

### C.  The Parties' Friendship and the Beginning of the Coin Purchases

Mrs. Marini met Mrs. Adamo in May of 1992 when they both lived on the same block in Manhasset Hills, New York. (Tr. at 353, 999.) The Marinis and the Adamos became close friends; they are godparents to each other's children. (*Id.* at 383, 514.) The families spent considerable time socializing with one another and traveling together. (*Id.* at 383, 1000.)

In 2002, approximately ten years after they became friends, the Adamos surprised the Marinis by unexpectedly joining them during a Caribbean vacation. (*Id.* at 384-85.) During the vacation, Marini and Adamo began discussing a coin transaction Adamo recently completed. (*Id.* at 387-89, 1217-18.) Marini expressed interest in investing in coins with Adamo. (*Id.* at 389, 1218.)

In August 2002, Adamo encouraged Marini to purchase coins through him during a breakfast at the Seacrest Diner. (*Id.* at 389.) Marini credibly testified that Adamo made the following representations during this conversation or in the days following this meeting:

- Marini would be purchasing coins at the "dirt bottom" (*id.* at 389), and they were "poised to rise in value" (*id.* at 392).
- Marini would be buying the "same coins" Adamo purchases for himself (*id.* at 393, 395), and their "investment portfolio[s] would be pretty much identical" (*id.* at 439).
- Marini "[could not] go wrong with" these coins because "they were the top one percent of one percent." (*Id.* at 393.)
- Adamo had "never seen these kinds of coins go down." (*Id.* at 394.)

---

[5] However, Mrs. Marini testified that she witnessed Mrs. Adamo use a corporate credit card to pay for lunch on at least one occasion and that Mrs. Adamo spent her husband's money. (*Id.* at 1010.)

- The coin market had gone up "300 percent in the past" and was "poised to repeat itself in the next 5, 10, 15 years" (*id.* at 390), with investment "potential" of "20 to 30 percent" (*id.* at 407).[6]
- The coin purchases were investments. (*Id.* at 393.)
- The coins were liquid and Marini "could get out in 24 to 48 hours at the current price." (*Id.* at 397.)
- Adamo would only charge a "small commission." (*Id.* at 395.)

Adamo asked Marini that he only sell coins through Adamo. (*Id.* at 878.) Marini never bought coins from anyone besides Adamo and never sold coins to anyone other than Adamo until after their relationship ended. (*Id.* at 611). In addition, Marini never selected any coins; he solely relied on the advice and representations of Adamo regarding which coins to buy. (*Id.* at 447.) Moreover, although Marini clearly bought coins directly through Adamo, Adamo also admitted that he sold Marini coins through his two corporations, Bolton and H. Edward. (*See id.* at 1195-96.)

In September 2002, Marini purchased his first coin from Adamo, an 1879 Flowing Hair Stella, grade PR-64 Cameo. (*Id.* at 397-98.) Two weeks later, Marini purchased another Stella and a 1776 Silver dollar. (*Id.* at 402.) Adamo advised Marini that he purchased himself a Stella at the same time. (*Id.*) Approximately a week later, Marini purchased more coins from Adamo. (*Id.* at 403.) In the first two months of this relationship, Marini spent $1,665,000 on coins. (PX9 at 1.)

In May 2003, Adamo recommended that Marini sell one of his coins, a 1937-D Buffalo nickel that Marini purchased from Adamo seven months earlier. (Tr. at 477, 932.) Marini credibly testified that Adamo stated, "I'm strongly advising you to sell. I'm selling my coin, you should sell yours as well." (*Id.* at 932.) Marini sold the coin back to Adamo for a profit of $180,000. (*Id.* at 477.) This was not the only coin that Adamo bought back from Marini resulting in a profit for plaintiffs. In 2002, Marini bought a 1915 $50 round NGC MS65 from Adamo for $135,000. (*Id.* at 1376; PX2 at PL508.) In 2008, Adamo purchased the coin back from Marini for $200,000. (Tr. at 1322, 1376.) However, records indicate that Adamo actually sold that coin to another entity for $125,000. (PX 33 at CAMI34.) As discussed in more detail *infra*, plaintiffs allege that this practice of occasionally giving Marini a significant return on his investment was a misrepresentation intended to induce plaintiffs to purchase more coins.

D.  Coin Statements and False Valuations

In late 2002, after Marini purchased the first three coins, Marini requested documentation memorializing which coins he owned and their value. (Tr. at 408.) Adamo testified that the reason he prepared these coin statements, and did not provide invoices after each coin purchase, was because Marini told him that he did not want invoices. (*Id.* at 1238 (Adamo: "[Marini] said he didn't want any kind of paper trail.").)

In any event, it is undisputed that Adamo created coin statements for Marini. These statements were rudimentary lists that contained the type of coin, its grade, and its value. (*See* PX2.) The value was expressed in a basic code, represented by the term "POINT BREAK." In this code, P=1, O=2, I=3, N=4, T=5, B=6, R=7, E=8, A=9, and

---

[6] Although plaintiffs also claim that Adamo promised Marini "20 to 40 percent returns plus" if he invested (Pls.' Mem. at 9), such testimony was from a 2009 deposition and was contradicted by Marini's representation at trial that the investment "potential" was "20 to 30 percent" (Tr. at 407).

K=0. (*See, e.g.*, Tr. at 411-12, 1253-54, 1475.) For example, PTK next to a coin meant that the coin was worth 150. During the trial, the parties strongly contested how to translate the code into a dollar value, *i.e.*, whether PTK represented $150, $1,500, $15,000, or $150,000. Marini testified that the code always represented a price in thousands (*id.* at 414), while Adamo stated that the value varied depending on the coin, and that only he knew how many zeros to add that represented an accurate value for the coin (*id.* at 1254-55). At trial, defendants introduced testimony from Adamo that attempted to demonstrate that this variability in what the code represented meant that Marini did not purchase nearly the dollar value in coins that he claimed he did. (*See id.* at 1255-59, 1281-82. *Compare id.* at 1254 (Adamo testified that for some coins he added double letters or omitted Ks), *with id.* at 1335 (Adamo testified that for some coins the code was as Marini represented it).) For example, Adamo stated that a coin listed on the coin statement for ONK (representing $240,000 according to Marini) was actually bought by Marini for just $24,000. (*Id.* at 1256.)

However, the documentary evidence overwhelmingly corroborates Marini's credible testimony. For example, the code on the coin statement for the first coin purchased (the 1879 Stella) is PKK. (PX2 at PL508.) Plaintiffs introduced evidence demonstrating that Marini paid for the coin with a check for $100,000. (PX8 at PL918.) In addition, e-mails between the parties confirm some of plaintiffs' code to price conversions. (*Compare* PX1 at PL3676 (e-mail from Adamo to Marini stating that the cost of the 1793 S-1 Chain Cent Ameri. was "150"), *with* PX2 at PL516 (coin statement listing the price of that coin as PTK, *i.e.* 150).) A secretly recorded conversation between Marini and Adamo also confirms Marini's interpretation. (*Compare* PX48 at

PL1062 (Adamo states that Marini paid "$830,000" in "cash" for the 1933 $10 MS65 coin), *with* PX2 at PL562 (coin statement lists that code as EIK, *i.e.*, 830).) Although defendants attempt to explain this evidence away due to the nature of their argument, *i.e.*, that PKK *could* equal $100,000 but did not *have* to equal $100,000, the numerous corroborations of the consistent code conversion, combined with all of the evidence at trial (including Marini's credible testimony), support plaintiffs' assertions regarding the code.

At trial, in an attempt to prove that Marini did not pay as much for the coins as he claimed, defendants introduced an exhibit in which Adamo "corrected" the prices that Marini paid. (*See* DX69.) This exhibit was created for purposes of the trial. For some coins, Adamo admitted that the prices paid were what Marini claimed, while for others the price of the coin was reduced by a factor of 10 or 100 to coincide with Adamo's explanation regarding the code. For other coins, Adamo stated that Marini did not actually pay him for the coins, but that they were part of a trade. However, this exhibit is merely a summary of testimony that Adamo gave, which was not credible and not supported by any documentary evidence.

The lack of credibility in Adamo's testimony is further demonstrated by inconsistencies within his sworn statements. For example, at one deposition, Adamo stated that he changed the code frequently. (PX54, Dep. of Harry Adamo, Nov. 11, 2009 at 92.) However, at another deposition, Adamo testified that he had been using the same system for twenty years. (PX54, Dep. of Harry Adamo, June 23, 2009 at 249.)

After reviewing all of the evidence and the demeanor of the witnesses, the Court finds Marini's testimony credible and Adamo's testimony not credible, and that

the code always represented a value in the thousands, and represented the amounts to which Marini testified.

The coin statements that Adamo created for Marini consistently showed an increase in the value of plaintiffs' collection. As of the November 2005 statements, plaintiffs had invested approximately $13,054,000 in coins and Adamo had valued the collection at $19,133,000. (PX2 PL536-10 – PL536-18; *see also* PX9 (plaintiffs' summary exhibit listing all payments made to defendants).) As of March 2006, Adamo valued Marini's coin collection at $21,764,000, an average increase of 32% over the purchase price. (PX2 at PL537 – PL545.) By September 2006, it was valued at $25,865,000. (PX2 at PL546 – PL554.)

The Court finds that Adamo overcharged Marini for many coins *and* affirmatively misrepresented the value of the coins on these coin statements.[7] There are many examples of excessive markups, including the following: In December 2002, Marini purchased an 1880-S Morgan Dollar with a grade of MS-69 from Adamo for $250,000. (PX2 at PL516.) Just one month later, Adamo purchased the same coin in the same grade from a dealer for just $33,500. (PX41 at DEF435.) The unrebutted, credible testimony of one of plaintiffs' experts, discussed more fully *infra*, is that this coin

was worth $50,000 in 2002. (PX29 at 10.) In February 2003, Marini purchased a 1918/7-S Standing Liberty 25 cent coin for $110,000 from Adamo (PX2 at PL517), while Adamo purchased the same coin in the same grade that month for just $13,000 (PX41 at DEF433). One of plaintiffs' experts credibly testified that this coin was worth only $18,500 in 2003. (PX29 at 15.) In addition, the highest markup of all occurred when Adamo purchased a 1888 $1 Morgan Silver Dollar in April 2003 for $200 (PX40 at WEIN3), and then sold that same exact coin to Marini in December 2003 for $100,000 (PX2 at PL536-7). Through discovery, plaintiffs were able to ascertain Adamo's purchase price for 36 coins that he later sold to Marini; 35 of the 36 coins had a markup of at least 50%, 32 of the 36 coins had a markup of at least 100%, and 12 of the 36 coins had a markup of at least 1000%. (*See* PX5.) The coin statements reflect the inflated value of all the coins. (*See, e.g.*, PX2 at PL516 (listing coin as costing $375,000 when plaintiffs' expert places the value at the time of purchase at $62,200).)

Adamo also made oral statements to corroborate the misrepresentations on the coin statements. For example, Marini paid $575,000 for a 15-piece Indian set. (Tr. at 495-96; PX2 at PL530.) Adamo later valued the set at $700,000 (PX2 at PL530), then $750,000 (*id.* at PL536-7), and then $800,000 (*id.* at PL536-16). Adamo told Marini when he bought it "this is a great set. It is already moving in value." (Tr. at 495.) However, Adamo bought this set for just $61,500 (PX41 at DEF 429-30), and plaintiffs' expert credibly valued the set at $62,400 (PX29 at 18-19).

Plaintiffs' allegations are also confirmed by e-mails between the parties. For example, in March 2003, Marini paid $150,000 for a 1793 Chain Cent Ameri. Coin. (PX2 at PL516.) In a September 28, 2006 e-mail,

---

[7] As discussed more fully in the Conclusions of Law, that an individual is charged an excessive markup for a coin does not, by itself, result in a finding of securities fraud and common law fraud. However, the Court finds that the markup in this case constitutes fraud because, *inter alia*: (1) defendants stipulated that the coins were securities and Adamo, as a dealer of securities, could not charge an excessive markup absent adequate disclosures, (2) Adamo made affirmative representations that he would only charge Marini a small commission; and (3) Adamo's misrepresentations regarding the *value* of the coins, and not simply the price paid, induced further purchases.

Adamo told Marini that the cost of this coin was "150" and that the current value was "200," clearly representing $150,000 and $200,000 respectively. (PX1 at PL3676.) Plaintiffs' expert credibly estimated that the 2003 value was just $30,500. (PX29 at 3.)

These are just some of the many examples that demonstrate that Adamo made affirmative misrepresentations regarding the valuation of coins, not simply that he charged Marini a higher price than other dealers would have. Adamo used the coin statements, as well as e-mails and oral statements, to reinforce to Marini the falsehood that these coins were worth a market price far above their true value.

E.   Amount Paid for Coins

The parties stipulated that plaintiffs paid $11,633,404.39 for coins, supported by wires and checks from plaintiffs to defendants that were produced during discovery.[8] (PTO ¶ 7.) Plaintiffs allege that they actually paid defendants $12,123,404 for coins through wires and checks. The difference in the figures is that plaintiffs claim that Marini's mother wrote Adamo a check for $415,000 in 2006, although no record of this check could be produced during discovery. (Tr. at 1008.) Plaintiffs also claim that in early 2005 Marini took a principal check that Jay Yackow brought back to him for $75,000 and signed it over to Adamo. (Id. at 732-33.) After weighing the credibility of the testimony, as well as the fact that these payments are supported by the total amount paid as detailed in the coin statements, the Court finds that plaintiffs paid defendants $12,123,404 in checks and wires for coins.

One of the critical factual disputes at trial centered on how much cash was used to fund coin purchases. Marini testified that he paid Adamo approximately $4.7 million in cash for rare coins. (Tr. at 667.) According to Marini, Adamo asked Marini to pay for some older coins in cash in order to motivate collectors to sell. (Id. at 731.) Marini stored the cash in a safe at his parents' home. (Id. at 724-25.) Marini testified that on one occasion, he delivered a large amount of cash (approximately $1.34 million) to Adamo in "glossy shopping bags." (Id. at 729.) Marini stated that he brought the shopping bags into the garage and that he and Mrs. Adamo made small talk while Adamo counted the money. (Id. at 730.)

Defendants spent a considerable portion of the trial attempting to discredit plaintiffs' assertions regarding the amount of cash Marini used to purchase coins. They argued that: (1) Marini could not possibly have accumulated $5 million in cash from the flea market wholesale business; (2) Marini could not and would not have kept $5 million in cash in his parents' house; (3) even if Marini had such a large amount of cash, no one could possibly fit and carry $1.34 million of U.S. currency into shopping bags.[9] To

_____

[8] Discovery actually produced $11,658,404.39 in checks and wires paid to defendants, but plaintiffs admitted that $25,000 of that money was for the purchase of watches. (PTO ¶ 7; Tr. at 734-35.)

[9] With respect to the last point, defendants argued at trial that Marini could not possibly carry $1.34 million in U.S. currency in shopping bags given the weight of such money. The Court rejects that argument based upon the credible evidence, including Marini's testimony, regarding the amount of cash given to Mr. Adamo. Specifically, Marini testified during the trial that the cash he brought to Adamo was primarily composed of $100 bills, although the bags contained other denominations as well. (See Tr. at 729.) Although defendants read portions of Marini's depositions in which he stated that he could not recall the exact denominations of currency that he brought to Adamo on this important occasion (Tr. at 864), the Court credits the trial testimony in light of Marini's demeanor and the other evidence in the record, including the recorded conversation with Adamo. If the $1.34 million dollars was comprised of $100 bills, the cash would weigh approximately

support their accusations, Adamo testified that he only received $55,000 in cash from Marini. (*Id.* at 1200.) In addition, Mrs Adamo rejected Marini's version of the events regarding the cash delivery, and stated that she never saw Marini giving her husband cash in their garage. (*Id.* at 1588-89.)

To corroborate their assertion regarding the amount of cash used, plaintiffs introduced a conversation Marini surreptitiously recorded with Adamo after Marini had discovered the fraud, but had not yet told Adamo of his knowledge. During the conversation, Marini asked Adamo to repurchase some of the coins with cash:

> Marini: Even if it's still, I don't know if you still have some of the cash that we did, I could sell back in cash, because I can do that in cash, as well.
>
> Adamo: No, that all went. I don't keep that. I have no use for it.
>
> Marini: You burned through five million dollars?
>
> Adamo: Whatever it was it's gone. That was gone years ago.
>
> Marini: Oh s***. I thought the . . .

---

29.5 pounds, which certainly could be placed in several shopping bags. (*See* Tr. at 844 (parties stipulate that the Court may take judicial notice of the fact that 454 bills of U.S. currency equals one pound).) Even with some portion of the currency in lower denominations, the Court does not conclude that Marini's testimony is lacking in credibility because of the weight of the money. In short, after considering this issue, the credibility of the witnesses, and the other evidence demonstrating that Adamo received over $4.6 million in cash, the Court finds Marini's testimony regarding the amount of the cash given to Adamo to be credible.

> Adamo: No I just move it from widget to widget, from me to you to somebody else. That's not something I would hold. First of all, where are you going to put it? You know Zurich's out again.

(PX 48 at PL1083.)

Additional support for plaintiffs' argument is that the purchase price for the coins as totaled by the coins statements exceeds the amount of checks and wires that were produced during discovery. For example, in just the first five months of the parties' transactions, the coin statements show that Adamo sold Marini approximately $5.3 million in coins (*see* PX2 at PL510-511), while discovery only produced approximately $2.25 million in checks and wires being paid from plaintiffs to defendants (*see* PX9).

Defendants tried to demonstrate that the documentation regarding coin prices is not an accurate reflections of how much Marini paid per coin because some prices were for sets of coins. For example, Adamo testified that when he wrote that the price for the 1937 D three legs MS 63 coin was $100,000 "each", the understanding was that $100,000 was for each set of 10 coins. (Tr. at 1384-85; *see also* PX1 at PL3797.) Other times, when plaintiffs introduced a document that Adamo himself created to support their assertions of how much they paid, Adamo would simply say that the handwritten prices that contradicted his testimony were not his. (*See, e.g.,* Tr. at 1473-74.) However, Adamo has no documentary evidence to support this assertion, and the Court finds his testimony and evidence on this issue to be completely lacking in credibility. In contrast, the Court finds Marini's testimony on this issue to be credible.

Further supporting plaintiffs' version is that Adamo's testimony at trial regarding the price paid for some coins contradicted his deposition testimony. (*See* Tr. 1420-39 (plaintiffs' counsel cross-examining Adamo on the inconsistencies between the testimonies).) Although a number of Adamo's modifications of the price paid actually support plaintiffs' position, *i.e.*, result in a higher price paid for each coin, these prior inconsistent statements support the Court's finding that Adamo's testimony is not credible.

Plaintiffs also read into the record a portion of a cash ledger, written by Marini, that contemporaneously tracked how much cash was being used for coin purchases.[10] (*Id.* at 723-28.)

After weighing all of the evidence— including among other things, the testimony

of the witnesses, the demeanor of Marini and Adamo, the secretly recorded conversation, and the coin statements—the Court finds that Marini paid Adamo $4,690,000 in cash for coins.[11]

F.   Money From T&R/Children's Trust

Steven Prince, Marini and T&R's accountant, testified that Marini would loan his business money because the corporation did not have "an actual credit line." (Tr. at 1022.) Prince confirmed that the amount of money T&R owed Marini fluctuated between 2000 and 2007 (*id.* at 1023), and that Marini could repay himself either through payments directly from the corporation to his personal account or with a payment to a third-party whom Marini personally owed money (*id.* at 1022-23).

Marini also admitted during the trial that he used approximately $1.2 million from his children's trust accounts to pay for coin purchases.[12] (*Id.* at 880.)

G.   Trades

On eleven occasions, Marini and Adamo engaged in trades instead of straight coin purchases. Sometimes, these trades were simply coins for coins, while on other occasions either Marini or Adamo would receive money along with coins. Plaintiffs have demonstrated that, based on the

---

[10] The ledger primarily contained Marini's father's handwriting, although two entries were written by Marini. (*See* Tr. 724-27.) The Court allowed Marini to read the portion of the exhibit containing his handwriting as a past recollection recorded under Fed. R. Evid. 803(5). (*See id.* at 769.) However, the Court did not admit, and has not considered, the remainder of the exhibit written by Marini's father. In particular, the entire document could not be offered as a business record because (1) Marini's father did not testify as to how the record was regularly maintained in the course of a business, and (2) the "business record" was simply a handwritten list of cash that was kept in an individual's safe. (*See id.* at 765-69.) Plaintiffs did not call Marini's father in an attempt to have the ledger admitted through him, either as a business record or through past recollection recorded. Thus, other than Marini's past recollection recorded of the entries he authored and read into the record, the Court has not considered the other information on the exhibit. In any event, even if the Court did not consider Marini's past recollection recorded from that exhibit or any testimony regarding the exhibit, the Court would still conclude that Marini's testimony regarding the amount of cash given to Adamo is credible based upon his demeanor and the other evidence in the case.

[11] Mrs. Marini agreed to use her and her husband's money to purchase coins from Adamo, but stated that her husband made all of the decisions regarding coin purchases. (Tr. at 1004.) She confirmed that they spent over $16 million on coins through Adamo. (*Id.* at 1005.)

[12] As discussed *infra*, to the extent that defendants argued in a pretrial memorandum that there was a trust funds misusage, that argument fails for numerous reasons, including that defendants withdrew their defense of unclean hands and culpable conduct, and that defendants lack standing to make such a claim.

approximate retail value of the coins that were traded, Marini lost money on each and every trade, sometimes as much as $461,000. (*See* PS3.) Adamo would make similar misrepresentations regarding the value of coins given to Marini in trades as he did when Marini purchased coins. For example, in April 2007, Marini gave Adamo two coins that were actually worth $480,000 (although Adamo represented they were worth $1.225 million) in exchange for a coin (1779 Continental Dollar Brass) that was only worth $190,000 but Adamo said was worth $1.3 million. (*See* PS3 at 24.) During one of the secretly recorded conversations, Marini got Adamo to confirm that this trade occurred as plaintiffs describe, and Adamo falsely stated that the 1776 Continental Dollar was worth "over a million." (PX48 at PL1065.)

During the trial, Adamo testified that some of the trades did not occur as plaintiffs represent. (*See, e.g.*, Tr. at 1351.) To the extent Marini's version of events regarding the trades contradicts with Adamo's version, the Court finds Adamo's testimony not credible.

### H. Liquidity

As discussed *supra*, Adamo initially told Marini that Marini could sell any coin within 24 to 48 hours. (*Id.* at 397.) However, when Marini attempted to sell his coins in 2008, Adamo proposed trades instead. On June 17, 2008, Marini e-mailed Adamo that he was "not looking to take in more coins at this time; I would be looking to cash out the 1907 [$10 Indian] for its full cash value of $550,000." (PX1 at PL3811.) Adamo responded that he could not change the deal. (*Id.* at PL3812.) In response, Marini asked Adamo to "confirm that this is cash out deal for $550,000 and how long I most [sic] wait for funds." (*Id.* at PL3814; *see also* Tr. at 605.)

On September 17, 2008, Adamo proposed another trade: Marini would give Adamo certain coins while Adamo would give Marini the same coins in lower grades and a $450,000 check. (Tr. at 668.) Marini angrily responded to Adamo:

> Need to clear the air Harry. What the hell happened to 24 to 48 hour out?? I'm even willing to get out of a few coins at COST that I have owned for more than 5 year[s]. Surely buying coins today for the same value as 5 years ago must be attractive to you. You said there is nothing available to buy . . . well here you go, I am offering you 2 million dollars worth of value at cost, a savings of 700,000. Why do you make statements that you have heavy hitters coming this week that only buy once a year, how hard is it to sell them a great deal. When you needed an abundance of cash to get us [] good deals I provided it in days.

(PX1 at PL3894.) The next day, the parties e-mailed multiple times but Adamo never contradicted Marini's assertion that he had been promised 24 to 48 hour liquidity. (*See id.* at PL3895-3902.) These e-mails are strong circumstantial evidence corroborating Marini's credible testimony that Adamo falsely promised him he could sell back his coins within 24 to 48 hours, and they provide direct evidence that Marini was not able to do so. Based on all of the evidence presented at trial, including these e-mails, the Court finds that plaintiffs could not sell their coins back to Adamo within 24 to 48 hours as Adamo represented, and that Adamo's statement regarding liquidity was intentionally false.

## I. The Fraud is Discovered

After growing frustrated with his professional relationship with Adamo due to not being able to sell back his coins, Marini grew concerned and decided to have some coins appraised with another dealer. (Tr. at 611.) Marini hired Joseph Parrella ("Parrella"), whom plaintiffs later retained as an expert in this case, to appraise five or six Buffalo nickels. (*Id.* at 612.) Parella told Marini that they were worth "a couple of thousand dollars each," which was a "fraction" of what Marini paid for them. (*Id.* at 612-13.) A week later, Marini gave Parrella his entire collection to appraise; Parrella told him that the coins were not worth nearly what Adamo told him they were. (*Id.* at 620.)

## J. Plaintiffs' Experts

In support of their argument that Adamo misrepresented the value of the coins and charged Marini an excessive commission, plaintiffs presented the testimony of two coin experts, Parrella and Fred Weinberg ("Weinberg"). As discussed *infra*, the expert testimony of Weinberg and Parrella was admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and was completely credible.

Weinberg testified regarding the value of error coins, which are coins produced as a result of a mistake in the manufacturing process. (Tr. at 58.) Weinberg produced a report on all coins currently or formerly owned by plaintiffs. (*See* PX 28.) As discussed more fully *infra*, Weinberg used auction records to determine the wholesale value of the exact coins or similar coins, and then applied a markup to determine the retail value.[13] As detailed in PX2, Weinberg

valued each error coin Marini purchased at a fraction of what Adamo charged. For example, Weinberg valued the 1879-S Silver Dollar 15% off-center at $7,500-$10,000 on the approximate date of purchase. (PX28 at 2.) However, Adamo charged Marini $240,000 for that coin. (PX2 at PL516.)

Weinberg also had unique insight into the markup Adamo charged Marini because Weinberg actually sold Adamo some of the exact coins that were later sold to Marini. For example, on November 14, 2002, Weinberg sold Adamo a 1965 era two-tailed dime for $35,000. (PX40 at WEIN26.) Weinberg values that coin at between $60,000-80,000. (PX28 at 5.) In November 2002, Adamo sold Marini that exact coin for $250,000. (PX2 at PL516.)

The Court notes that this coin demonstrates the difficulty in determining the market value for coins, as Weinberg charged Adamo only $35,000 for the coin, but believes its true retail value to be between $60,000-$80,000. Part of the markup is due to the difference in retail and wholesale pricing. However, that cannot explain the entire difference. The Court, as the trier of fact, finds these estimates of coin values to be credible and reasonable, and uses them as a basis for determining both liability and damages. Although coin experts may disagree on the price of a coin, the Court finds both of plaintiffs' experts to be credible, and that plaintiffs' estimates drew some reasonable inferences in defendants' favor which buttress their credibility. In addition, defendants chose not to call any expert witnesses to refute the credible estimates of plaintiffs' experts. Accordingly, it is clear from all of the testimony presented

---

[13] In calculating the difference between the price Marini paid and the estimated retail value, plaintiffs drew reasonable inferences in defendants favor. For

example, Weinberg gave his valuation for each coin in a range due to the difficult nature of detailing an exact price for each coin. In calculating Marini's loss on each coin, plaintiffs used Weinberg's highest valuation for each coin.

that the price Adamo charged far exceeded the value of the coins, in the amount credibly testified to by plaintiffs' experts.

Parrella testified regarding the value of non-error coins. Like Weinberg, and as discussed more fully *infra*, Parrella used auction records for comparable coins, and then used his expertise regarding the state of the coin market, to estimate the value of the coins in Marini's collection. (*See, e.g.*, Tr. at 198-201.) However, unlike Weinberg, Parrella occasionally incorporated the valuation of a coin as listed in numismatic publications. Parrella's expert report details the value of each coin that Marini owns or used to own as of different dates. (*See* PX29.)

As with Weinberg's testimony, the Court fully credits the testimony of Parrella. The Court finds Parrella's estimates reasonable and relies on his valuations of non-error coins.

### K.  The Brancatos

To corroborate their allegations, plaintiffs called Frank and Giacomo Brancato to testify.  The Court found the testimony of both of the witnesses to be credible.

Giacomo Brancato corroborated that Adamo used cash to make large purchases, including once using over $10,000 in cash to pay part of a hotel bill. (*Id.* at 1042-43.) Giacomo Brancato also corroborated that Adamo used vacations to pitch friends on investing in coins (*id.* at 1045); however, he never invested with Adamo (*id.* at 1047).

Frank Brancato purchased three coins from Adamo for a total of $126,000. (*Id.* at 1099.) Frank Brancato then traded one coin that was allegedly worth $100,000, along with an additional $25,000 in cash, for a different coin. (*Id.* at 1105-06; PX 13 at FRANK842.)  Adamo made similar representations to Frank Brancato as he did to Marini: that he would only buy the same coins as he bought himself and that he could cash out in 24 to 48 hours. (Tr. at 1088-89.) Unlike with Marini, who Adamo told that he would only take a small commission, Adamo told Frank Brancato that "he wouldn't make money from selling the coins." (*Id.* at 1088.) This preferential treatment was allegedly in exchange for repairs performed for Adamo's office. (*Id.* at 1086-87.) Adamo also requested that Frank Brancato only sell the coins back to him. (*Id.* at 1099.)

E-mails between Frank Brancato and Adamo confirm that Adamo had a pattern of receiving significant amounts of cash, along with checks, as payments for coins. (*See* PX 13 at FRANK842 (e-mail from Adamo to Frank Brancato indicating that Frank Brancato paid $50,000 cash and a $50,000 check for the first coin purchased); Tr. at 1105.)

In January 2008, Frank Brancato tried to cash out his coins with Adamo, but ran into a similar difficulty as Marini. Adamo told Brancato that Adamo could get him over $275,000 in a couple of months (PX 13 at FRANK843), but at that time he could only trade him $90,000 and another coin for his collection. (*Id.* at FRANK842.) Frank Brancato rejected the trade. (*Id.* at FRANK852.) Adamo kept telling him that a purchase would come through, but it was not until July 2008 that Adamo finally purchased back the most valuable coin, but at a price lower than what Adamo had previously represented. (Tr. at 1128-29; PX 13 at FRANK868.) However, unlike Marini, Frank Brancato made a profit on his coin dealings with Adamo. (Tr. at 1151.)

The Court finds that Frank Brancato's credible testimony, which is substantiated by e-mails between Frank Brancato and Adamo, reveals Adamo's common scheme and business practices in coin transactions, and is circumstantial evidence that further confirms some of Marini's testimony regarding his transactions with Adamo.[14]

## L. Adamo's Testimony

During the trial, Adamo denied plaintiffs' allegations and attempted to refute much of Marini's testimony. Most significantly, Adamo denied making the representations Marini claimed he made during their first meeting regarding coins. (Tr. at 1224-25.) In addition, as discussed more fully *supra*, Adamo denied that the coin code had a consistent interpretation and that Marini paid approximately $4.6 million in cash for coins. As has been discussed throughout the Findings of Fact, after evaluating all of the documentary evidence and the demeanor of the witnesses, the Court does not find Adamo's testimony to be credible, and finds Marini's testimony fully credible.[15]

Adamo's inconsistent testimony supports the Court's determination that he was not a credible witness. For example, in one of the recorded conversations between Marini and Adamo, Adamo told Marini that the 1892-S Morgan dollar was worth $550,000. (PX48 at PL1062.) However, at

trial, Adamo testified that this coin was worth only $55,000 (Tr. at 1458), and that he was "very confused" during the conversation with Marini because he thought they were discussing a different coin (*Id.* at 1460).

Some of Adamo's other testimony was nonsensical, and reinforces the Court's finding, based upon his demeanor and all the evidence at trial, that Adamo's testimony as a whole was not credible. For example, he stated that "[a]lmost all coin dealers use some kind of code" to disguise their prices and valuations. (*Id.* at 1249.) However, Adamo also testified that it was Marini who asked Adamo to devise a code to hide the cost of the coins. (*Id.* at 1250.) Adamo's "blaming" Marini for devising a code for the coin statements lacks credibility on its face.

During the trial, plaintiffs introduced a video of one of Adamo's depositions. To support their argument that Adamo represented to Marini that they would be buying the same coins, plaintiffs' counsel referenced a conversation between the parties in which Adamo said: "It's pretty much the same as yours. I may have two of somewhere where you have one. I may have four of something and you have three. You know, a few odds and ends that I have because I like that I wouldn't recommend to you for investment . . . ." (Dep. of Harry Adamo, June 23, 2009, at 361.) At first, Adamo did not deny that they were talking about coins. But then, his story continually and rapidly changed. He said, "I don't think we're even talking about coins in that conversation," elaborating that he and Marini were talking about "cars." (*Id.* at 363.) Then, Adamo stated that "maybe we were talking about houses." (*Id.* at 364.) After that, Adamo changed his story yet again, stating that they could have been talking about "snowmobiles." (*Id.* at 364.) Finally, Adamo concluded that he did not

---

[14] The Court notes that its findings and conclusions would be the same even without the testimony of the Brancatos.

[15] In plaintiffs' rebuttal case, plaintiffs offered the deposition testimony of one of defendants' retained experts, who was not called during the trial, to impeach Adamo's testimony. Defendants objected to this testimony, and the Court declined to rule on the objection until the parties submitted letter motions. Defendants' objections are moot because the Court has not considered this testimony in concluding that Adamo's testimony is not credible.

know what they were talking about, but that they were not talking about coins. (*Id.* at 364-66.) Such nonsensical testimony is simply one example supporting the Court's conclusion that Adamo was not a credible witness. There were also numerous other instances where he contradicted his own testimony or contradicted other credible and overwhelming evidence in the trial.

## M. Material Misrepresentations and Puffery

As discussed more fully *infra*, the Court must determine which of Adamo's representations were material, *i.e.*, there is a substantial likelihood that a reasonable investor would find that the information would have significantly altered the total mix of information made available to her, and which were mere puffery that no rational investor could rely upon.

After considering all of the evidence at trial, and the relevant law that is set forth in the Conclusions of Law, the Court finds the following representations to be material misrepresentations: (1) Adamo would be buying the same coins as Marini; (2) the coins were liquid and Marini could sell his coins within 24 to 48 hours; (3) Adamo would only charge a small commission on each coin; (4) the inflated values on the written coin statements; and (5) oral statements by Adamo and in emails regarding the specific value of particular coins.

However, the following statements by Adamo were mere puffery: (1) Marini was purchasing coins at the dirt bottom and the coins were poised to rise in value; (2) Adamo had never seen these kinds of coins lose value; (3) Adamo had seen these coins go up 300 percent in the past and they could bring Marini a 20 to 30 percent return; and (4) Marini was purchasing the top 1 percent of the 1 percent of coins.

## N. Should Marini Have Discovered the Fraud?

As discussed *infra* in the Conclusions of Law, the trier of fact must determine: (1) when a reasonable plaintiff would have discovered the fraud, and (2) whether it was reasonable for Marini to rely on Adamo's representations.

### 1. When Would a Reasonable Plaintiff Have Discovered Fraud?

In order to significantly limit plaintiffs' potential recovery on the Exchange Act claim, defendants argue that Marini should have discovered the fraud prior to September 30, 2006. For the reasons set forth below, the Court disagrees.

The parties dispute when Marini first possessed "The Red Book" and other numismatic publications that list approximate values for coins. (*Compare* Tr. at 936 (Marini stating that he obtained the Red Book in 2005 or 2006), *with id.* at 1589 (Mrs. Adamo testifying that she saw Marini with the Red Book in the fall of 2002).) However, even if Marini had access to these materials during the beginning of the parties' business relationship, those materials would not have assisted Marini or a reasonable plaintiff in discovering the fraud. Marini credibly testified that, when he would ask Adamo about these publications, Adamo would quickly discard the question and state that the coins they were buying were not comparable to the coins listed in the publications. (*Id.* at 972.) One of plaintiffs' experts confirmed that, for error coins, these publications are not helpful for determining the value of a coin. (*Id.* at 101-02.) Even Adamo himself, on his direct examination, stated that the values of the coins listed in these publications are not accurate and "usually [] a year or two out of date." (*Id.* at 1207; *see also id.* at 1226

(Adamo states that the "Red Book" is the "bible of US coins" but that "it's not good for price").)

Defendants also argue that Marini should have discovered the fraud through auction records available on the internet. However, one of plaintiffs' experts credibly testified that at least one of the main auction records websites was not publically available until after 2008. (*Id.* at 274.)[16]

A reasonable plaintiff also would not have discovered the fraud prior to September 30, 2006 because, among other things, Adamo was producing false returns for Marini. These false profits not only induced additional purchases, but discouraged Marini from further investigating the true value of his coins.

In addition, there were some other misrepresentations that Marini could not have discovered prior to September 30, 2006—most notably that the coins could be liquidated in 24 to 48 hours. Because Marini did not try to quickly sell any coins prior to that date, neither he nor any reasonable plaintiff could have discovered that this was a material misrepresentation.

Accordingly, the Court finds that a reasonable plaintiff would not have

discovered the fraud prior to September 30, 2006.

### 2. Was It Reasonable For Marini to Rely on Adamo's Representations?

A distinct but related inquiry is whether it was reasonable for Marini to rely on Adamo's representations. As discussed in the Conclusions of Law, if Marini unreasonably relied on these misrepresentations, plaintiffs cannot recover on their Exchange Act claim and their common law fraud claim.

Defendants argue that plaintiffs are sophisticated investors. However, as discussed in the Conclusions of Law, the relevant inquiry is not whether a plaintiff has money or has made investments generally, but whether a plaintiff is sophisticated regarding this specific investment. It is clear from the testimony at trial that Marini was extremely unsophisticated regarding coins. (*See, e.g.*, Tr. at 400-02.)

Second, as discussed *supra*, Marini did not ignore readily available information regarding coin values. Adamo told Marini that the numismatic publications did not have accurate values, and this representation was confirmed not only by plaintiffs' experts but by Adamo himself during the trial. In addition, defendants introduced no credible evidence that auction records were widely and publicly available during most of the relevant time period.

Marini first discovered one of the auction websites that contain historical auction prices in June 2007. (*Id.* at 968.) Marini noticed that a coin Adamo had paid Marini $300,000 for had been auctioned off for approximately $170,000. (*Id.* at 968-69.) When Marini asked Adamo whether Adamo was giving him more for the coins than their

---

[16] Defendants now argue in their post-trial submission that a September 27, 2002 press release from a different auction house demonstrates that some auctions results were publically available for free during the beginning of the relationship. (*See* Defs.' Mem. at 85 n.14.) However, defendants did not introduce this exhibit into evidence during the trial or use it to impeach plaintiffs' expert's testimony. Obviously, this Court cannot consider evidence not introduced during the trial. In any event, even if the auction records for one auction house were available online in 2002, the Court still concludes that a reasonable plaintiff would not have discovered the fraud prior to September 30, 2006.

market value, Adamo told Marini that the coins they bought had a "higher purity of gold" and, therefore, were not comparable to the coins listed on the auction websites. (*Id.* at 970.) Marini did not investigate further. (*Id.*)

Of course, with hindsight, it is obvious that Marini should not have relied on these statements, and should have investigated every representation that Adamo made on the value of the coins. However, the Court is not tasked with determining what Marini should have done in hindsight, but whether it was reasonable for Marini to rely on these representations. Because of the difficulty in finding accurate prices for these coins (especially during the formative years of this business relationship), Marini's lack of sophistication regarding coins, the nature of the relationship, and Adamo's continued representations that the coins Marini was purchasing were not comparable to other coins, the Court finds that it was reasonable for Marini to rely on Adamo's statements.

## O. Scienter

As discussed *infra* in the Conclusions of Law, to find defendants liable under Section 10(b) of the Exchange Act, plaintiffs must prove by a preponderance of the evidence that defendants acted with scienter, also known as intent. The Court finds, after weighing all of the evidence and the demeanor of the witnesses, that Adamo acted with scienter because he intentionally deceived plaintiffs. Because Adamo directly bought the coins that he later resold, he knew how much each coin cost. (*See* PX5.) Adamo then sold those coins at an excessive markup, despite the representation that Adamo would only charge a small commission. Thus, it is clear that Adamo intentionally charged an excessive markup.

Plaintiffs have also demonstrated that Adamo intentionally misrepresented that the coins were fully liquid assets and that Marini could cash out within 24 to 48 hours. When Marini demanded that Adamo buy back his coins for what Marini believed to be a substantial discount over their true value, Adamo refused. Adamo also made this same representation to Frank Brancato, but again refused to cash him out within 48 hours. The Court finds, based upon the evidence, that not only was this statement false, but that Adamo knew it was false at the time it was made.

The Court also finds that Adamo acted with fraudulent intent when he represented to Marini that they would be buying the same coins, and that they had similar collections.

In addition, the values listed on the coin statements were clearly inflated, and Adamo intentionally used those false coin statements, as well as the purchasing back of some coins at a substantial profit to Marini, in order to induce further purchases.

For all of the foregoing reasons, plaintiffs have demonstrated that Adamo acted with the requisite intent.[17]

---

[17] The Court notes that even if it did not find that Adamo knowingly and intentionally made misrepresentations, plaintiffs have alternatively demonstrated scienter by proving that Adamo had acted with conscious recklessness. *See SEC v. Stanard*, 06 Civ. 7736, 2009 WL 196023, at *27 (S.D.N.Y. Jan. 27, 2009) ("An egregious refusal to see the obvious, or to investigate the doubtful, may also give rise to an inference of recklessness. Accordingly, a defendant cannot plead ignorance of facts where there are warning signs or information that should have put him on notice of either misrepresented or undisclosed facts." (citations omitted)). It is clear from the testimony at trial and the evidence presented that even if Adamo did not knowingly make these material misrepresentations,

### III.   BURDEN OF PROOF

Plaintiffs bear the burden of proof in this case on each and every claim, as well as on the issue of damages.  They must prove by a preponderance of the evidence that defendants violated the Exchange Act. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 534 (S.D.N.Y. 2011). Plaintiffs must also prove their breach of fiduciary duty, unjust enrichment, and money had and received claims by a preponderance of the evidence. *See Newman v. Herbst*, No. 09-CV-4313, 2011 WL 684165, at *7 (E.D.N.Y. Feb 15, 2011) (unjust enrichment and breach of fiduciary duty); *Lum v. New Century Mortg. Corp.*, 19 A.D.3d 558, 559-60 (2d Dep't 2005) (stating that unjust enrichment and money had and received claims are "quasi-contract" claims); *see also Mercury Partners LLC v. Pac. Med. Bldgs., L.P.*, No. 02 Civ. 6005, 2007 WL 2197830, at *8 (S.D.N.Y. July 31, 2007) ("Under New York law, the burden of proof in an action for breach of contract is on the plaintiff to prove the elements of its complaint by a preponderance of the evidence." (citing *Enercomp, Inc. v. McCorhill Publ'g, Inc.*, 873 F.2d 536, 542 (2d Cir. 1989) (addition citations omitted))). However, to recover under a theory of common law fraud in New York, plaintiffs must demonstrate liability by clear and convincing evidence. *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 971 (2d Cir. 1987).

### IV.   CONCLUSIONS OF LAW

#### A.  *Daubert*

During the trial, the Court ruled that the expert testimony of Weinberg and Parrella was admissible under *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  As discussed below, their methodology was reliable and their testimony was helpful to the trier of fact.

##### 1.  Legal Standard

The admissibility of expert testimony is analyzed under Rule 702 of the Federal Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of the expert testimony bears the burden of establishing the admissibility of such testimony under the *Daubert* framework by a preponderance of the evidence standard. *See Daubert*, 509 U.S. at 592 n.10 ("These matters should be established by a preponderance of proof." (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987))); *see also Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010) ("[T]he party offering the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." (citations and internal quotation marks omitted)); *accord Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 353

---

he acted with conscious recklessness as to the value of the coins, their liquidity, and the markup.

(S.D.N.Y. 2003); Fed. R. Evid. 702 advisory committee's note ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

"The district court is the ultimate 'gatekeeper,'" *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007), and must ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable," *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (holding that whether the witness' area of expertise is technical, scientific, or more generally "experience-based," the district court, in its "gatekeeping" function, must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) ("The shift under the Federal Rules to a more permissive approach to expert testimony [] did not represent an abdication of the screening function traditionally played by trial judges.").

Thus, under Rule 702, the district court must make several determinations before allowing expert testimony: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact. *See Nimely*, 414 F.3d at 396-97. Moreover, if the requirements of Rule 702 are met, the district court must also analyze the testimony under Rule 403 and may exclude the testimony "if its probative value is substantially outweighed by the

danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403; *accord Nimely*, 414 F.3d at 397.

Under the *Daubert* standards, the Court must first determine whether the expert has sufficient qualifications to testify. *See Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 360 (2d Cir. 2004) (stating that, where the witness lacked qualifications, an analysis of the remaining *Daubert* factors "seems almost superfluous"). Specifically, under Rule 702, the Court must determine whether the expert is qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. A court should look at the totality of the witness' qualifications in making this assessment. *See, e.g., Rosco, Inc. v. Mirror Lite Co.*, 506 F. Supp. 2d 137, 144-45 (E.D.N.Y. 2007) ("A court must consider the 'totality of a witness's background when evaluating the witness's qualifications to testify as an expert.'" (quoting 29 Wright & Gold, Fed. Prac. & Proc. § 6265, at 246 (1997))); *accord Arista Records LLC v. Lime Group LLC*, 06 CV 5936, 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011). In addition, the Court must ensure that the expert will be proffering opinions on issues or subject matters that are within his or her area of expertise. *See Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997).

With respect to reliability, "the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." *Williams*, 506 F.3d at 160 (citation and internal quotation marks omitted). As the Second Circuit has explained, the *Daubert* Court "has identified a number of factors bearing on reliability that district courts may consider, such as (1)

whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (internal citations and quotation marks omitted); *accord Nimely*, 414 F.3d at 396. These criteria are designed to be instructive, but do not constitute a definitive test in every case. *See Kumho*, 526 U.S. at 151; *Nimely*, 414 F.3d at 396. Moreover, in addition to these criteria for determining whether the methodology is reliable, Rule 702 also requires that there be a sufficiently reliable connection between the methodology and the expert's conclusions for such conclusions to be admissible. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *see also Amorgianos*, 303 F.3d at 266 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

With respect to whether the expert's testimony will assist the trier of fact, the Second Circuit has repeatedly emphasized that "expert testimony that usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it, by definition does not aid the jury in

making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." *Nimely*, 414 F.3d at 397 (internal alterations, citations, and quotation marks omitted).

### 2.   Analysis

#### a.   Weinberg

Plaintiffs offered Weinberg as an expert in the valuation of error coins to demonstrate that Adamo charged Marini far above the market rate for rare coins. At trial, and again in their post-trial motion, defendants argued that Weinberg's methodology is not reliable and his testimony should not be credited. For the reasons set forth below, the Court disagrees.

The Court notes that, although defendants do not challenge Weinberg's qualifications, Weinberg is clearly qualified to be an expert in rare coins. He has been a full-time coin dealer since 1972 and has been buying and selling error coins professionally for 41 years. (Tr. at 56, 62.) Weinberg grades coins for a certification service (*id.* at 67), and appraises coins for insurance valuations (*id.* at 77).

Weinberg's methodology is also reliable. In preparing his expert report, Weinberg primarily determined a coin's value by looking at auction records for similar coins and then using his expertise to determine if the coin should be valued higher or lower depending on the strength of the market at the time of the sale versus the time of appraisal. (*Id.* at 73-76.) Because the coins sold at auctions were often at wholesale prices (because they were being sold to a dealer), Weinberg would then add a markup to determine a retail value. (*Id.* at 80-83.)

Defendants argue that Weinberg's methodology is unreliable for two reasons. First, Weinberg stated that he did not have a standard markup that he used, that it ranged from "10 to 25, possibly 30 percent" depending on the coin. (*Id.* at 83.) Second, defendants argue that such a methodology is not feasible in a market for the truly rare coins at issue here because there is an extremely limited supply of these items. (Defs.' Mem. at 43-45.) Both arguments are without merit. The Court finds that this system for valuing coins rests on well-established industry standards, publications and market trends, which are sufficiently reliable to form the basis of expert testimony. Although it is uncontroverted that there is a subjective component to valuing coins, that subjective component does not render the expert testimony unreliable given the widely-accepted valuation publications and other methods (such as auction records) that are utilized in the industry to determine the current market value of coins. *See United States v. Kayne*, 90 F.3d 7, 12 (1st Cir. 1996) (holding that expert testimony on the valuation of coins was admissible despite defendants contention "that the opinions were not based on consistent standards, and were subject to factors of taste and assessment of the market, and that the experts often disagreed among themselves"). Defendants' arguments regarding the inconsistent markup and the difficulty of pricing coins with such a limited supply is a proper avenue for cross-examination, and goes to the weight of the testimony and not its admissibility. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to . . . faults in [the expert's] use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."); *see also Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 181 (6th Cir. 2009)

("Admissibility under Rule 702 does not require perfect methodology.").

In addition, because "[o]ne could hardly expect a lay jury to form conclusions about such an esoteric subject as the value of rare coins without the help of experts," the Court finds that this testimony assists the trier of fact. *Kayne*, 90 F.3d at 12.

Therefore, plaintiffs have demonstrated by a preponderance of the evidence that Weinberg's opinions are admissible under *Daubert*.

b.  Parrella

Plaintiffs offered Parrella as an expert in the valuation of non-error coins to demonstrate that Adamo charged Marini far above the market rate for rare coins. At trial, and again in their post-trial motion, defendants argue that Parrella's methodology is not reliable and his testimony should not be credited. For the reasons set forth below, the Court disagrees.

The Court notes that Parrella is clearly qualified to testify as an expert in rare coins. Parrella has been working in the coin industry since college and formed a business buying and selling rare coins in 1974. (Tr. at 151.) Parrella has appraised rare coins for private collectors and insurance companies, as well as testified as an expert on coin valuation in court. (*Id.* at 153.)

Parrella's methodology is also reliable. To determine a coin's value, Parrella would find what a comparable coin sold for at an auction and then add a markup to arrive at a retail price for the coin. (*Id.* at 157.) The markup was done on a sliding scale depending on the wholesale price of the coin: 20% for coins priced up to $25,000, 15% for coins from $25,000 to $75,000, and 10% for coins above $75,000. (*Id.*)

Defendants' challenge to Parrella's methodology is similar to their challenge to Weinberg's; they argue that the markup he applied "was completely arbitrary." (Defs.' Mem. at 46.)

For the same reasons the Court found Weinberg's methodology reliable, the Court also found Parrella's methodology reliable. Although there may be disagreement within the numismatic community on the value of certain coins and the best methodology to arrive at that value, such inconsistencies do not render Parrella's testimony inadmissible. Defendants' arguments are better suited for cross-examination, which they availed themselves of at trial and which the Court fully considered in determining the appropriate weight of this expert testimony.

## B.   Exchange Act

Plaintiffs assert that Adamo's misrepresentations violated Section 10(b)(5) of the Exchange Act, 15 U.S.C. § 78j(b). Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). "The fundamental purpose undergirding the Securities Acts is to eliminate serious abuses in a largely unregulated securities market [and] [i]n defining the scope of the market that it wished to regulate, Congress painted with a broad brush." *Reves v. Ernst & Young*, 494 U.S. 56, 60 (1990) (citation and internal quotation marks omitted). Although Congress "enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment . . . [it] did not, however, intend to provide a broad federal remedy for all fraud." *Id.* at 61 (citations and internal quotation marks omitted).

### 1.   Statute of Repose and Statute of Limitations

The Exchange Act contains both a statute of repose and a statute of limitations. The statute reads in relevant part:

> [A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of –
>
> (1) 2 years after the discovery of the facts constituting the violation; or
>
> (2) 5 years after such violation.

28 U.S.C. § 1658(b). Defendants argue that both the statute of repose of five years and the statute of limitations of two years limits plaintiffs' recovery.

#### a.   Statute of Repose

Defendants argue that the statute of repose bars any securities claim for transactions that occurred prior to September 30, 2003, five years before the complaint was filed in this action. Plaintiffs counter that the statute of repose is inapplicable because Adamo continued to make misrepresentations through 2008, and, thus, the "continuing violations" doctrine applies. For the reasons set forth below, the Court finds that plaintiffs cannot recover under the Exchange Act for any transactions that occurred prior to September 30, 2003.

"Unlike a statute of limitations, a statute of repose is not a limitation of a plaintiff's remedy, but rather defines the right involved

in terms of the time allowed to bring suit." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 102 (2d Cir. 2004). "Therefore, a statute of repose begins to run without interruption once the necessary triggering event has occurred, even if equitable considerations would warrant tolling or even if the plaintiff has not yet, or could not yet have, discovered that she has a cause of action." *Id.* at 102-03.

The continuing violations doctrine (sometimes called the continuing wrong doctrine) allows a plaintiff to bring an action for a violation that occurs outside the repose period when a series of misrepresentations have been made and the last misrepresentation occurred during the repose period. Courts that have discussed whether the doctrine applies in this Circuit have noted that this is "an uncertain area of the law." *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 155 (E.D.N.Y. 2008); *see also Plymouth Cnty. Ret. Ass'n v. Schroeder*, 576 F. Supp. 2d 360, 378 (E.D.N.Y. 2008) (stating that "the law in this area is somewhat unresolved"). District courts within this Circuit that have examined this issue and reviewed case law have reached diametrically opposite conclusions. *Compare Comverse*, 543 F. Supp. 2d at 155 ("The weight of authority in this circuit is skeptical of the application of the continuing violations doctrine in securities fraud cases.") *with Plymouth Cnty.*, 576 F. Supp. 2d at 378 ("[T]he weight of authority, including in this Circuit, dictates that the five year statute of repose first runs from the date of the last alleged misrepresentation regarding related subject matter.") *and In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 324 (S.D.N.Y. 2012) (citing *Plymouth* and stating that this rule has been "adopted by the majority of courts in this Circuit"). The case law in other circuits is also split. *See Carlucci v. Han*, 886 F. Supp. 2d 497, 514

(E.D. Va. 2012) ("District courts in the First Circuit have applied the continuing fraud exception to Section 10(b)'s statute of repose, while district courts in the Fifth and Ninth Circuits have rejected it.").

Although the Supreme Court and the Second Circuit have not directly ruled on this issue, those courts have reaffirmed the essential role of the statute of repose in limiting securities claims. *See Merck & Co., Inc. v. Reynolds*, 130 S. Ct. 1784, 1797 (2010) (holding that the statute of limitations does not begin to run until a reasonable plaintiff would have discovered defendant's intent, and, in response to defendant's "fears that this requirement will give life to stale claims or subject defendants to liability for acts taken long ago," stating that the statute of repose is an "unqualified bar on actions . . . giving defendants total repose after five years"); *P. Stolz*, 355 F.3d at 103 ("[A] repose period can run to completion even before injury has occurred to a potential plaintiff, extinguishing a cause of action before it even accrues.").

Therefore, because the Supreme Court has emphasized that the statute of repose is "an unqualified bar" on 10(b) claims, and because the Court agrees with the persuasive analysis of a majority of district courts throughout the country that have rejected the continuing violations doctrine in this context, the Court holds that plaintiffs cannot recover under the Exchange Act for any purchases that occurred prior to September 30, 2003. *See Carlucci*, 886 F. Supp. 2d at 514 (reviewing the state of the law throughout the country and rejecting the continuing violations doctrine).

b.   Statute of Limitations

Defendants also argue that not only does the statute of repose bar recovery for any

transactions occurring prior to September 30, 2003, but that the statute of limitations bars plaintiffs from bringing an action regarding any coin purchases that occurred prior to September 30, 2006.

The Exchange Act establishes a statute of limitations of "2 years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b)(1). The Supreme Court recently held that the "word 'discovery' refers not only to a plaintiff's *actual* discovery of certain facts, but also to the facts that a reasonably diligent plaintiff would have discovered." *Merck*, 130 S. Ct. at 1793. However, the Court clarified that a plaintiff must have been able to discover facts necessary to prove each element of a 10(b) violation, including the intent of the defendant. *Id.* at 1796; *see also City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011) ("[T]he reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities fraud violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss."). Facts sufficient to demonstrate a materially false statement may not be sufficient to demonstrate intent, and, thus, may not automatically cause the statute of limitations to commence. *Merck*, 130 S.Ct. at 1796-97. "[T]he question of whether a plaintiff exercised reasonable diligence is usually a question of fact for the jury to decide." *Lenz v. Associated Inns & Rests. Co. of Am.*, 833 F. Supp. 362, 371 (S.D.N.Y. 1993).

As discussed in the Findings of Fact, the Court concludes that a reasonably diligent plaintiff could not have discovered the fraud by September 30, 2006. Underlying much of the Court's reasoning regarding why a reasonably diligent plaintiff could not have discovered this fraud by September 30, 2006

is because Adamo targeted an unsophisticated coin purchaser. *See id.* at 376 ("The sophistication of the investor . . . is thus extremely relevant, because the investor's sophistication affects the extent to which a court may properly conclude that a particular event should have influenced the investor to undertake an inquiry."). This lack of sophistication, along with Adamo's creation of false profits and the difficulty of determining coin values for such rare coins by an unsophisticated investor, demonstrates that a reasonably diligent plaintiff would not have discovered the fraud prior to September 30, 2006.[18]

### 2.  Elements of a 10(b) Claim

"In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). A plaintiff must of course also demonstrate that the transaction at issue concerns a security as defined by the Exchange Act. *See* 15 U.S.C. § 78c(a)(10).

### a.  Defendants Stipulated That These Coins Were Securities

In denying defendants' motion for summary judgment, the Court determined that questions of material fact existed on whether defendants' sale of rare coins constituted a security, and therefore,

---

[18] The Court also notes that, even if Marini had discovered the disparity in the coin prices, he could not have discovered prior to September 30, 2006 that (1) Adamo was not purchasing the same coins as Marini, and (2) that Marini would not be able to cash out his coins in 24 to 48 hours.

whether defendants could have violated the Exchange Act. Specifically, the Court noted that the test defining investment contracts as "securities" under the Act, as set forth in *SEC v. Howey, Co.,* 328 U.S. 293 (1946), would require a factual showing of "vertical commonality" between Marini and Adamo, meaning that Adamo would earn a commission for selling Marini's coins, and that there was a factual dispute in the record on that issue. Then, several months after the summary judgment decision, on April 11, 2012, defendants stipulated that the transactions at issue in this case "constitute securities transactions" and that "this agreement does not require or depend on Plaintiffs presenting evidence at trial that the above constitute securities transactions." (Stipulation, Apr. 11, 2012, ECF No. 156.)

During closing arguments, defendants tried to indirectly argue that rare coins could not constitute a security under the Exchange Act. Any such argument, whether directly or indirectly made, must be rejected. "Courts generally enforce stipulations that narrow the issues in a case" as long as the stipulations do not require the Court to "apply an improper standard of law," or it would be "manifestly unjust" for the Court to enforce the stipulation. *Sinicropi v. Milone*, 915 F.2d 66, 68 (2d Cir. 1990). Neither circumstance is present here. Not only does the stipulation not require this Court to apply an improper standard of law, but it would not be manifestly unjust to enforce the stipulation because defendants "knowingly and voluntarily" entered into this agreement in order to secure the dismissal of plaintiffs' RICO claim. *Id.* In addition, defendants have not even made a formal application for the stipulation to be withdrawn.

Because there was a factual basis for jurisdiction and defendants stipulated that the transactions in this case were securities, the Court finds that plaintiffs did not need to prove at trial the "vertical commonality" highlighted in the summary judgment decision, or otherwise present any additional evidence at trial to demonstrate that the transactions met the definition of a security as defined by the Exchange Act.[19] *See Mental Disability Law Clinic, Touro Law Ctr. v. Carpinello*, 189 F. App'x 5, 7 (2d Cir. 2006). In any event, there is evidence in the trial record to support the Court's independent conclusion that the coin transactions were securities and that the jurisdictional requirement was met.[20]

---

[19] To be clear, although the stipulation resolved the question whether the arrangement was a "security" under the Exchange Act, it was not an impermissible attempt to confer subject-matter jurisdiction. *See generally United Housing Found., Inc. v. Forman*, 421 U.S. 837, 859 (1975) (finding no jurisdiction where definition of a "security" not met). As noted in the summary judgment decision, there were undisputed facts to support four of the elements of jurisdiction under the *Howey* test and, as to the "common enterprise" element, plaintiff had presented evidence which, if credited and all reasonable inferences were drawn in his favor, would establish strict vertical commonality by demonstrating that Adamo was earning a commission on the sale of Marini's coins and, thus, Adamo's fortunes would rise and fall on plaintiff's fortunes. *See* 812 F. Supp. 2d 243, 255-57 (E.D.N.Y. 2011). However, because defendants disputed that fact, the Court concluded it could not be resolved on summary judgment. *Id.* at 260-61. By entering the stipulation and agreeing that they were not challenging plaintiff's evidence for purposes of jurisdiction, defendants were allowing the Court to accept plaintiff's factual basis to support the conclusion that the transactions were "securities" under the Exchange Act. In any event, as noted below, even apart from the summary judgment evidence and stipulation, the Court independently concludes from the credible evidence at trial that there is a factual basis for all of the elements of the *Howey* test, including the fourth element. *See infra* note 20.

[20] In particular, the Court credits Marini's trial testimony that Adamo said he would take a commission on the coins both when he sold them to Marini, and when he would re-sell them on the open market. (Tr. 395-96.) That testimony shows that

b.  Material Misrepresentation or Omission

i.  Applicable Law

Disclosure is a key aspect of securities regulation because Congress enacted these laws to ensure that all investors could make informed and rational investment decisions through equal access of important information. However, the law does not require corporations or other entities to speak in all circumstances. "An omission is actionable only if: (a) the omitted fact is material; and (b) the speaker had a duty to disclose the omitted fact." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 560 (S.D.N.Y. 2011) (citing *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988)). However, if an entity does choose to speak, it will be held liable if it "make[s] any untrue statement of a material fact." 17 C.F.R. § 240.10b–5(b); *see also Panter v. Marshall Field & Co.*, 646 F.2d 271, 292 (7th Cir. 1981) ("[O]nce a company undertakes partial disclosure of [] information there is a duty to make the full disclosure of known facts necessary to avoid making such statements misleading.").

What constitutes a material misrepresentation is now well-settled. "[A] statement or omission [is material if] a reasonable investor would have considered [the statement or omission] significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000) (citing *Basic*, 485 U.S. at 231-32 (holding that an omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" (citation and internal quotation marks omitted))). "It is not sufficient to allege that the investor might have considered the misrepresentation or omission important. On the other hand, it is not necessary to assert that the investor would have acted differently if an accurate disclosure was made." *Id.* at 162. "Therefore, whether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case." *Id.* The materiality element is a mixed question of law and fact. *In re Wachovia Equity Secs. Litig.*, 753 F. Supp. 2d 326, 376 (S.D.N.Y. 2011).

The SEC has promulgated internal guidance on assessing materiality that looks at both quantitative and qualitative factors. *See* SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150, 45150–52 (1999). The bulletin "suggests that there exists a preliminary assumption, or 'rule of thumb,' that changes of less than 5% to financial statements are immaterial, although there are various "qualitative factors" that could make even a small change material. *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012). The qualitative factors that may make a small misstatement material include, *inter alia*, (1) "whether the

---

"the fortunes of plaintiff and defendants are linked so that they rise and fall together." *In re J.P. Jeanneret Assoc.. Inc.*, 769 F. Supp. 2d 340, 359 (S.D.N.Y. 2011) (internal quotation marks and citation omitted). Thus, plaintiff proved that the transactions were a "common enterprise" under the *Howey* test, which this Court had previously noted was the primary fact in dispute. *See* 812 F. Supp. 2d at 257-61. Although there is not clear evidence that Adamo ever actually took a commission, "the fact that an investment company's operations are a sham and thus might not actually satisfy the common enterprise prong of the *Howey* test does not mean that the investment company can avoid the Securities Act." *SEC v. Unique Financial Concepts, Inc.*, 196 F.3d 1195, 1200 (11th Cir. 1999); *see also SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995) ("It would be a considerable paradox if the worse the securities fraud, the less applicable the securities laws.").

misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate"; (2) "whether the misstatement changes a loss into income or vice versa"; (3) whether management expects that "a known misstatement may result in a significant positive or negative market reaction." SEC Staff Accounting Bulletin No. 99, 64 Fed.Reg. at 45152. The Second Circuit considers this "persuasive authority." *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

"While opinion or puffery will often not be actionable, in particular contexts when it is both factual and material, it may be actionable." *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999). For example, in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), the Supreme Court held that a board of directors' statement of opinion that a proposal to purchase investors' shares was "fair" and represented a "high value" was a material misrepresentation if the defendants knew the statement was false. *Id.* at 1090-94; *see also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (holding that statements that inventory situation was "in good shape" and "under control" even though defendants "allegedly knew that the contrary was true" were actionable and stating that "[w]hile statements containing simple economic projections, expressions of optimism, and other puffery are insufficient, defendants may be liable for misrepresentations of existing facts" (internal citation omitted)).

"[I]t is well settled in this Circuit that a 10b-5 action can be maintained by the seller of a security who has been induced to sell by a misrepresentation as to the consideration to be paid for that security." *Pages, Inc. v. Gruner & Jahr Printing & Publ'g Co.*, 95

CIV. 9703, 1996 WL 48586, at *1 (S.D.N.Y. Feb. 7, 1996). The same is true for knowingly advising someone to buy a security at an inflated price. In *DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110 (S.D.N.Y. 2004), the defendants allegedly manipulated the price of a stock "by disseminating research analyst reports advising investors to purchase the stock at a time when defendants actually believed the stock to be greatly overvalued." *Id.* at 114. The Court held that the statements significantly overvaluing the stock, if true, were "amply sufficient to permit a reasonable factfinder to conclude that the misrepresentations were material." *Id.* at 118.

Although most cases involve a misrepresentation regarding a security, a broker-dealer who simply sells securities with an excessive markup is liable under the securities laws absent proper disclosure. *See Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184, 190 (2d Cir. 1998) ("A broker-dealer commits fraud (in violation of § 10(b) and Rule 10b–5) by charging customers excessive markups without proper disclosure." (collecting cases)). "The markup on a security is the difference between the price charged to the customer and the prevailing market price." *Id.* at 189. "The key issue in these cases has always been how to determine the 'prevailing market price,' which is the basis on which retail markups are computed," and, when a dealer is not a marketmaker, "a dealer's contemporaneous cost is the best evidence of the current market." *Id.* (citations and additional quotation marks omitted). "While a broker-dealer may add a markup to the wholesale price it pays for securities, the markup must be reasonable. Whether a markup is excessive must be determined on a case-by-case basis." *Id.* at 190. However, "[a]n undisclosed markup of more than 10%

above the prevailing market price has been held to constitute fraud *per se.*" *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1469 (2d Cir. 1996); *but see Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 535 (2d Cir. 1999) ("A ten percent mark-up on an instrument that is difficult to obtain and priced accordingly might not [always be excessive].").

ii.    Analysis

First, the Court notes that Adamo is unquestionably a dealer of securities. *See* 15 U.S.C § 78c(a)(5)(A) ("The term 'dealer' means any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise."). Although the statute includes an exception for individuals that buy or sell securities "not as a part of regular business," *id.* at 78(c)(a)(5)(B), such an exception is not applicable here because Adamo's business was buying and selling coins for profit. Accordingly, Adamo is a dealer of securities as defined by the Exchange Act. *See Couldock & Bohan, Inc. v. Societe Generale Sec. Corp.*, 93 F. Supp. 2d 220, 229 (D. Conn. 2000) ("It is clear that Plaintiff was not merely matching buyers and sellers, but rather was placing itself squarely in the middle of each transaction in order to reap the profits from the spread, i.e., the price difference between the buy and sell sides of the transactions, for its own account. The Court thus has no difficulty discerning from the undisputed facts that Plaintiff was a buyer and seller of securities for its own account as a part of its regular business, and thus was a dealer of securities as defined in the Exchange Act.").

Based on the representations of plaintiffs' experts (which, again, the Court finds credible) and the prices that Adamo charged Marini, Adamo marked up the price on these coins by extremely large amounts,

many times over 100% or 1000%. In addition, for some coins, the Court has documentary evidence of the price that Adamo paid for the exact coin he turned around and sold to Marini for a significantly higher price. *See First Jersey*, 101 F.3d at 1469 (stating that when a market for a security is not competitive, "the best evidence of the security's prevailing market price is the price controlling or dominating dealer actually paid").[21]

Because it is sometimes difficult to price rare coins, simply because Adamo charged a high markup does not necessarily indicate that such a markup is excessive.    The Second Circuit has stated that the following factors are relevant to determine whether a markup is excessive:

> the expense associated with effectuating the transaction, the reasonable profit fairly earned by the broker or dealer, the expertise provided by the broker or dealer, the total dollar amount of the transaction, the availability of the financial product in the market, the price or yield of the instrument, the resulting yield after the subtraction of the markup compared to the yield on other securities of comparable quality, maturity, availability, and risk, and the role played by the broker or dealer.

*Press*, 166 F.3d at 535. Weighing all these factors, the Court easily concludes that the markup was excessive. Even construing all of the relevant factors in defendants' favor, and assuming that the reasonable profit to be

---

[21] The Court notes that, even if Adamo paid an extremely low price for these coins (below market value), and even if plaintiffs' experts underestimated the value of the coins, Adamo *still* charged Marini an extremely high markup on the coins.

earned was high and that it was extremely difficult and time-consuming for Adamo to find and purchase these coins, the fact that the markups were often over 100% and sometimes were over 1000% demonstrates that the markup was excessive.

Accordingly, case law is clear that even absent any of the other material misrepresentations, Adamo is liable under § 10(b) because he is a securities dealer who charged an excessive markup. *See First Jersey*, 101 F.3d at 1469-71 (upholding district court's finding that defendant violated Section 10(b) when it charged an excessive markup for over-the-counter equity securities); *see also Grandon*, 147 F.3d at 192-94 (extending *First Jersey* to prohibit excessive markups on municipal securities even though such a disclosure is not mandated by the plain text of the Exchange Act).[22]

In addition, even if Adamo were not a dealer, or the case law regarding excessive markups did not apply to these securities, Adamo made several other material misrepresentations that render him liable under the Exchange Act.

As discussed in the Findings of Fact, Adamo made the following material

misrepresentations: (1) Adamo would be buying the same coins as Marini; (2) the coins were liquid and Marini could sell his coins within 24 to 48 hours; (3) Adamo would only charge a small commission on each coin; (4) the inflated values on the written coin statements; and (5) oral statements by Adamo and in emails regarding the specific value of particular coins.

Although related to the excessive markup claim, the Court finds that Marini would be liable under the Exchange Act even if he were not a dealer because he affirmatively represented that he would only charge Marini a minimal markup on each coin. Because it is apparent from the evidence at trial that Adamo charged a markup that often exceeded 100%, the representation that he would only charge Marini a small markup is an actionable misrepresentation under § 10(b).

Adamo's representation that Marini's assets were liquid because he could sell back the coins within 24 to 48 hours also constitutes a material misrepresentation. *See S.E.C. v. Gottlieb*, 88 F. App'x 476, 477 (2d Cir. 2004); *see also Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986) ("[M]aking a specific promise to perform a particular act in the future while secretly intending not to perform that act may violate Section 10(b) where the promise is part of the consideration for the transfer of securities.").

In addition, the inflated values of the coins contained on the written coin statements constitute material misrepresentations that induced Marini to purchase additional coins. In connection with that aspect of fraud, Adamo would buy back some coins at inflated prices to induce more purchases, and then once Marini made those purchases, by misrepresenting the

---

[22] Because defendants did not introduce any testimony rebutting the valuations of these coins, defendants' main theory throughout the trial was that charging a large markup for coins is not illegal. That may be true in a typical commercial transaction. However, because defendants stipulated that these transactions were securities, and because the Court finds that all of the other elements of a § 10(b) claim have been met, plaintiffs have demonstrated that this excessive markup constitutes a misrepresentation or omission that creates liability under the Exchange Act. However, assuming *arguendo* that the markup was not excessive, Adamo is still liable under Section 10(b) for failing to disclose the markup because there was a "fiduciary relationship with the complaining party." *Press*, 166 F.3d at 534.

value of those coins on the coin statements. While a "post-purchase fraud inducing plaintiff[s] not to pull out of the [coin transactions] would be inadequate in this circuit as a basis for establishing 10b–5 liability," fraudulent documents created after the initial purchase that induce additional purchases can form the basis of liability as long as the new purchase has some "causal relationship to the alleged fraudulent act." *Connors v. Lexington Ins. Co.*, 666 F. Supp. 434, 443-44 (E.D.N.Y. 1987).

Some of these misrepresentations that the Court finds constitute a violation of § 10(b) occurred outside of the period of repose, *i.e.*, they were made in connection with the first coin purchases that the Court has now found are not actionable because they occurred more than five years before the complaint was filed. However, in making the purchases after September 30, 2003, these oral representations made prior to September 30, 2003 were inherent in the parties' dealings based on the nature of these transactions, and the Court finds that those representations constitute a § 10(b) violation for transactions that occurred after September 30, 2003. In other words, when Marini purchased coins after September 30, 2003, he relied on material misrepresentations that occurred prior to September 30, 2003 because the course of the parties' dealings remained the same throughout the six-year period of these transactions. In any event, assuming *arguendo* that the Court found that those oral representations were no longer actionable, Adamo would still be liable under the Exchange Act because: (1) he was a securities dealer who charged an excessive markup without full disclosure; and (2) he created coin statements with false values for coins in order to induce further purchases.

However, as stated in the Findings of Fact, certain other representations made by Adamo were mere puffery, and thus not actionable under the Exchange Act. Adamo's broad statements informing Marini that these prices were at the "dirt bottom," that the coins never went down and would certainly rise in value, that the coins had potential returns of over 20 percent, and that Marini was purchasing the top 1 percent of 1 percent of coins could not have misled a reasonable investor. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (statement that company was "optimistic" about its earnings was mere puffery); *Zerman v. Ball*, 735 F.2d 15, 21 (2d Cir. 1984) (characterizing a bond as "marvelous" not actionable); *Rotstein v. Reynolds & Co.*, 359 F. Supp. 109, 113 (N.D. Ill. 1973) (saying it is "impossible to lose money in an investment" is puffery). A reasonable investor would have known that these statements, as opposed to the specific material misrepresentations that are actionable, were "nothing more than the common puff of a salesman."[23] *Newman v.*

---

[23] The parties spent a considerable portion of the trial disputing whether Adamo ever described the coin purchases as "investments." (*Compare* Tr. at 434 (Marini testifying that Adamo stated the coins would be "incredible investment purchases") *and* PX48 at PL1123 (Adamo stating in surreptitiously recorded conversation that he owned some coins that he would not "recommend to [Marini] for investment"), *with* Tr. at 1480 (Adamo testifying that he "never represented them as investment").) As a threshold matter, the Court notes that it credits Marini's testimony that Adamo explicitly referred to the coin purchases as investments and there is absolutely no question based upon the overwhelming credible evidence in the record submitted by plaintiff that both parties understood these purchases to be for investment. In any event, the Court finds that the label is not dispositive for purposes of determining liability. The mere reference to a purchase as an "investment," without more, is not a material misstatement and would not establish liability under the Exchange Act. To the extent plaintiffs' suggest

*L.F. Rothschild, Unterberg, Towbin*, 651 F. Supp. 160, 163 (S.D.N.Y. 1986) (citation and internal quotation marks omitted).

c.  Scienter

"To establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citation and internal quotation marks omitted). "A plaintiff can establish this intent either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citation and internal quotation marks omitted); *see also Novak*, 216 F.3d at 312 (stating that conscious recklessness is a "state of mind approximating actual intent, and not merely a heightened form of negligence" (citation and internal quotation marks omitted)). The Second Circuit has stated that the "requisite intent exists when it is clear that a scheme, viewed broadly, is necessarily going to injure." *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 220

(2d Cir. 2000) (alteration, citation, and internal quotation marks omitted). Proof of scienter "can be and customarily is presented through circumstantial evidence." *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 495-96 (S.D.N.Y. 2005). "Whether or not a given intent existed, is, of course, a question of fact." *First Jersey*, 101 F.3d at 1467.

As discussed in the Findings of Fact, the Court concludes—as the trier of fact in this matter—that Adamo intentionally made material misstatements or omissions. Because Adamo "knowingly and intentionally" deceived plaintiffs and made material misrepresentations, he acted with the requisite scienter to establish liability under § 10(b)(5). *S.E.C. v. Enters. Solutions, Inc.*, 142 F. Supp. 2d 561, 574 (S.D.N.Y. 2001); *see also S.E.C. v. Constantin*, 11 CV 4642, 2013 WL 1453792, a *16-17 (S.D.N.Y. Apr. 2, 2013) (defendants acted with requisite scienter when they, *inter alia*, lied to clients, manufactured false documents, and sent clients account statements they knew to be false).

d.  Connection

Plaintiffs must also demonstrate a connection between the misrepresentation or omission and the purchase or sale of a security. "[D]istrict courts have found that when an alleged misrepresentation concerns the value, nature or investment characteristics of the securities at issue, it satisfies the in connection with requirement." *Louros v. Kreicas*, 367 F. Supp. 2d 572, 588 (S.D.N.Y. 2005) (citations and internal quotation marks omitted); *cf. Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 596-97 (2001) (in connection with requirement satisfied when defendant sold an option "while secretly intending from the very beginning not to honor the option").

that Adamo's statements regarding the term "investment" were material misstatements because of Adamo's statements regarding the strength of the investment, (*i.e.*, the coins were "incredible investments"), such a statement is mere puffery. *See Dafofin Holdings S.A. v. Hotelworks.com, Inc.*, 00 CIV. 7861, 2001 WL 940632, at *4 n.6 (S.D.N.Y. Aug. 17, 2001) (statement that a hotel was a "great investment" which would make "quick money" is "mere puffery" (internal quotation marks omitted)). As discussed *supra*, other statements of this nature by Adamo are not actionable. However, the more specific statements that Adamo made regarding the nature of this securities purchase, whether or not it was explicitly labelled as an "investment," are actionable and give rise to liability under the Exchange Act for all the reasons stated herein.

31

In this case, it is clear that the in connection with requirement is satisfied. Adamo made material misrepresentations in order to induce plaintiffs to purchase securities. Thus, plaintiffs have satisfied the burden of proof as to this element. *See United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1221 (10th Cir. 2000) ("The representations allegedly were made to induce UIH to purchase the option. As such, the misrepresentations were made to influence UIH's investment decision and were made in connection with the purchase or sale of a security."), *aff'd*, 532 U.S. 588 (2001); *Troyer v. Karcagi*, 476 F. Supp. 1142, 1147 (S.D.N.Y. 1979) (element satisfied "because the misrepresentations and omissions allegedly induced" plaintiffs' actions.).

e.   Transaction Causation

i.   Applicable Law

In order to prove liability under § 10(b)(5), a plaintiff must demonstrate reliance, also known as transaction causation. To satisfy this element, a plaintiff must show "that but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001). However, a plaintiff need not specifically demonstrate reliance when there is a duty to disclose, such as when a defendant is a dealer or a fiduciary. Instead, there is "a rebuttable presumption of reliance . . . if there is an omission of a material fact by one with a duty to disclose." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008).

Not all reliance is sufficient to demonstrate liability under the Exchange Act. Instead, the reliance must be "reasonable" or "justifiable." *In re Adelphia*

*Commc'ns Corp. Sec. & Derivative Litig.*, 542 F. Supp. 2d 266, 267 (S.D.N.Y. 2008). The Second Circuit has succinctly explained the standard that courts must apply:

A showing of reliance may be defeated, however, where defendant establishes that plaintiff should have discovered the true facts. This has been called the due diligence test, to which, traditionally, a negligence standard has applied. . . . [T]he degree of diligence to which plaintiffs are held has been diminished to minimal diligence. More specifically, a plaintiff bears only the burden of negating its own recklessness, once the issue of diligence is raised by defendant.

*Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1016 (2d Cir. 1989) (internal citations and quotation marks omitted); *see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003) ("In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them.").

The Second Circuit has stated that although district courts need not "recite its factor-by-factor balancing of the relevant considerations," that many courts have been guided by the following factors:

(1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the

32

opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993).

ii.    Analysis

As stated in the Findings of Fact, the Court concludes that plaintiffs reasonably relied on Adamo's misrepresentations, and that a reasonable plaintiff would find that these representations were important in making an investment decision. The Court now sets forth the details of that reasoning as applied specifically to this element (as opposed to the other elements of this case in which reliance must be determined) and the case law that supports such a determination.

Defendants do not dispute that a reasonable investor would find these representations important in making an investment decision. *Affiliated Ute*, 406 U.S. 128 at 153-54. Instead, defendants argue that Marini could not have reasonably relied on Adamo's statements because he did not perform any due diligence before purchasing the initial coins and throughout the relevant period, *i.e.*, that he should have discovered the markups. They claim that because Marini was a sophisticated investor with ample resources, it was unreasonable for him to rely on any representations without verifying the market price of the coins, something that could have been easily performed. However, the Court finds that plaintiffs have satisfied their burden on this issue.

Marini admits that he did not perform due diligence on the coins. He admitted that he "never thought about" using the internet

to research coin values. (Tr. at 947-48.) Although the parties dispute when Marini acquired a coin pricing guide, it is undisputed that he did not use it to thoroughly investigate the price of coins.

First, in balancing the factors laid out by the Second Circuit to assist this Court in determining the reasonableness of a plaintiff's reliance, defendants incorrectly state that Marini is a sophisticated investor in coins due to his wealth, board membership at a bank, and his experience owning a successful small business. In evaluating the sophistication of a plaintiff, courts must determine whether the individual is sophisticated in the security at issue, not whether he is generally knowledgeable about finances. *See McAnally v. Gildersleeve*, 16 F.3d 1493, 1500 (8th Cir. 1994) (holding that there was sufficient evidence to conclude that plaintiffs were not sophisticated about commodities futures options even though plaintiffs had "significant experience and success with stocks and bonds"); *Nathel v. Siegal*, 592 F. Supp. 2d 452, 466 (S.D.N.Y. 2008) (holding that plaintiffs were not sophisticated in oil and gas investments despite their ownership of a fruit wholesale business); *Babaev v. Grossman*, 03-CV-5076, 2007 WL 633990, at *7 (E.D.N.Y. Feb. 26, 2007) ("Although plaintiffs are sophisticated business persons in the catering or wait-service industry, there is no indication that they are sophisticated and possess expertise in finance or investment matters."). The trial testimony overwhelmingly demonstrated that Marini was unsophisticated regarding rare coins.

Additional support for the Court's conclusion is that Marini and Adamo shared a longstanding personal relationship. As detailed *supra*, the Marinis met the Adamos in 1992 and became close friends, which included spending vacations together and

becoming godparents to their kids. The families were friends for ten years before any business relationship formed. *See Holdsworth v. Strong*, 545 F.2d 687, 697 (10th Cir. 1976) (en banc) (affirming district court's conclusion following a bench trial that plaintiff reasonably relied on defendant's misrepresentations when plaintiff and defendant were not only "business friends, [but] their friendship extended as well to their families" and stating that the friendship "explains why [plaintiff] failed to challenge [defendant's] representations every step of the way").

In *Abbey v. 3F Therapeutics, Inc.*, 06 CV 409, 2011 WL 651416 (S.D.N.Y. Feb. 22, 2011), *aff'd sub nom. Abbey v. Skokos*, 509 F. App'x 92 (2d Cir. 2013), the Court found that a personal relationship between the parties did not lead to a finding of reasonable reliance. However, the facts of *Abbey* are entirely distinguishable from this case. First, in *Abbey*, the parties talked "sporadically at best" and communicated only "once or twice per year." *Id.* at *12. Here, in contrast, the Marinis and Adamos were close personal friends who went on vacation together and were the godparents to each other's kids. In addition, in *Abbey*, plaintiff was a "very sophisticated investor with expertise concerning federal securities transactions" who had been given materials to review, *id.* at *8, while Marini was unsophisticated regarding coins and was not given materials that would have demonstrated that he was being charged an excessive markup.

Also supporting a finding of reasonable reliance is that Adamo fraudulently returned sizeable profits for plaintiffs in order to induce future purchases and conceal the fraud. The Court concludes, after hearing all of the testimony and reviewing the documentary evidence, that Adamo

sacrificed some of his own ill-gotten profits early in the relationship in order to conceal the fraud from Marini and discourage him from conducting an investigation into the true value of the coins. This is buttressed by the fact that when Marini did try to do some research in the latter half of the relationship, Adamo always had convincing excuses for why Marini could not rely upon outside sources for information. (*See, e.g.*, Tr. at 970, 972.) Accordingly, the concealment of the fraud factor also weighs in plaintiffs favor.

Some testimony was introduced at trial that Marini could have looked up coin values in books. However, Adamo stated that those coin values were outdated by at least a year, inaccurate, and did not represent the type of coins that Marini was buying. In addition, the experts that testified primarily used prices of similar coins sold at auction to triangulate the value of the coin. This data would not have been available to Marini because even if Marini had the sophistication to determine which similar coins could have been used as comparators, which he did not, there is no indication of how he would get this information. Despite defense counsel's suggestion that search engines existed in 2002 and defense counsel's attempt to introduce a 2002 press release in a post-trial submission, there was no evidence introduced at trial that this specific information was readily available online during the first few years of the parties' dealings. In fact, Parrella testified that one of the main sources of auction records was not publically available online until after 2008.[24]

---

[24] Even assuming *arguendo* that defendants had properly submitted evidence indicating that at least one auction website had information on coins available, this evidence alone would not alter the Court's decision because, as noted *supra*, the Second Circuit has held that whether reliance is reasonable

In addition, this is not a case where the misstatements "contained a high level of generality, severely weakening [plaintiffs'] claim of reasonable reliance." *In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 537 (S.D.N.Y. 2012). Although there were some general statements that the Court finds to be puffery, Adamo made specific statements regarding the liquidity of the investments, the value of the coins, and the markup to be charged.

Therefore, after having considered all of the evidence, and especially the factors highlighted by the Second Circuit in *Brown*, the Court finds that it was reasonable for Marini to rely on Adamo's representations, and that plaintiffs have satisfied their burden on this issue. The law in this Circuit does not require a plaintiff to perform adequate due diligence; instead, a plaintiff must merely show that he did "not act recklessly." *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 319 (S.D.N.Y. 2011). In this case, plaintiffs did not act recklessly (and did not even act negligently under the circumstances), and because plaintiffs would not have entered into these transactions without the fraudulent statements or omissions, plaintiffs have demonstrated transaction causation.

### f.   Economic Loss

Plaintiffs have established an economic loss as a result of the fraud. The testimony at trial demonstrated that plaintiffs paid $16,797,404 for coins, that $2,540,000 was returned to Marini in various deals, and that plaintiffs' current holdings are worth approximately $2,953,325. (*See* PX52.) Plaintiff suffered an economic loss by paying over $16 million for securities that were worth far less. Accordingly, plaintiffs are entitled to "the excess of what [they] paid over the value of what [they] got." *Gurary v. Winehouse*, 235 F.3d 792, 799 (2d Cir. 2000) (citation and internal quotation marks omitted).

### g.   Loss Causation

Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (citation and internal quotation marks omitted). "Thus to establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise, the loss in question was not foreseeable." *Id.* at 173 (alteration, citation, and internal quotation marks omitted). It is not sufficient for an investor to allege only that she paid an inflated purchase price for a security. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-47 (2005). Instead, plaintiffs must demonstrate that "(1) defendants concealed a foreseeable risk associated with a securities transaction between plaintiffs and defendants; and (2) the foreseeable risk occurred causing plaintiffs' loss." *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 305 (S.D.N.Y. 2005) (citing *Mfrs. Hanover Trust Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 22 (2d Cir. 1986) and *Weiss v. Wittcoff*, 966 F.2d 109, 112 (2d Cir. 1992), *aff'd sub nom. Tenney v. Credit Suisse First Boston Corp., Inc.*, Nos. 05-3430-CV, 05-4759-CV, 05-4760-CV, 2006 WL 1423785 (2d Cir. May 19, 2006).

In a typical § 10(b) action, a plaintiff demonstrates loss causation through a fraud-

---

requires a balancing of numerous factors, and nearly all of the factors weigh in plaintiffs' favor.

on-the-market theory. A plaintiff will identify a "'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud)" and then show that "the stock price dropped soon after the corrective disclosure." *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1311 (11th Cir. 2011). A plaintiff must also eliminate "other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure – as opposed to other possible depressive factors – that caused at least a substantial amount of the price drop." *Id.* at 1312 (citation and internal quotation marks omitted). Therefore, in those cases, a court must determine whether the drop in a stock's price is attributable to a misrepresentation or to unrelated intervening factors that would have caused the drop in price even in the absence of a misrepresentation.

The case before this Court, however, is far simpler. The Court need not review expert reports to determine if the value of the security would have dropped in the absence of the disclosures because Adamo did not inject misrepresentations into the market to boost the value of the security. Instead, the value of the security was always lower than Adamo claimed, and his misrepresentations inflated how much plaintiffs should have paid for that security. Therefore, the value of plaintiffs' investments did not drop after a corrective disclosure; it dropped immediately upon purchase. *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 97-98 (2d Cir. 2001) (stating that loss causation is demonstrated if "defendants' misrepresentations induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of transaction"); *Marbury Mgmt., Inc.*

*v. Kohn*, 629 F.2d 705, 708-09 (2d Cir. 1980) (upholding district court's determination following a bench trial that loss causation was established when defendant misrepresented that he was licensed to sell securities because liability should attach "for the damages flowing from" the misrepresentation).

Plaintiffs have demonstrated by a preponderance of the evidence that defendants' misrepresentation was the cause of the actual loss suffered. Judge Scheindlin's decision in *Fogarazzo v. Lehman Brothers*, *Inc.*, 341 F. Supp. 2d 274 (S.D.N.Y. 2004), while not directly on point, is instructive. In that case, plaintiffs alleged that investment banks lied about the financial health of the security by stating that the security was drastically underpriced even though the banks knew that there were warning signs of its decline. Judge Scheindlin held that plaintiffs adequately alleged loss causation by stating that the banks inflated the price of the shares. *See id.* at 289-92.

The situation in this case is slightly different, but far simpler and leads to the same conclusion. Had Adamo not made misrepresentations regarding the markup he charged, plaintiffs would have paid far less for the security. Thus, the evidence showed that the losses plaintiffs suffered directly resulted from Adamo's misrepresentations because those misrepresentations induced plaintiffs into paying for a security at a far higher cost than it was ever worth. *Cf. Lentell*, 396 F.3d at 175 (stating that plaintiffs had not adequately pled loss causation because, *inter alia*, "plaintiffs [did not] allege that [defendant] concealed or misstated any risks associated with an investment in [the security], some of which presumably caused plaintiffs' loss").

Defendants argue that "the alleged misrepresentations . . . have no logical or factual connection to the reasons why Marini's coin transactions may ultimately turn out to be losing propositions . . . . If Marini loses money on his coin transactions, the reason is that today's buyers are unwilling to pay what Marini (and others) were paying for those or similar coins prior to the financial crash." (Defs.' Mem. at 97.) This argument is without merit. Plaintiffs' purchase turned out to be a losing proposition because Adamo lied, *inter alia*, about the value of the securities and about the markup he would charge. The loss did not occur because of the intervening force of the financial crash; it occurred as soon as Adamo sold him coins with an excessive markup while falsely claiming he only charged a small commission.[25]

The 1980 Canadian Penny, Grade PMS64 is an instructive example. In February 2003, records indicate that Adamo bought that coin from Fred Weinberg & Co for $15,000. One month later, Adamo sold Marini that coin for $250,000. Accordingly, Adamo's fraudulent statement about the markup he would charge and the value of that coin was the cause of the actual loss suffered in 2003, long before any intervening force could have caused the drop in value.

The Second Circuit has held that loss causation occurs when "the damage was either a direct result of the misleading statement or one which could reasonably have been foreseen." *Mfrs. Hanover Trust*,

801 F.2d at 21. For the reasons set forth above, the Court finds that plaintiffs' loss was a direct result of Adamo's false and misleading statements, and, therefore, that plaintiffs have satisfied their burden of proof on this claim.

### h.  Parties Liable

Plaintiffs request relief against not only Adamo himself but the corporations he owns, H. Edward and Bolton. "To prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). Adamo's actions are indisputably attributable to the corporate entities of Bolton and H. Edward because Adamo was the owner and president of both corporations. *See Constantin*, 2013 WL 1453792, at *17 (because the two defendants were "essentially" the corporation's only two employees, their conduct was "clearly attributable" to the corporate defendant). Because Adamo's actions are attributable to the corporations he owns, the Court finds that Adamo, H. Edward, and Bolton are all liable under the Exchange Act.

### C.  Common Law Fraud

"Under New York law, the elements of common law fraud are a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir. 1999) (citation and internal quotation marks omitted). Courts have found that the elements necessary to establish a claim under 10(b) "are essentially the same

---

[25] The Court notes that this argument is also clearly erroneous because the undisputed and credible evidence at trial was that only Marini paid such high prices for coins, and that other coin purchasers would not have paid such high prices. Defendants did not attempt to introduce any evidence that other coin purchasers bought these coins at the same or a similar price as Marini.

as those for common law fraud in New York." *Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*, 747 F. Supp. 2d 406, 414 (S.D.N.Y. 2010), *aff'd sub nom. Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636 (2d Cir. 2012); *see also Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 298 (S.D.N.Y. 2011) ("Because the elements of common law fraud under New York law are substantially identical to those governing Section 10(b), an identical analysis applies." (citation and internal quotation marks omitted)).

However, as plaintiffs note in their post-trial submission, there are some elements of New York common law that are more favorable to their case. Those differences are addressed below. To the extent that the law is identical, such as whether: (1) a representation is material; (2) defendants acted with intent; (3) there is reasonable reliance on the representations[26,27,28]; and (4)

damage has been caused by defendants' actions, the Court's analysis under § 10(b) applies with equal force to the common law fraud claim.

One major difference between a claim under § 10(b) and New York common law is that, as discussed *supra*, plaintiffs must prove each element of common law fraud by clear and convincing evidence, as opposed to a preponderance of the evidence. The

---

[26] Often, the reliance inquiry is different when analyzing claims for common law fraud as compared to the federal securities laws. *See Turtur v. Rothschild Registry Int'l, Inc.*, 92 CIV. 8710, 1993 WL 338205, at *7 (S.D.N.Y. Aug. 27, 1993) ("Because common law fraud claims must be supported by a showing of direct reliance on the misrepresentation or omission, they are distinct from actions brought under the federal securities laws, which permit a rebuttable presumption of reliance where a plaintiff purchases his shares on the open market." (citation and internal quotation marks omitted)). Here, the analysis is identical because plaintiffs did not purchase these coins on the open market, as in most securities cases, but instead engaged in a face-to-face transaction. In any event, the Court finds, based upon the evidence summarized in connection with the Exchange Act claim, that plaintiffs have demonstrated by clear and convincing evidence that Marini reasonably relied on Adamo's representations.

[27] Defendants argue that plaintiffs cannot prove a common law fraud claim because they purchased some coins with money from their children's trust accounts and co-mingled that money with other funds. (Defs.' Mem. at 93.) Defendants make two distinct but related arguments. First, plaintiffs had an

"independent duty to conduct due diligence when investing their children's [trust] funds." (*Id.* at 94.) Defendants also argue that plaintiffs cannot recover for the coins they purchased with funds from their children's trust accounts because they lack standing to recover for those funds. (*Id.*) With regard to plaintiffs' standing, plaintiffs as custodian of the trust have standing to bring this action. *See* N.Y. E.P.T.L. § 7-6.11(b). As for the due diligence argument, defendants indirectly appear to be making an "unclean hands" or "culpable conduct" defense, which they specifically withdrew. (JPTO at ¶ 3.) Therefore, plaintiffs need only demonstrate that the reliance on Adamo's representations was reasonable, which the Court has determined it was. In addition, defendants lack standing to challenge the use of the trust funds. *See* N.Y. E.P.T.L. § 7-6.19. Therefore, any argument that plaintiffs cannot recover the money they took from their children's trust funds to purchase coins is without merit.

[28] After post-trial briefing in this matter was complete, defendants submitted a letter directing the Court's attention to a recent opinion in which the Supreme Court in Kings County dismissed a lawsuit by law school graduates claiming that the law school's publication of misleading statistics was an act of fraud because, *inter alia*, reliance on such statistics was "not justifiable as a matter of law, given the other sources of information that were available to plaintiffs." *Bevelacqua v. Brooklyn Law Sch.*, 39 Misc. 3d 1216(A) (Kings Cnty. Sup. Ct. 2013). However, as the Court has noted, plaintiffs reasonably relied on Adamo's misrepresentations because valuations for these coins was not readily available to an unsophisticated investor such as Marini; this information was certainly far more difficult to find than statistics on employment following law school. In any event, even if coin valuations were more widely available, Adamo is still liable under New York common law because, as discussed *infra*, he had a broader duty to speak because of his fiduciary relationship with Marini.

Court finds that plaintiffs' have satisfied their burden, and that they have shown by clear and convincing evidence that defendants committed fraud under New York law.[29]

### 1. Material False Representation

New York common law imposes a broader duty of truthfulness in a business transaction than § 10(b). As discussed *supra*, under the Exchange Act, an individual only has a duty of full disclosure if she is a dealer of securities, is an agent, or if she has made partial disclosures that leaves a statement misleading in the absence of additional disclosures. However, "New York recognizes a duty by a party to a business transaction to speak in three situations: first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth, second, when the parties stand in a fiduciary or confidential relationship with each other, and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (internal citations and quotation marks omitted).

Because the Court finds that Adamo made material misrepresentations that are liable under the Exchange Act, Adamo also made material misrepresentations that satisfy the element under New York common law. However, Adamo is additionally liable because of the broader duty to speak under New York law.

### a. Fiduciary or Confidential Relationship

First, Adamo had a broader duty to speak due to the relationship between him and Marini. The parties were close friends for ten years before they began conducting business. They were godparents to each other's children and they took vacations together. Under New York law, "a fiduciary relationship embraces not only those the law has long adopted – such as trustee and beneficiary – but also more informal relationships where it can be readily seen that one party reasonably trusted another [such as] . . . close friends or family members." *Id.* at 150-51. As set forth in greater detail *infra* in connection with whether Adamo is liable for breach of fiduciary duty, the Court finds that this relationship rose to a level in which Adamo stood as a fiduciary to Marini. Accordingly, because of this relationship, the Court finds that Adamo breached his duty to disclose. *See Bickhardt v. Ratner*, 871 F. Supp. 613, 619 (S.D.N.Y. 1994) (denying summary judgment on fraud claim because, *inter alia*, jury could find that defendant had breached duty to disclose when parties had been friends for twenty-five years).

### b. Superior Knowledge

Adamo also had a duty to disclose because Adamo had superior knowledge that was not readily available to Marini, and Adamo knew that Marini was acting on the basis of that knowledge. It is undisputed that Adamo had superior knowledge of rare coins, and it is clear from the trial testimony that Marini fully relied on Adamo's recommendations regarding which coins to buy and sell. However, defendants spent a significant amount of time at trial advancing the notion that information regarding the market price of these coins was readily

---

[29] Thus, to be clear, to the extent that an element is identical under New York law and federal law, plaintiffs have proven that element by clear and convincing evidence, and not simply by a preponderance of the evidence.

available through coin books or auction records.

"In general where a buyer has an opportunity equal to that of a seller to obtain information, such information is 'readily available,' and the buyer is expected to protect himself in a business transaction. Yet, in an increasing number of situations, a buyer is not required to conduct investigations to unearth facts and defects that are present, but not manifest." *Brass*, 987 F.2d at 151 (internal citation omitted). However, courts have held that a plaintiff cannot establish a "duty to disclose where the information at issue was a matter of public record that could have been discovered through the exercise of ordinary diligence." *246 Sears Rd. Realty Corp. v. Exxon Mobil Corp.*, 09-CV-889, 2012 WL 4174862, at *14 (E.D.N.Y. Sept. 18, 2012) (collecting cases under New York law).

As set forth in the Findings of Fact, the Court finds that this information was not readily available to Marini. This is not a simple case where a duty to disclose clearly exists because the information is solely within the defendants' possession. *See, e.g.*, *Century Pac., Inc. v. Hilton Hotels Corp.*, 03 CIV. 8258, 2004 WL 868211, at *9 (S.D.N.Y. Apr. 21, 2004). The situation between these parties is more difficult because the market value of the coins could have been discovered, but it would have required plaintiffs to engage in an extensive investigation, demanding additional expertise. Although there are numismatic publications that list approximate values for coins, Adamo himself admitted that those books were outdated and often did not contain prices for high grade coins. (Tr. at 1226.) Instead, as plaintiffs' experts testified, the best way to determine the market value for a coin is by using auction records. While those records are readily

available online now, those records were not easily available to a non-expert in 2002 and 2003. (*Id.* at 274.)

Case law is clear that plaintiffs are not required to undertake an extensive investigation to demonstrate common law fraud. *See Brass*, 987 F.2d at 151 (stating that "the rule of 'superior knowledge' [now applies] in an array of contexts in which silence would at one time have escaped criticism" and that, for example, "a buyer is not expected to discover that a house is infested with termites").

It is also clear that Adamo knew Marini was acting on the basis of mistaken knowledge. To contrast this situation, in *Banque Arabe Et Internationale D'Investissement v. Maryland National Bank*, 57 F.3d 146 (2d Cir. 1995), the Second Circuit held that no duty to disclose existed because a plaintiff must establish that they were "either relying on [defendant] for that information or acting on the basis of mistaken information." 57 F.3d at 156. In this case, the testimony overwhelmingly demonstrated that Adamo knew that Marini was relying on his disclosures regarding the value of the coins and that Marini acted on the basis of the misrepresentations. *See Stevenson Equip., Inc. v. Chemig Const. Corp.*, 170 A.D.2d 769, 771 (3d Dep't 1991) *aff'd*, 79 N.Y.2d 989 (1992) (upholding jury verdict of fraud when "[t]here is also evidence that defendants were aware that plaintiff was acting on the basis of a mistaken belief . . . [and] [t]his situation imposed an obligation to disclose on defendants' part").

### 2.  Proximate Causation

Under New York common law, a plaintiff need not demonstrate loss causation as required under the federal securities law.

*See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007). Instead, "a fraud plaintiff must show that he acted on the basis of the fraud and suffered pecuniary loss as a result of so acting." *Id.*; *see also Friedman v. Anderson*, 23 A.D.3d 163, 167 (1st Dep't 2005) ("To establish a fraud claim, a plaintiff must demonstrate that a defendant's misrepresentations were the direct and proximate cause of the claimed losses.").

Plaintiffs have demonstrated by clear and convincing evidence that defendants' actions were the proximate cause of their loss. As discussed *supra*, Adamo made material misrepresentations regarding the value of the coins and how much markup he would charge, the type of coins he bought, and the liquidity of the investment. As soon as plaintiffs purchased those coins in direct reliance of those misrepresentations, Adamo's actions proximately caused plaintiffs' loss because plaintiffs now owned coins worth far less than they paid for them.

\* \* \*

Accordingly, because Adamo not only made material misrepresentations but also violated his broader duty to speak, plaintiffs have proven by clear and convincing evidence that Adamo is liable for fraud under New York common law. H. Edward and Bolton are also liable because Adamo owned those corporations and used them to commit the fraud. *See Connell v. Hayden*, 83 A.D.2d 30, 46 (2d Dep't 1981) ("Business corporations are liable under the doctrine of *respondeat superior* for the torts of their employees committed within the scope of the corporate business.").

## D.  Breach of Fiduciary Duty

Plaintiffs also argue that Adamo breached a fiduciary duty he owed to Marini. "In order to sustain a claim of breach of fiduciary duty under New York law, [plaintiffs] must prove the existence of a fiduciary relationship, misconduct by [defendants], and damages directly caused by [defendants'] misconduct." *Margrabe v. Sexter & Warmflash, P.C.*, 353 F. App'x 547, 549 (2d Cir. 2009) (citation and internal quotation marks omitted); *see also Rut v. Young Adult Inst., Inc.*, 74 A.D.3d 776, 777 (2d Dep't 2010).

### 1.  Fiduciary Relationship

The determination of whether a fiduciary duty exists cannot be determined "by recourse to rigid formulas." *Scott v. Dime Sav. Bank of N.Y., FSB*, 886 F. Supp. 1073, 1078 (S.D.N.Y. 1995). In determining whether a fiduciary relationship exists under New York law, a court must examine "whether one person has reposed trust or confidence in the integrity and fidelity of another who thereby gains a resulting superiority or influence over the first." *Teachers Ins. & Annuity Ass'n of Am. v. Wometco Enters., Inc.*, 833 F. Supp. 344, 349–50 (S.D.N.Y. 1993); *see also Mandelblatt v. Devon Stores*, 132 A.D.2d 162, 168 (1st Dep't 1987) ("'A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'" (quoting Restatement (Second) of Torts § 874, cmt. a)). "[D]etermining the existence of a fiduciary relationship requires a fact-specific inquiry . . . ." *St. John's Univ., N.Y. v. Bolton*, 757 F. Supp. 2d 144, 166 (E.D.N.Y. 2010).

Although plaintiffs strenuously argue to the contrary, New York law requires that a fiduciary relationship "must exhibit the characteristics of 'de facto control and dominance.'" *Doe v. Roman Catholic Diocese of Rochester*, 12 N.Y.3d 764, 765, (2009) (citation omitted); *see also People ex rel. Cuomo v. Coventry First LLC*, 13 N.Y.3d 108, 115 (2009) (stating that a fiduciary relationship "exists only when a person reposes a high level of confidence and reliance in another, who thereby exercises control and dominance over him"). However, such control and dominance can be asserted in informal relationships, including those between friends. *See Marmelstein v. Kehillat New Hempstead*, 45 A.D.3d 33, 37 (1st Dep't 2007), *aff'd*, 11 N.Y.3d 15 (2008). Based on the unique circumstances of this case, the Court finds that Marini's complete "confidence and reliance" in Adamo allowed Adamo to "exercise[] control and dominance over him." *Coventry First*, 13 N.Y.3d at 115. (*See* PX1 at PL3596-97 (after Adamo tells Marini that "COINS, gold, silver & platinum are on the move faster than your seatbelt," Marini asks Adamo "should I be buying metals?" and Adamo advises him "not yet, wait for the dips in metals and [I] will advise you"); *id.* at PL3599 (Marini e-mails Adamo: I want to express my gratitude for exposing me to your world giving me the opportunity to generate security for my family"); *id.* at PL3637 (Adamo e-mails: "Here is the deal that will make you and me the best money yet").)

Courts have held that relationships between individuals in which there should be less confidence and reliance than this one constitute a fiduciary relationship. *See Precision Glass Tinting, Inc. v. Long*, 293 A.D.2d 594, 594 (2d Dep't 2002) ("It is well established that a real estate broker is a fiduciary with a duty of loyalty and an obligation to act in the best interests of the principal.").

It is true that "[b]y their nature, arms-length commercial transactions ordinarily do not involve relationships defined by the New York courts as fiduciary. However, a fiduciary duty may arise in the context of a commercial transaction upon a requisite showing of trust and confidence." *Muller-Paisner v. TIAA*, 289 F. App'x 461, 466 (2d Cir. 2008) (internal citation omitted). In this case, is it clear that this was not an arms-length commercial transaction because Marini believed that Adamo was acting in his best interest by selecting coins, getting beneficial prices, and buying the same coins as Marini. Even if this was such a transaction, plaintiffs have demonstrated that there was sufficient trust and confidence to elevate these coin deals into a fiduciary relationship.

After considering all of the testimony and case-law, the Court finds that Adamo had a fiduciary relationship with Marini. No one single factor informs the Court's decision on this highly fact-specific issue. Upon consideration of the extremely close friendship between these two individuals and their families, Adamo's superior knowledge of rare coins, Adamo's representation that he was buying the same coins as Marini was, Marini's belief that Adamo was facilitating these coin purchases for Marini's best interest, and Marini's complete trust and confidence in Adamo's selections and pricing, it is clear that Adamo acted as Marini's fiduciary. *See St. John's Univ.*, 757 F. Supp. 2d at 167 (stating that a fiduciary relationship exists when "a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge" (citation and internal quotation marks omitted)).

## 2.  Misconduct

Plaintiffs must also demonstrate that Adamo breached his fiduciary duty, *i.e.*, that he committed misconduct in the course of his relationship with Marini. A fiduciary's undisclosed financial benefit in a transaction has been held to constitute a breach of that duty. For example, in *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11 (2005), the New York Court of Appeals held that plaintiff had sufficiently alleged that Goldman Sachs breached its fiduciary duty by failing to disclose that it had a financial incentive to set a lower price for its client's IPO. *See id.* at 18-20; *see also Sheehy v. New Century Mortg. Corp.*, 690 F. Supp. 2d 51, 71 (E.D.N.Y. 2010) (finding that a rational jury could conclude that individual breached fiduciary duty when he did not provide "full disclosure about the payments he was receiving").

Adamo breached his fiduciary duty to Marini during the course of these coin transactions. Adamo represented to Marini that he was charging him a small commission. However, he was charging commissions that far exceeded his representations. In other words, he failed to disclose to Marini that he had a conflict of interest and was engaging in self-dealing, actions that are forbidden under the well-established law of fiduciaries. *See Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466 (1989) (stating that the law of fiduciaries "bar[s] not only blatant self-dealing, but also require[es] avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty").

Defendants continuously argued at trial that a businessman can charge whatever someone will pay for an item. This is true in a typical commercial transaction. However,

Adamo could not charge Marini such prices because he was Marini's fiduciary and made explicit representations regarding the commission he would charge. Thus, Adamo violated Justice Cardozo's often repeated rule that "[if] dual interests are to be served, the disclosure to be effective must lay bare the truth, without ambiguity or reservation, in all its stark significance."[30] *Wendt v. Fischer*, 243 N.Y. 439, 443 (1926).

## 3.  Damages

Plaintiffs must establish that their damages were directly caused by Adamo's misconduct. As repeatedly stated *supra*, plaintiffs have demonstrated that Adamo's misconduct and misrepresentations caused plaintiffs to invest in rare coins at a dollar amount far above what they were actually worth, causing plaintiffs to lose over $11 million.

\* \* \*

Accordingly, plaintiffs have demonstrated by a preponderance of the evidence that Adamo is liable for breach of fiduciary duty.[31]

## E.  Unjust Enrichment

In order to prove unjust enrichment under New York law, a plaintiff must demonstrate: "(1) that the defendant benefitted; (2) at the plaintiffs' expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon*

---

[30] In any event, Adamo also breached that duty by making the other false, material representations discussed *supra*.

[31] Although plaintiffs cite general propositions of tort law for the proposition that H. Edward and Bolton are also liable for a breach of fiduciary duty, plaintiffs did not assert this cause of action against any defendant except Adamo. (*See* Second Am. Compl., ECF No. 94, ¶¶ 234-39.)

*Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (citations and internal quotation marks omitted). "It is important to note, however, the nature of an unjust enrichment claim in New York: 'The theory of unjust enrichment lies as a quasi-contractual claim. It is an obligation the law creates in the absence of any agreement.'" *Id.* at 586-87 (quoting *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005) (emphasis omitted)).

### 1.  Adamo and Corporate Defendants

The Court finds that plaintiffs have satisfied their burden in demonstrating that Adamo and the two corporate defendants were unjustly enriched. Adamo's fraudulent actions caused Marini to "pay artificially inflated prices" for the coins. *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40 (1st Dep't 2004). Because plaintiffs "did not receive what they believed they had paid for," *Hughes v. Ester C Co.*, No. 12-CV-41, 2013 WL 1080533, at *25 (E.D.N.Y. Mar. 15, 2013), equity and good conscience require restitution of plaintiffs' losses. *See Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 404 (E.D.N.Y. 2010) ("Under New York law, it is contrary to equity and good conscience to enable a party to benefit from misleading representations." (citation and internal quotation marks omitted)).[32]

### 2.  Mrs. Adamo

Plaintiffs also assert that Mrs. Adamo is "liable for unjust enrichment because, though committing no fraud, she took custody of fraud proceeds, because substantial funds from Plaintiffs went to her joint account." (Pls.' Mem. at 101.) However, as set forth below, the Court concludes that the existence of a joint bank account (through which some of the proceeds passed as a result of her husband's wrongful conduct) is, by itself, insufficient to demonstrate that Mrs. Adamo personally benefitted from the fraud proceeds for purposes of an unjust enrichment claim. Thus, the Court requires supplemental briefing as to any evidence in the record that Mrs. Adamo personally benefited from money in the joint account that can be traced to fraudulent proceeds from the coin transactions at issue in this case.

The New York Court of Appeals has held that "[i]nnocent parties may frequently be unjustly enriched. What is required, generally, is that a party hold property under such circumstances that in equity and good conscience he ought not to retain it." *Simonds v. Simonds*, 45 N.Y.2d 233, 242, (1978) (citations and internal quotation marks omitted). While "[a] bona fide purchaser of property upon which a constructive trust would otherwise be imposed takes free of the constructive trust, [] a gratuitous donee, however innocent, does not." *Id.* For example, in *Simonds*, the decedent's second wife received $7,000 in life insurance that he had promised to his first wife. No allegation of wrongdoing was directed towards the second wife. However, the Court of Appeals found that the second wife was unjustly enriched and was liable for the $7,000. *Id.* at 242-43. Accordingly, plaintiffs do not need to demonstrate that Mrs. Adamo committed a wrongful act to find her liable on an unjust enrichment claim. *Id.*; *see also United States v. Nagelberg*, 772 F. Supp. 120, 122-23 (E.D.N.Y. 1991).

---

[32] Defendants' only argument that Adamo and the corporate defendants are not liable for unjust enrichment is that an unjust enrichment claim cannot proceed when "Plaintiffs have previously sworn that there was a contract between the parties regarding the terms on which Plaintiffs purchased the coins at issue." (Defs.' Mem. at 134.) As discussed *infra*, such a claim is without merit.

As a threshold matter, there is no evidence, or even an allegation, that Mrs. Adamo was aware of any wrongful conduct by her husband. Moreover, although she was an officer of H. Edward and Bolton, there is no evidence or allegation that she had any personal involvement in coin transactions at issue in this case. However, contrary to defendants' suggestion, the Court concludes that Mrs. Adamo could be liable for unjust enrichment as a gratuitous donee of some of the wrongfully acquired funds. In particular, defendants stipulated that Mrs. Adamo's joint bank account that she shared with her husband received some of the proceeds (JPTO ¶ 7.3). Thus, if it could be proven that she personally benefitted from the specific funds in the joint account that represented the fraudulent proceeds from her husband's coin transactions with plaintiffs, equity and good conscience would require restitution by Mrs. Adamo for that particular amount of money.

The cases defendants cite are not to the contrary. In *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511 (2012), the defendant paid $150,000 for due diligence materials from a third-party, and then used those materials to sell a property and receive a $500,000 commission. However, those materials were not created by the third-party, but were actually developed by plaintiff. The Court held that an unjust enrichment claim could not stand because there was no business relationship between the parties. *Id.* at 515-16. The Court distinguished its decision in *Simonds* because the defendant in *Georgia Malone* paid for the due diligence materials and was not aware of the wrongfulness by the party they bought them from, while the second wife in *Simonds* was a "gratuitous donee." *Id.* at 518-19. The same rationale applies here. Mrs. Adamo (like the second wife in *Simonds*) was a gratuitous donee of the

wrongfully acquired funds, and therefore, she can be held liable on an unjust enrichment claim even though she was an innocent party.

Defendants also cite to *MGR Meats, Inc. v. Schweid*, 10-CV-3068, 2012 WL 6675123 (E.D.N.Y. Dec. 21, 2012), for the proposition that there must be "a connection or relationship between the parties that could have caused reliance or inducement on the plaintiff's part." *Id.* at *7 (citation and internal quotation marks omitted). However, in *MGR* itself, the Court allowed an unjust enrichment claim to proceed despite the lack of relationship between the parties because the "'property of one person [was] used in discharging an obligation owed by another.'" *Id.* (quoting *In re Chateaugay Corp.*, 89 F.3d 942, 947 (2d Cir. 1996)).

Thus, although there is no allegation that Mrs. Adamo was involved in, or had knowledge of, the wrongful conduct by her husband, an unjust enrichment claim could still be proven against her. However, the Court disagrees with plaintiffs' contention that she has been unjustly enriched simply by virtue of the fact that proceeds from the coin transactions at issue were placed in a bank account that Mrs. Adamo held jointly with her husband. That precise argument was rejected by the Second Department in *Zell & Ettinger v. Berglas*, 261 A.D.2d 613, 613-14 (2d Dep't 1999). In *Zell*, the plaintiff argued that the husband was liable for unjust enrichment because the funds that were misappropriated by his wife were deposited in a bank account that they shared. The Second Department held that summary judgment should have been granted for the husband because "plaintiffs did not show that any of the stolen funds were traceable to the [defendant husband] and the plaintiffs' unsubstantiated allegations that [the husband] benefited from and had knowledge

of his wife's theft, made in the affirmation of their attorney, who had no personal knowledge of the facts, was insufficient to defeat [the husband's summary judgment] motion." *Id.* at 614.

This Court similarly concludes that the fact that Mrs. Adamo shared a joint account with her husband, and funds wrongfully obtained by her husband from plaintiffs were deposited into that account, is insufficient to demonstrate that Mrs. Adamo is liable for unjust enrichment. Although the Court is doubtful, based upon the evidence in the record, that plaintiffs can meet the requisite standard, the Court will allow plaintiffs to provide supplemental briefing regarding any evidence already in the record[33] that Mrs. Adamo personally benefitted from the specific funds in the joint account attributable to the fraudulent proceeds from her husband's coin transactions with plaintiffs.

### F.  Money Had and Received

"The essential elements in a claim for money had and received under New York law are that (1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984). This cause of action "allows plaintiff to recover money which has come into the hands of the defendant impressed with a species of trust because under the circumstances it is against good conscience for the defendant to keep the money." *Parsa*

*v. State*, 64 N.Y.2d 143, 148 (1984) (internal citations and quotation marks omitted). While "[t]he remedy is available if one man has obtained money from another, through the medium of oppression, imposition, extortion, or deceit, or by the commission of a trespass," *id.* (citation and internal quotation marks omitted), "[i]t is immaterial [] whether the original possession of the money by the defendant was rightful or wrongful," *Roberts v. Ely*, 113 N.Y. 128, 132 (1889).

For the same reasons that plaintiffs have proved that defendants Adamo and the two corporate defendants were unjustly enriched, plaintiffs have also satisfied the elements for a money had and received claim against those defendants. *See Maxus Leasing Grp., Inc. v. Kobelco Am., Inc.*, 04-CV-518, 2007 WL 655779, at *5 n.15 (N.D.N.Y. Feb. 26, 2007) ("The causes of action for unjust enrichment and money had and received are identical."); *Freedman v. Freedman*, 116 F. Supp. 2d 379, 381 (E.D.N.Y. 2000) (stating that a claim for money had and received is "similar in nature to unjust enrichment"); *but see Robert Smalls Inc. v. Hamilton*, 09 CIV. 7171, 2010 WL 3238955, at *6 (S.D.N.Y. July 19, 2010) (Report and Recommendation) (stating that "New York courts appear to disagree about the relationship between unjust enrichment and money had and received" and that while some courts have allowed both theories to proceed in a single case, "[o]thers consider a claim for money had and received to be an equitable cause of action *premised upon* unjust enrichment" (citation and internal quotation marks omitted)). Defendants received plaintiffs' money, they benefited from it, and principles of equity and good conscience require defendants to return that money to plaintiffs.[34]  Similarly, for the

---

[33] The Court does not intend to allow plaintiffs to reopen the trial record and submit additional evidence. Instead, plaintiffs' supplemental brief must refer to evidence already in the trial record.

[34] Even if the Court considered the money had and received claim an equitable claim that is "premised

same reasons that the Court has concluded that supplemental briefing is necessary to determine whether there is any evidence in the record to support an unjust enrichment claim against Mrs. Adamo, such supplemental briefing is also necessary on this claim.

### G.  Duplicative Claims

Defendants argue that although plaintiffs dismissed their breach of contract claim, all of plaintiffs' state law claims must be dismissed because plaintiffs have asserted during the course of this litigation that Marini and Adamo had entered into a contract. (Defs.' Mem. at 108-109, 134-35.) According to defendants, "Plaintiffs cannot predicate a claim of fraud on any act or omission that would have constituted a breach of an agreement between the parties." (*Id.* at 108; *see also id.* at 134-35 (arguing that unjust enrichment cannot exist when there is a contract between parties).) Defendants further assert that because plaintiffs *had previously* asserted a breach of contract claim, their claims must be dismissed. (*Id.* at 108 ("Yet [plaintiffs] dismissed their breach of contract claim with prejudice, a fact that precludes them from recovering on a fraud claim now.").) It appears that defendants are conflating two premises of the law, and neither premise bars plaintiffs' fraud claim in this action.

First, with regard to the fraud claim, under well-settled New York law, a claim for fraud will be dismissed unless it alleges facts that are "sufficiently distinct from the breach of contract claim." *Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1162 (S.D.N.Y. 1996). "[P]art of the

rationale for striking duplicative fraud claims is that there is ordinarily no difference between contract damages for nonperformance and fraud damages." *VTech Holdings Ltd. v. Lucent Techs., Inc.*, 172 F. Supp. 2d 435, 440-41 (S.D.N.Y. 2001). The Second Circuit has detailed three narrow exceptions for allowing both a fraud claim and a breach of contract claim to stand: "a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (internal citations omitted). However, the Court need not even examine the *Bridgestone/Firestone* factors because plaintiffs are not currently asserting a breach of contract claim, thus, there is no duplicative claim. Defendants cite to no case law to support their assertion that once a plaintiff asserts a breach of contract action, they can never bring a fraud claim once they determine that the contract action, for whatever reason, should be dismissed.

Defendants' related argument that plaintiffs cannot bring any tort claim when they allude that there was a contract is also not supported by the case law. The New York Court of Appeals has held that if a "plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory." *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 552 (1992). However, plaintiffs are not making such an assertion here. Plaintiffs are not trying to enforce a contract that was not performed; they are claiming that they were defrauded. Even though the transactions at issue may be labeled "investment contracts" under federal securities law, because plaintiffs are not

---

upon" unjust enrichment, plaintiffs have proven a money had and received claim because they have also demonstrated that defendants were unjustly enriched.

seeking enforcement of a bargain, they are not required to bring this action as a breach of contract.

Accordingly, plaintiffs' state law claims may proceed.

### V.  Damages

#### A.  Compensatory Damages

For all of their claims, plaintiffs seek compensatory damages of $11,304,079, representing the total charged to plaintiffs minus the total value plaintiffs received.

The Court agrees with plaintiffs' damages calculations, and concludes that they have met their burden of proving damages in the amount of $11,304,079. (*See* PX52.) Plaintiffs introduced credible evidence that they paid $12,148,404 to Adamo in checks and wires, and $4,690,000 in cash, but that $41,000 of the checks, wires, and cash were for items other than coins. Defendants even stipulated that they received $11,633,404.40 for coins, supported by wires and checks from plaintiffs to defendants that were produced during discovery. (JPTO ¶ 7.) The parties dispute almost the entire amount of the cash, plus two checks that plaintiffs do not have records for. However, as stated in the Findings of Fact, the Court finds that plaintiffs have proven by clear and convincing evidence that these representations regarding the amount paid are accurate. Accordingly, the Court finds that plaintiffs were charged $16,797,404.

Plaintiffs argue that the total value they received is $5,493,325. The parties stipulated that plaintiffs received $2,540,000 from Adamo for the sale of coins. (JPTO ¶ 21.) Plaintiffs also contend that the current value of their coins is $2,953,325 based on

the expert reports. Defendants have not introduced any expert testimony to rebut the valuations, and as stated in the Findings of Fact, the Court finds plaintiffs' experts credible.

Accordingly, the Court awards compensatory damages of $11,304,079 on plaintiffs' state law claims. However, because the Court limits plaintiffs' recovery on the Exchange Act claim to transactions that occurred after September 30, 2003, the Court will need supplemental briefing from the parties to identify evidence in the record that will assist in the calculation of damges for this particular claim.

#### B.  Punitive Damages

Plaintiffs seek punitive damages for the fraud and breach of fiduciary duty claims in an amount equal to the compensatory damages, $11,304,079. Punitive damages are discretionary and may be awarded "to punish the defendant for his outrageous conduct and to deter him and others like him from similar conduct in the future." *Smith v. Wade*, 461 U.S. 30, 54 (1983) (alteration, citations and internal quotation marks omitted); *see also Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1118 (2d Cir. 1986) ("Under New York law . . . punitive or exemplary damages may be awarded where the defendant's conduct amounts to such gross, wanton or willful fraud, dishonesty, or malicious wrongdoing as to involve a high degree of moral culpability, making it appropriate to deter the defendants from engaging in similar conduct in the future and to induce the victim to take action against the wrongdoer."). "That the harm alleged might not have been aimed at the general public does not alter this result." *Swersky v. Dreyer & Traub*, 219 A.D.2d 321, 328 (1st Dep't 1996).

The Court declines in its discretion to award punitive damages in this matter. Although Adamo engaged in illegal acts that resulted in the fraudulent receipt of over $11 million from his close friend, the Court does not believe, in light of the substantial compensatory award, that the fraud warrants the imposition of further sanctions to achieve punishment or deterrence.

C.  Interest

On plaintiffs' state law claims, the Court must apply New York's statutory rate of pre-judgment interest of 9%. *See Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508 (2d Cir. 1991) (citing N.Y. C.P.L.R. § 5001 and reversing district court for failing to apply New York's statutory rate of pre-judgment interest on claims of breach of fiduciary duty and unjust enrichment); *see also Huang v. Sy*, 18 Misc. 3d 1141(A), (Sup. Ct. Queens Cnty. 2008) ("Causes of action such as fraud, breach of fiduciary duty[,] conversion and unjust enrichment qualify for the recovery of prejudgment interest under [N.Y. C.P.L.R. § 5001]."), *aff'd*, 62 A.D.3d 660 (2d Dep't 2009).

The statute provides:

Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

N.Y. C.P.L.R. § 5001(b).

Plaintiffs propose a "reasonable intermediate date" of January 1, 2005. (Pls.' Mem. at 117.) Because the Court has "substantial discretion" in this selection, *Pac. Westeel, Inc. v. D & R Installation*, 01-CIV-0293, 2003 WL 22359512, at *3 (S.D.N.Y. Oct. 17, 2003), and because plaintiffs made the vast majority of their payments prior to this date, the Court selects January 1, 2005 as a reasonable intermediate date.

In calculating the pre-judgment interest on plaintiffs' federal claim, this Court has "broad discretion" in determining "whether to grant prejudgment interest and the rate used if such interest is granted." *First Jersey*, 101 F.3d at 1476 (citation and internal quotation marks omitted); *see also Mfrs. Hanover Trust*, 801 F.2d at 28 ("Pre-judgment interest on federal securities claims, unlike on New York state law claims, is not mandatory."). The Court elects to award pre-judgment interest on the Exchange Act claim at 9% from April 5, 2006, the "last significant payment" after September 30, 2003. *See Pac. Westeel*, 2003 WL 22359512, at *4.

Plaintiffs are also entitled to post-judgment interest of 9% from the date of the entry of judgment until the date of payment for their state law claims. *See* N.Y. C.P.L.R. §§ 5003, 5004; *Denio v. State*, 7 N.Y.3d 159, 164 (2006). Plaintiffs are also entitled to post-judgment interest for their Exchange Act claim. *See* 28 U.S.C. § 1961.

VI.  CONCLUSION

For the foregoing reasons, the Court concludes, after carefully considering the evidence introduced at trial, the arguments of counsel, and the controlling law on the issues presented, that plaintiffs have shown by a preponderance of the evidence that Adamo, H. Edward, and Bolton violated

49

Section 10(b) of the Exchange Act, as well as New York common law for claims of unjust enrichment, and money had and received. Plaintiffs have also demonstrated that Adamo breached his fiduciary duty to Marini. The Court also finds that plaintiffs have proven by clear and convincing evidence that Adamo, H. Edward, and Bolton committed fraud in violation of New York common law.  On the state law claims, once the damages issue on the Exchange Act claim is resolved, the Court will enter judgment in the amount of $11,304,079, plus pre-judgment interest calculated at a rate of 9% from January 1, 2005 to the present, as well as post-judgment interest. With respect to the claims against Mrs. Adamo for unjust enrichment, as well as money had and received, the Court concludes that supplemental briefing is necessary to assist the Court in determining whether liability exists and, if so, the amount of such liability.  The Court will set a schedule for additional briefing on the amount of damages for the Exchange Act claim, as well as the claims against Mrs. Adamo, in light of this Memorandum and Order.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: February 6, 2014
          Central Islip, NY

* * *

Plaintiffs are represented by Michael H. Schaalman, Quarles & Brady LLP, 411 E. Wisconsin Ave, Milwaukee, WI 53202, Scott A. Moss and Marianna Moss, Moss Law Practice, 8053 East 24th Drive, Denver, CO 80238, and Paul A. Brancato, 106-43 157th Street, Jamaica, NY 11433. Defendants are represented by Richard Dolan, Robert Begleiter, and Andrew Harris, Schlam Stone & Dolan LLP, 26 Broadway, New York, NY 10004.